**138**

1 | THOMAS G. MOUZES (SBN 099446)
MARK GORTON (SBN 099312)
2 | **BOUTIN JONES INC.**
Attorneys at Law
3 | 555 Capitol Mall, Suite 1500
Sacramento, CA 95814
4 | Phone: 916.321.4444
Fax:    916.441.7597
5 | Email: tmouzes@boutinjones.com
6 |       mgorton@boutinjones.com
7 | Attorneys for Creditor
American AgCredit, PCA
8

9 | UNITED STATES BANKRUPTCY COURT

10 | EASTERN DISTRICT OF CALIFORNIA

11 | (FRESNO DIVISION)

12 | In re

13 | LJB FARMS, LLC,

14 |                    Debtor.

15

16

17

18

19

20

| | Case No. **2017-12998** |
| | |
| | Chapter 12 |
| | |
| | **EXHIBITS TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF CONDITIONAL OPPOSITION OF AMERICAN AGCREDIT, PCA TO DEBTOR'S REQUEST TO USE CASH COLLATERAL** |
| | Date:  September 14, 2017 |
| | Time:  9:30 a.m. |
| | Place: 2500 Tulare Street |
| |        Dept. B, Courtroom 13, Fifth Floor |
| |        Fresno, California |
| | Judge: Honorable René Lastreto II |

21

22

| **EXHIBIT** | **DOCUMENT** | **PAGE** |
|---|---|---|
| 1 | Debtor's Schedules, filed August 31, 2017, Doc. No. 43 | 2-36 |
| 2 | American's Proof of Claim filed August 29, 2017 | 37-138 |

23

24

25

26

27

28

1

Exhibits to Request for Judicial Notice In Support of Conditional Opposition
892260.1

# EXHIBIT 1

Exhibit 1 to
Request for Judicial Notice
Page 2

Fill in this information to identify the case:

Debtor name    **LJB FARMS, LLC**

United States Bankruptcy Court for the:    **EASTERN DISTRICT OF CALIFORNIA**

Case number (if known)  **17-12998**

☐ Check if this is an
amended filing

## Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

          Declaration and signature

I am the president, another officer, or an authorized agent of the corporation, a member or an authorized agent of the partnership, or another individual serving as a representative of the debtor in this case

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct.

■    Schedule A/B Assets–Real and Personal Property (Official Form 206A/B)

■    Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)

■    Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)

■    Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)

■    Schedule H: Codebtors (Official Form 206H)

■    Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)

☐    Amended Schedule

☐    Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)

☐    Other document that requires a declaration

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **August 31, 2017**          X /s/ Joanna Botelho
                                            Signature of individual signing on behalf of debtor

                                            Joanna Botelho
                                            Printed name          ORIGINAL

                                            **Managing Member**
                                            Position or relationship to debtor

Official Form 202                    Declaration Under Penalty of Perjury for Non-Individual Debtors

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com                              Best Case Bankruptcy

Exhibit 1 to
Request for Judicial Notice
Page 3

Filed 08/31/17                          Case 17-12998                                    Doc 43

Fill in this information to identify the case:

Debtor name     **LJB FARMS, LLC**

United States Bankruptcy Court for the:   **EASTERN DISTRICT OF CALIFORNIA**

Case number (if known)   **17-12998**

☐ Check if this is an
amended filing

## Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals                            12/15

**Part 1: Summary of Assets**

1.  *Schedule A/B: Assets-Real and Personal Property* (Official Form 206A/B)

   1a. Real property:
   Copy line 88 from *Schedule A/B*...................................................................................................................    $    3,000,000.00

   1b. Total personal property:
   Copy line 91A from *Schedule A/B*.................................................................................................................    $    324,464.00

   1c. Total of all property:
   Copy line 92 from *Schedule A/B*..................................................................................................................    $    3,324,464.00

**Part 2: Summary of Liabilities**

2.  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim*, from line 3 of *Schedule D*..................................    $    2,318,247.37

3.  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

   3a. Total claim amounts of priority unsecured claims:
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*.......................................................................    $    6,415.71

   3b. Total amount of claims of nonpriority amount of unsecured claims:
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*...............................................    +$    409,862.32

4.  Total liabilities .................................................................................................................................................    $    2,734,525.40
   Lines 2 + 3a + 3b

Exhibit 1 to
Request for Judicial Notice
Page 4

---

Fill in this information to identify the case:

Debtor name **LJB FARMS, LLC**

United States Bankruptcy Court for the: **EASTERN DISTRICT OF CALIFORNIA**

Case number (if known) **17-12998**

☐ Check if this is an amended filing

---

## Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property                    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

**Part 1:     Cash and cash equivalents**

1. Does the debtor have any cash or cash equivalents?

■ No. Go to Part 2.
☐ Yes Fill in the information below.

All cash or cash equivalents owned or controlled by the debtor

Current value of
debtor's interest

**Part 2:     Deposits and Prepayments**

6. Does the debtor have any deposits or prepayments?

■ No. Go to Part 3.
☐ Yes Fill in the information below.

**Part 3:     Accounts receivable**

10. Does the debtor have any accounts receivable?

☐ No. Go to Part 4.
■ Yes Fill in the information below.

11.    Accounts receivable

| 11a. 90 days old or less: | Unknown | - | | 0.00 | = .... | Unknown |
|---|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | | |

12.    Total of Part 3.

Current value on lines 11a + 11b = line 12. Copy the total to line 82.

$0.00

**Part 4:     Investments**

13. Does the debtor own any investments?

■ No. Go to Part 5.
☐ Yes Fill in the information below.

**Part 5:     Inventory, excluding agriculture assets**

18. Does the debtor own any inventory (excluding agriculture assets)?

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 1

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

Exhibit 1 to
Request for Judicial Notice
Page 5

Fill in this information to identify the case:

Debtor name    **LJB FARMS, LLC**

United States Bankruptcy Court for the:    EASTERN DISTRICT OF CALIFORNIA

Case number (if known)    **17-12998**

☐ Check if this is an
amended filing

# Official Form 206A/B
# Schedule A/B: Assets - Real and Personal Property                    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in e particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

**Part 1    Cash and cash equivalents**

1. Does the debtor have any cash or cash equivalents?

☑ No. Go to Part 2.
☐ Yes Fill in the information below.

All cash or cash equivalents owned or controlled by the debtor

Current value of
debtor's interest

**Part 2    Deposits and Prepayments**

6. Does the debtor have any deposits or prepayments?

☑ No. Go to Part 3.
☐ Yes Fill in the information below.

**Part 3    Accounts receivable**

10. Does the debtor have any accounts receivable?

☐ No. Go to Part 4.
☑ Yes Fill in the information below.

11.    **Accounts receivable**

| 11a. 90 days old or less: | | - | | = .... | **Unknown** |
| | face amount | | doubtful or uncollectible accounts | | |

12.    **Total of Part 3.**                                    | **$0.00** |

Current value on lines 11a + 11b = line 12. Copy the total to line 82.

**Part 4    Investments**

13. Does the debtor own any Investments?

☑ No. Go to Part 5.
☐ Yes Fill in the information below.

**Part 5    Inventory, excluding agriculture assets**

18. Does the debtor own any inventory (excluding agriculture assets)?

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 1

Exhibit 1 to
Request for Judicial Notice
Page 6

| Debtor | **LJB FARMS, LLC** | | Case number *(if known)* **17-12998** |
|---|---|---|---|
| | Name | | |

■ No. Go to Part 6.
☐ Yes Fill in the information below.

**Part 6     Farming and fishing-related assets (other than titled motor vehicles and land)**

27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?

☐ No. Go to Part 7.
■ Yes Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28.** **Crops-either planted or harvested** **Almond Crop to be harvested August 2017** **including:** | | | |
| Farm One: 18.25 acres of Butte and 18.25 acres of Padre ( 9th year) Value: $136,500 | $0.00 | | $136,500.00 |
| **Almond Crop to be harvested August 2017** **including:** | | | |
| **Farm Three:** **11 acres of Butte and 11 acres of Padre (10th** **year) Value: $64,350.00** **5 acres of Butte and 5 acres of Padre (2nd** **year)  Value: Nil** **5 acres Nonpereil and 5 acres of Carmel (28th** **year)  Value: $20,500.00** | $0.00 | | $84,850.00 |
| **29.** Farm animals *Examples: Livestock, poultry, farm-raised fish* | | | |
| **30.** Farm machinery and equipment *(Other than titled motor vehicles)* 2015 PJ Goose Neck Trailer VIN 4P5LY3629F1220908 | $0.00 | | $10,000.00 |
| 2001 JCB 214S Backhoe | $0.00 | | $25,000.00 |
| Schmiezer Land Leveler | $0.00 | | $5,000.00 |
| Irrigation System with steel pipe for 40 acres 40 HP US Electrical Motors Well Pump ID#7-BF48A-M | $0.00 | | $45,000.00 |

31. Farm and fishing supplies, chemicals, and feed

32. Other farming and fishing-related property not already listed in Part 6

33. **Total of Part 6.**
    Add lines 28 through 32. Copy the total to line 85.                                    | **$306,350.00** |

34. Is the debtor a member of an agricultural cooperative?
    ☐ No
    ■ Yes. Is any of the debtor's property stored at the cooperative?

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 2

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com

Exhibit 1 to
Request for Judicial Notice
Page 7

| Debtor | **LJB FARMS, LLC** | Case number *(if known)* **17-12998** |
|---|---|---|
| | Name | |

■ No
☐ Yes

35. Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?
■ No
☐ Yes. Book value _____ Valuation method _____ Current Value _____

36. Is a depreciation schedule available for any of the property listed in Part 6?
■ No
☐ Yes

37. Has any of the property listed in Part 6 been appraised by a professional within the last year?
■ No
☐ Yes

**Part 7:**    **Office furniture, fixtures, and equipment; and collectibles**

38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?

■ No. Go to Part 8.
☐ Yes Fill in the information below.

**Part 8:**    **Machinery, equipment, and vehicles**

46. Does the debtor own or lease any machinery, equipment, or vehicles?

☐ No. Go to Part 9.
■ Yes Fill in the information below.

| General description<br>Include year, make, model, and identification numbers<br>(i.e., VIN, HIN, or N-number) | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| **47.** Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles | | | |
| 47.1. 2014 Ford Fusion automobile | $0.00 | | $11,218.00 |
| 47.2. 1996 Ford automobile VIN<br>1FMCU24X3TUC81529 (Salvage Title) | $0.00 | | $1,896.00 |
| **48.** Watercraft, trailers, motors, and related accessories *Examples:* Boats, trailers, motors,<br>floating homes, personal watercraft, and fishing vessels | | | |
| **49.** Aircraft and accessories | | | |
| **50.** Other machinery, fixtures, and equipment (excluding farm<br>machinery and equipment)<br>Frank Russell, Inc. 50 Blower S/N 658-14 | $0.00 | | $5,000.00 |

51. **Total of Part 8.**
Add lines 47 through 50. Copy the total to line 87.      **$18,114.00**

52. Is a depreciation schedule available for any of the property listed in Part 8?
■ No
☐ Yes

53. Has any of the property listed in Part 8 been appraised by a professional within the last year?

Exhibit 1 to
Request for Judicial Notice
Page 8

| Debtor | **LJB FARMS, LLC** | Case number *(if known)* **17-12998** |
|---|---|---|
| | Name | |

■ No
☐ Yes

Part 9    **Real property**

54. Does the debtor own or lease any real property?

☐ No. Go to Part 10.
■ Yes Fill in the information below.

55.    Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building, if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1.  **"FARM ONE"**<br>**39.24 Acres Real Property located at 13610 Avenue 21 1/2, Chowchilla, CA (APN 024-120-007)**<br>**Legally described on the attached Exhibit "A"**<br><br>The above real property is improved by one homes and 36.5 acres of almond trees. | Fee simple | $0.00 | | $1,500,000.00 |
| 55.2.  **"FARM 3"**<br>**34.23 Acres Real Property located at 4035 S. Clausen Road, Merced, CA (APN 068-030-053) and 10.80 Acres Real Property located at 4261 S. Clausen Road, Merced, CA (APN 068-030-054)**<br>**Legally described on the attached Exhibit "B"**<br><br>The above real property is improved by two homes and 42 acres of almond trees. | Fee simple | $0.00 | | $1,500,000.00 |

56.    **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets.

$3,000,000.00

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

Exhibit 1 to
Request for Judicial Notice
Page 9

| Debtor | **LJB FARMS, LLC** | Case number *(if known)* **17-12998** |
|---|---|---|
| | Name | |

Copy the total to line 88.

57. Is a depreciation schedule available for any of the property listed in Part 9?
■ No
☐ Yes

58. Has any of the property listed in Part 9 been appraised by a professional within the last year?
☐ No
■ Yes

**Part 10     Intangibles and Intellectual property**

59. Does the debtor have any interests in intangibles or intellectual property?

■ No. Go to Part 11.
☐ Yes Fill in the information below.

**Part 11     All other assets**

70. Does the debtor own any other assets that have not yet been reported on this form?
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
■ Yes Fill in the information below.

Current value of
debtor's interest

71. **Notes receivable**
Description (include name of obligor)

72. **Tax refunds and unused net operating losses (NOLs)**
Description (for example, federal, state, local)

73. **Interests in insurance policies or annuities**

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

| **Claims against The Almond Company** | | **Unknown** |
|---|---|---|
| Nature of claim | **Breach of Contract** | |
| Amount requested | $0.00 | |

| **Claims against America AgCredit, PCA** | | **Unknown** |
|---|---|---|
| Nature of claim | **Breach of Contract and Lender Liability** | |
| Amount requested | $0.00 | |

| **Claims against Jerry Blosser, former owner of Farm 3, for failure to disclose that two wells on the real proerpty were inoperable.** | | **Unknown** |
|---|---|---|
| Nature of claim | | |
| Amount requested | $0.00 | |

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

76. **Trusts, equitable or future interests in property**

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 5

Exhibit 1 to
Request for Judicial Notice
Page 10

| Debtor | **LJB FARMS, LLC** | Case number *(if known)* **17-12998** |
|--------|-------------------|---------------------------------------|
|        | Name              |                                       |

77. Other property of any kind not already listed *Examples:* Season tickets, country club membership

78. **Total of Part 11.**
    Add lines 71 through 77. Copy the total to line 90.

| $0.00 |
|-------|

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
    ■ No
    ☐ Yes

Exhibit 1 to
Request for Judicial Notice
Page 11

Filed 08/31/17              Case 17-12998                Doc 43

Debtor   **LJB FARMS, LLC**                          Case number *(if known)* **17-12998**
          Name

### Part 12:  Summary

In Part 12 copy all of the totals from the earlier parts of the form

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. Cash, cash equivalents, and financial assets. *Copy line 5, Part 1* | $0.00 | |
| 81. Deposits and prepayments. *Copy line 9, Part 2.* | $0.00 | |
| 82. Accounts receivable. *Copy line 12, Part 3.* | $0.00 | |
| 83. Investments. *Copy line 17, Part 4.* | $0.00 | |
| 84. Inventory. *Copy line 23, Part 5.* | $0.00 | |
| 85. Farming and fishing-related assets. *Copy line 33, Part 6.* | $306,350.00 | |
| 86. Office furniture, fixtures, and equipment; and collectibles. *Copy line 43, Part 7.* | $0.00 | |
| 87. Machinery, equipment, and vehicles. *Copy line 51, Part 8.* | $18,114.00 | |
| 88. Real property. *Copy line 56, Part 9.* .................................................................................> | | $3,000,000.00 |
| 89. Intangibles and intellectual property. *Copy line 66, Part 10.* | $0.00 | |
| 90. All other assets. *Copy line 78, Part 11.* | + $0.00 | |
| 91. Total. Add lines 80 through 90 for each column | $324,464.00 | +91b. $3,000,000.00 |

92. Total of all property on Schedule A/B. Add lines 91a+91b=92                        $3,324,464.00

Exhibit 1 to
Request for Judicial Notice
Page 12

**Exhibit "A"**

**Legal Description**

A.P.N.: 024-120-007

Real property in the City of Chowchilla, County of Madera, State of California, described as follows:

LOT 10 IN BLOCK 23 OF CENTRAL TRACT ACCORDING TO MAP ENTITLED, "CENTRAL TRACT" BEING A
PORTION OF SUBDIVISION NO. 1 OF THE CHOWCHILLA RANCH, FILED AND RECORDED IN THE OFFICE
OF THE COUNTY RECORDER OF THE COUNTY OF MADERA, STATE
OF CALIFORNIA, OCTOBER 10, 1912 IN BOOK 3 OF MAPS, AT PAGE 13.

Exhibit 1 to
Request for Judicial Notice
Page 13

File Number:          1015-5043351

## Exhibit B

### Legal Description

Real property In the City of Le Grand, County of Merced, State of California, described as follows:

PARCEL 1:

ALL THAT PORTION OF THE EAST HALF OF LOT 4, AS SHOWN ON THE MAP ENTITLED "LE GRAND COLONY NO. 1", FILED MAY 5, 1914, IN THE OFFICE OF THE COUNTY RECORDER OF MERCED COUNTY, IN VOL. 7 OF OFFICIAL PLATS, AT PAGE 11, DESCRIBED AS FOLLOWS:, TO-WIT:

BEGINNING AT A POINT ON THE EAST LINE OF SAID LOT 4, DISTANT THEREON, NORTH 0° 26' EAST, 936.77 FEET FROM THE SOUTHEAST CORNER OF SAID LOT 4; THENCE NORTH 89° 22' WEST, 1247.95 FEET; THENCE NORTH 0° 26' EAST, 383.23 FEET TO THE NORTH LINE OF SAID LOT 4; THENCE SOUTH 89° 32' EAST, 1247.95 FEET TO THE NORTHEAST CORNER OF SAID LOT 4; THENCE SOUTH 0° 26' WEST, 383.23 FEET TO THE POINT OF BEGINNING, (BEING ALL OF THE EAST HALF OF SAID LOT 4, EXCEPT THE 29.12 ACRE PARCEL OF LAND CONVEYED BY GENE CASTILE AND FAY D. CASTILE, TO EVA L. MILLER, BY DEED RECORDED FEBRUARY 8, 1950, IN VOL. 977 OF OFFICIAL RECORDS, AT PAGE 411).

. APN: 068-030-054-000

PARCEL 2:

THE EAST 34.78 ACRES OF LOT 1, AS SHOWN ON THE MAP ENTITLED, "MAP OF LE GRAND COLONY NO. 1", FILED MAY 5, 1914, IN THE OFFICE OF THE COUNTY RECORDER OF MERCED COUNTY, IN VOL. 7 OF OFFICIAL PLATS AT PAGE 11.

A.P.N.: 068-030-053-000

Exhibit 1 to
Request for Judicial Notice
Page 14

Fill in this information to identify the case:

Debtor name    **LJB FARMS, LLC**

United States Bankruptcy Court for the:    **EASTERN DISTRICT OF CALIFORNIA**

Case number (if known)    **17-12998**

☐ Check if this is an
amended filing

## Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible.

1. Do any creditors have claims secured by debtor's property?

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

■ Yes. Fill in all of the information below.

**Part 1    List Creditors Who Have Secured Claims**

2. List in alphabetical order all creditors who have secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.1 America AgCredit PCA**<br>Creditor's Name | Describe debtor's property that is subject to a lien<br>**SEE ATTACHED EXHIBIT "C"** | $298,832.00 | $3,183,350.00 |
| **711 West 19th Street**<br>**Merced, CA 95340**<br>Creditor's mailing address | Describe the lien<br>**Deed of Trust and UCC Lien**<br>Is the creditor an insider or related party?<br>■ No | | |
| Creditor's email address, if known | ☐ Yes<br>Is anyone else liable on this claim? | | |
| Date debt was incurred<br>**8/19/2013**<br>Last 4 digits of account number<br>**7849** | ■ No<br>☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | | |
| Do multiple creditors have an interest in the same property?<br>■ No<br>☐ Yes. Specify each creditor, including this creditor and its relative priority. | As of the petition filing date, the claim is:<br>Check all that apply<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | | |
| **2.2 Community West Bank**<br>Creditor's Name<br>**2615 So. Miller Street, Ste.**<br>**110**<br>**Santa Maria, CA 93455**<br>Creditor's mailing address | Describe debtor's property that is subject to a lien<br>**SEE ATTACHED EXHIBIT "C"**<br><br>Describe the lien<br>**Deed of Trust and UCC Lien**<br>Is the creditor an insider or related party?<br>■ No | $412,405.00 | $3,183,350.00 |
| Creditor's email address, if known | ☐ Yes<br>Is anyone else liable on this claim? | | |
| Date debt was incurred | ■ No<br>☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | | |
| Last 4 digits of account number<br>**0158**<br>Do multiple creditors have an interest in the same property? | As of the petition filing date, the claim is:<br>Check all that apply | | |

Official Form 206D                Schedule D: Creditors Who Have Claims Secured by Property                page 1 of 6

Exhibit 1 to
Request for Judicial Notice
Page 15

Debtor    **LJB FARMS, LLC**
          Name                                          Case number (if known)   **17-12998**

- ■ No
- ☐ Yes. Specify each creditor, including this creditor and its relative priority.

☐ Contingent
☐ Unliquidated
☐ Disputed

---

| 2.3 | **Community West Bank** | Describe debtor's property that is subject to a lien | $1,091,033.00 | $3,183,350.00 |
|---|---|---|---|---|

Creditor's Name

2615 So. Miller Street, Ste. 110
**Santa Maria, CA 93455**
Creditor's mailing address

SEE ATTACHED EXHIBIT "C"

Describe the lien
**Deed of Trust and UCC Lien**
Is the creditor an insider or related party?
- ■ No

Creditor's email address, if known
- ☐ Yes
Is anyone else liable on this claim?

Date debt was incurred
**7/7/2016**
Last 4 digits of account number
**0151**
- ☐ No
- ■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Do multiple creditors have an interest in the same property?
- ■ No
- ☐ Yes. Specify each creditor, including this creditor and its relative priority.

As of the petition filing date, the claim is:
Check all that apply
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

---

| 2.4 | **Community West Bank, N.A.** | Describe debtor's property that is subject to a lien | $401,703.00 | $3,183,350.00 |
|---|---|---|---|---|

Creditor's Name

**PO Box 249**
**Goleta, CA 93116-0249**
Creditor's mailing address

SEE ATTACHED EXHIBIT "C"

Describe the lien
**Deed of Trust and UCC Lien**
Is the creditor an insider or related party?
- ■ No

Creditor's email address, if known
- ☐ Yes
Is anyone else liable on this claim?

Date debt was incurred
**12/30/2015**
Last 4 digits of account number
**0157**
- ■ No
- ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Do multiple creditors have an interest in the same property?
- ■ No
- ☐ Yes. Specify each creditor, including this creditor and its relative priority.

As of the petition filing date, the claim is:
Check all that apply
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

---

| 2.5 | **Deere & Company** | Describe debtor's property that is subject to a lien | $3,632.12 | $5,000.00 |
|---|---|---|---|---|

Creditor's Name

**6400 NW 86th St**
**Johnston, IA 50131-6330**
Creditor's mailing address

Frank Russell, Inc. 50 Blower S/N 658-14

Describe the lien
**UCC Financing Statement**
Is the creditor an insider or related party?
- ■ No

---

Official Form 206D        Additional Page of Schedule D: Creditors Who Have Claims Secured by Property          page 2 of 6

Exhibit 1 to
Request for Judicial Notice
Page 16

| Debtor | **LJB FARMS, LLC** | | Case number (if know) | **17-12998** |
|---|---|---|---|---|

Creditor's email address, if known

☐ Yes
Is anyone else liable on this claim?

**Date debt was incurred**
**6/24/2013**
Last 4 digits of account number
**9151**

■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Do multiple creditors have an interest in the same property?

■ No

☐ Yes. Specify each creditor, including this creditor and its relative priority.

As of the petition filing date, the claim is:
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

---

**2.6 | Exchange Bank**
Creditor's Name

**PO Box 760**
**Santa Rosa, CA 95402**
Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**
**12/2016**
Last 4 digits of account number
**1816**

Do multiple creditors have an interest in the same property?

■ No

☐ Yes. Specify each creditor, including this creditor and its relative priority.

Describe debtor's property that is subject to a lien
**2001 JCB 214S Backhoe**

Describe the lien
**UCC & PURCHASE MONEY SECURITY INTEREST**
Is the creditor an insider or related party?

■ No
☐ Yes
Is anyone else liable on this claim?

■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

As of the petition filing date, the claim is:
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

**$10,511.48**     **$25,000.00**

---

**2.7 | Exchange Bank**
Creditor's Name

**PO Box 760**
**Santa Rosa, CA 95402**
Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**
**10/2014**
Last 4 digits of account number
**4864**

Do multiple creditors have an interest in the same property?

■ No

☐ Yes. Specify each creditor, including this creditor and its relative priority.

Describe debtor's property that is subject to a lien
**Irrigation System with steel pipe for 40 acres 40 HP US Electrical Motors Well Pump ID#7-BF48A-M**

Describe the lien
**UCC & PURCHASE MONEY SECURITY INTEREST**
Is the creditor an insider or related party?

■ No
☐ Yes
Is anyone else liable on this claim?

■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

As of the petition filing date, the claim is:
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

**$44,685.26**     **$45,000.00**

---

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

Exhibit 1 to
Request for Judicial Notice
Page 17

| Debtor | **LJB FARMS, LLC** | | Case number (if know) | **17-12998** |
|---|---|---|---|---|
| | Name | | | |

| 2.8 | **Madera County Tax Collector** | Describe debtor's property that is subject to a lien | $7,667.36 | $1,500,000.00 |
|---|---|---|---|---|

**Madera County Tax Collector**
Creditor's Name

P.O. Box 1228
Madera, CA 93639
Creditor's mailing address

Describe debtor's property that is subject to a lien
"FARM ONE" 39.24 Acres Real Property located at 13610 Avenue 21 1/2, Chowchilla, CA (APN 024-120-007)    **$7,667.36    $1,500,000.00**

Describe the lien
County Tax Lien
Is the creditor an insider or related party?
■ No
□ Yes

Creditor's email address, if known

Is anyone else liable on this claim?
■ No
□ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

Date debt was incurred
2015 - 2016
Last 4 digits of account number
7000

Do multiple creditors have an interest in the same property?
■ No
□ Yes. Specify each creditor, including this creditor and its relative priority.

As of the petition filing date, the claim is:
Check all that apply
□ Contingent
□ Unliquidated
□ Disputed

---

| 2.9 | **Merced County Tax Collector** | Describe debtor's property that is subject to a lien | $4,397.46 | $0.00 |
|---|---|---|---|---|

**Merced County Tax Collector**
Creditor's Name

2222 M Street
Merced, CA 95340
Creditor's mailing address

Describe debtor's property that is subject to a lien
10.80 Acres Real Property located at 4261 S. Clausen Road, Merced, CA (APN 068-030-054)    **$4,397.46    $0.00**

Describe the lien
County Tax Lien
Is the creditor an insider or related party?
■ No
□ Yes

Creditor's email address, if known

Is anyone else liable on this claim?
■ No
□ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

Date debt was incurred
2015 - 2016
Last 4 digits of account number
9000

Do multiple creditors have an interest in the same property?
■ No
□ Yes. Specify each creditor, including this creditor and its relative priority.

As of the petition filing date, the claim is:
Check all that apply
□ Contingent
□ Unliquidated
□ Disputed

---

| 2.10 | **Merced County Tax Collector** | Describe debtor's property that is subject to a lien | $13,185.00 | $1,500,000.00 |
|---|---|---|---|---|

**Merced County Tax Collector**
Creditor's Name

2222 M Street
Merced, CA 95340
Creditor's mailing address

Describe debtor's property that is subject to a lien
34.23 Acres Real Property located at 4035 S. Clausen Road, Merced, CA (APN 068-030-053)    **$13,185.00    $1,500,000.00**

Describe the lien
County Tax Lien
Is the creditor an insider or related party?
■ No
□ Yes

Creditor's email address, if known

Is anyone else liable on this claim?
■ No
□ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

Date debt was incurred
205 - 2016

---

Official Form 206D        Additional Page of Schedule D: Creditors Who Have Claims Secured by Property        page 4 of 6

Exhibit 1 to
Request for Judicial Notice
Page 18

| Debtor | **LJB FARMS, LLC** | | Case number (if know) | 17-12998 |
| | Name | | | |

Last 4 digits of account number
**8000**

| | As of the petition filing date, the claim is: |
| Do multiple creditors have an interest in the same property? | Check all that apply |
| ■ No | ☐ Contingent |
| ☐ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated |
| | ☐ Disputed |

---

**2.1**
**1**

| **Sheffield Financial** | Describe debtor's property that is subject to a lien | $11,263.09 | $10,000.00 |
| Creditor's Name | 2015 PJ Goose Neck Trailer VIN | | |
| P.O. Box 580229 | 4P5LY3629F1220908 | | |
| Charlotte, NC 28258 | | | |
| Creditor's mailing address | Describe the lien | | |
| | **Vehicle Lien** | | |
| | Is the creditor an insider or related party? | | |
| | ■ No | | |
| Creditor's email address, if known | ☐ Yes | | |
| | Is anyone else liable on this claim? | | |
| Date debt was incurred | ■ No | | |
| | ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | | |

Last 4 digits of account number
**0967**

| | As of the petition filing date, the claim is: |
| Do multiple creditors have an interest in the same property? | Check all that apply |
| ■ No | ☐ Contingent |
| ☐ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated |
| | ☐ Disputed |

---

**2.1**
**2**

| **US Bank** | Describe debtor's property that is subject to a lien | $18,932.60 | $11,218.00 |
| Creditor's Name | 2014 Ford Fusion automobile | | |
| **Manifest Funding Services** | | | |
| P.O. Box 790448 | | | |
| Saint Louis, MO 63179 | | | |
| Creditor's mailing address | Describe the lien | | |
| | **Vehicle Lien** | | |
| | Is the creditor an insider or related party? | | |
| | ■ No | | |
| Creditor's email address, if known | ☐ Yes | | |
| | Is anyone else liable on this claim? | | |
| Date debt was incurred | ■ No | | |
| | ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | | |

Last 4 digits of account number
**3411**

| | As of the petition filing date, the claim is: |
| Do multiple creditors have an interest in the same property? | Check all that apply |
| ■ No | ☐ Contingent |
| ☐ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated |
| | ☐ Disputed |

---

3. Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.    **$2,318,247.37**

**Part 2:** List Others to Be Notified for a Debt Already Listed in Part 1

Official Form 206D        Additional Page of Schedule D: Creditors Who Have Claims Secured by Property        page 5 of 6

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com        Best Case Bankruptcy

Exhibit 1 to
Request for Judicial Notice
Page 19

| Debtor | **LJB FARMS, LLC** | Case number (if known) | **17-12998** |
|---|---|---|---|
| | Name | | |

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| **American AgCredit**<br>**711 W. 19th Street**<br>**Merced, CA 95340** | Line _2.1_ | |
| **Community West Bank, N.A.**<br>**Attn: Edward Prinz**<br>**445 Pine Avenue**<br>**Goleta, CA 93117** | Line _2.2_ | |
| **John Deere Financial**<br>**PO Box 4450**<br>**Carol Stream, IL 60197-4450** | Line _2.5_ | |
| **Mortgage Lender Services Inc.**<br>**11707 Fair Oaks Blvd, Ste 202**<br>**Fair Oaks, CA 95628** | Line _2.4_ | |
| **Mortgage Lender Services Inc.**<br>**11707 Fair Oaks Blvd, Ste 202**<br>**Fair Oaks, CA 95628** | Line _2.2_ | |
| **Mortgage Lender Services Inc.**<br>**11707 Fair Oaks Blvd, Ste 202**<br>**Fair Oaks, CA 95628** | Line _2.3_ | |
| **United States Dept. of Agriculture**<br>**1400 Independence Ave, S.W.**<br>**Washington, DC 20250** | Line _2.3_ | |

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

Exhibit 1 to
Request for Judicial Notice
Page 20

**EXHIBIT C**

## LJB FARMS, LLC.
### CREDITORS SECURED BY DEEDS OF TRUST AND BLANKET SECURITY INTERESTS

| Creditor | Loan Number | Claim Amount | Lien Priorty and Collateral |
|---|---|---|---|
| America AgCredit PCA | Loan No. XX7849 | $ 298,832 | First Priority UCC-1 Blanket Lien filed 8/19/2013<br>Second Trust Deed on Farm One recorded 4/10/2017<br>Third Trust Deed on Farm Three recorded 3/7/2017 |
| Community West Bank Loan | Loan No. XX0151 | $ 1,091,033 | First Trust Deed and Assignment of Rents on Farm One recorded 12/29/2015<br>Second Priority UCC-1 Blanket Lien filed 12/31/2015 |
| Community West Bank | Loan No. XX0157 | $ 401,703 | First Trust Deed and Assignment of Rents on Farm Three recorded 1/5/2016<br>Third Priority UCC-1 Blanket Lien filed on 1/7/2016 |
| Community West Bank | Loan No. XX0158 | $ 412,405 | Second Trust Deed on Farm Three recorded on 1/5/2016<br>Third Priority UCC-1 Blanket Lien filed on 1/7/2016 |

Exhibit 1 to
Request for Judicial Notice
Page 21

Fill in this information to identify the case:

Debtor name    **LJB FARMS, LLC**

United States Bankruptcy Court for the:    EASTERN DISTRICT OF CALIFORNIA

Case number (if known)    **17-12998**

☐ Check if this is an
amended filing

## Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims                    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

### Part 1:    List All Creditors with PRIORITY Unsecured Claims

1. Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).

   ☐ No. Go to Part 2.

   ■ Yes. Go to line 2.

2. List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  |  | Total claim | Priority amount |
|---|---|---|---|---|
| **2.1** | Priority creditor's name and mailing address<br>**Franchise Tax Board**<br>**Special Procedures Section**<br>**P.O. Box 2952**<br>**Sacramento, CA 95812-2952** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $6,415.71 | $6,415.71 |
|  | Date or dates debt was incurred<br>**2013 - 2017** | Basis for the claim:<br>**Taxes** |  |  |
|  | Last 4 digits of account number | Is the claim subject to offset? |  |  |
|  | Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (8) | ■ No<br>☐ Yes |  |  |
| **2.2** | Priority creditor's name and mailing address<br>**Internal Revenue Service**<br>**P.O. Box 7346**<br>**Philadelphia, PA 19101-7346** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $0.00 | $0.00 |
|  | Date or dates debt was incurred | Basis for the claim:<br>**NOTICE PURPOSE ONLY** |  |  |
|  | Last 4 digits of account number | Is the claim subject to offset? |  |  |
|  | Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (8) | ■ No<br>☐ Yes |  |  |

### Part 2:    List All Creditors with NONPRIORITY Unsecured Claims

3. List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

Amount of claim

Exhibit 1 to
Request for Judicial Notice
Page 22

| Debtor | **LJB FARMS, LLC** | | Case number (if known) | **17-12998** |
|---|---|---|---|---|
| | Name | | | |

**3.1** Nonpriority creditor's name and mailing address
**Aanonson Sprinkler Company**
**19170 Golden State Blvd.**
**Madera, CA 93637**
Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: Check all that apply.          **$542.81**
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim:  **Farm Supplies**
Is the claim subject to offset? ■ No  ☐ Yes

**3.2** Nonpriority creditor's name and mailing address
**Agri Tree, Inc.**
**22265 Road 18 1/2**
**Chowchilla, CA 93610**
Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: Check all that apply.          **$33,877.00**
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim:  **Harvest and other contract labor**
Is the claim subject to offset? ■ No  ☐ Yes

**3.3** Nonpriority creditor's name and mailing address
**American Express**
**P.O. Box 0001**
**Los Angeles, CA 90096**
Date(s) debt was incurred _
Last 4 digits of account number  **2006**

As of the petition filing date, the claim is: Check all that apply.          **$18,962.06**
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim:  **Business Credit Card**
Is the claim subject to offset? ■ No  ☐ Yes

**3.4** Nonpriority creditor's name and mailing address
**Amy Means**
**5624 Bonniemae Way**
**Sacramento, CA 95824**
Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: Check all that apply.          **$5,000.00**
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim:  **Personal Loan**
Is the claim subject to offset? ■ No  ☐ Yes

**3.5** Nonpriority creditor's name and mailing address
**Bank of America**
**P.O. Box 15796**
**Wilmington, DE 19886**
Date(s) debt was incurred _
Last 4 digits of account number  **2982**

As of the petition filing date, the claim is: Check all that apply.          **$34,037.35**
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim:  **Business Credit Card**
Is the claim subject to offset? ■ No  ☐ Yes

**3.6** Nonpriority creditor's name and mailing address
**Capital One**
**P.O. Box 60599**
**City of Industry, CA 91716**
Date(s) debt was incurred _
Last 4 digits of account number  **6556**

As of the petition filing date, the claim is: Check all that apply.          **$24,343.64**
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim:  **Business Credit Card**
Is the claim subject to offset? ■ No  ☐ Yes

**3.7** Nonpriority creditor's name and mailing address
**CenCal Pollination, LLC**
**3222 E. South Bear Creek Drive**
**Merced, CA 95340**
Date(s) debt was incurred  **6/30/2017**
Last 4 digits of account number  **7322**

As of the petition filing date, the claim is: Check all that apply.          **$11,385.00**
☐ Contingent
☐ Unliquidated
■ Disputed
Basis for the claim:  **Almond Pollen Application**
**Debtor disputes that the UCC filed by CenCal creates a lien against its crop**
Is the claim subject to offset? ■ No  ☐ Yes

Exhibit 1 to
Request for Judicial Notice
Page 23

| Debtor | **LJB FARMS, LLC** | Case number (if known)   **17-12998** |
|--------|--------------------|---------------------------------------|
|        | Name               |                                       |

| 3.8 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $3,794.12 |
|-----|-----------------------------------------------|------------------------------------------------------------------------|-----------|
|     | **Citi Costco Card** | ☐ Contingent | |
|     | P.O. Box 78019 | ☐ Unliquidated | |
|     | Phoenix, AZ 85062 | ☐ Disputed | |
|     | Date(s) debt was incurred _ | Basis for the claim: **Business Credit Card** | |
|     | Last 4 digits of account number **2954** | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.9 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $20,972.16 |
|-----|-----------------------------------------------|------------------------------------------------------------------------|-----------|
|     | **First Northern Bank** | ☐ Contingent | |
|     | P.O. Box 790408 | ☐ Unliquidated | |
|     | Saint Louis, MO 63179 | ☐ Disputed | |
|     | Date(s) debt was incurred _ | Basis for the claim: **Business Credit Card** | |
|     | Last 4 digits of account number **8707** | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.10 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $644.00 |
|------|-----------------------------------------------|------------------------------------------------------------------------|---------|
|      | **Hartford Insurance Company** | ☐ Contingent | |
|      | of the Midwest | ☐ Unliquidated | |
|      | P.O. Box 731178 | ☐ Disputed | |
|      | Dallas, TX 75373 | Basis for the claim: **Flood Insurance - Barn** | |
|      | Date(s) debt was incurred _ | | |
|      | Last 4 digits of account number **2016** | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.11 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $1,517.00 |
|------|-----------------------------------------------|------------------------------------------------------------------------|-----------|
|      | **Hartford Insurance Company** | ☐ Contingent | |
|      | of the Midwest | ☐ Unliquidated | |
|      | PO Box 731178 | ☐ Disputed | |
|      | Dallas, TX 75373-1178 | Basis for the claim: **Flood Insurance Home** | |
|      | Date(s) debt was incurred _ | | |
|      | Last 4 digits of account number **2016** | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.12 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $39,328.22 |
|------|-----------------------------------------------|------------------------------------------------------------------------|-----------|
|      | **Helena Chemical Co.** | ☐ Contingent | |
|      | PO Box 742558 | ☐ Unliquidated | |
|      | Los Angeles, CA 90074-2558 | ☐ Disputed | |
|      | Date(s) debt was incurred _ | Basis for the claim: **Chemicals** | |
|      | Last 4 digits of account number **3667** | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.13 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $15,000.00 |
|------|-----------------------------------------------|------------------------------------------------------------------------|-----------|
|      | **Joey's Well Drilling & Construction, LLC** | ☐ Contingent | |
|      | 13610 Avenue 21 1/2 | ☐ Unliquidated | |
|      | Chowchilla, CA 93610 | ☐ Disputed | |
|      | Date(s) debt was incurred _ | Basis for the claim: **Business Loan** | |
|      | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.14 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $29,780.00 |
|------|-----------------------------------------------|------------------------------------------------------------------------|-----------|
|      | **Joey's Well Drilling & Construction, LLC** | ☐ Contingent | |
|      | 13610 Avenue 21 1/2 | ☐ Unliquidated | |
|      | Chowchilla, CA 93610 | ☐ Disputed | |
|      | Date(s) debt was incurred _ | Basis for the claim: **New Domestic & Ag Well Permits, Ag & Domestic** | |
|      | Last 4 digits of account number _ | **Well Destruction, New 8" Domestic well 760' deep at Farm #3** | |
|      | | Is the claim subject to offset? ■ No ☐ Yes | |

Exhibit 1 to
Request for Judicial Notice
Page 24

| Debtor | **LJB FARMS, LLC** | Case number (if known) __17-12998__ |

**3.15** Nonpriority creditor's name and mailing address
**PG&E**
**P.O. Box 997300**
**Sacramento, CA 95899**
Date(s) debt was incurred _
Last 4 digits of account number __6981__

As of the petition filing date, the claim is: Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim: __Utilities Farm #3 Ag Wells__
Is the claim subject to offset? ■ No ☐ Yes
$11,096.80

**3.16** Nonpriority creditor's name and mailing address
**PG&E**
**P.O. Box 997300**
**Sacramento, CA 95899**
Date(s) debt was incurred _
Last 4 digits of account number __8707__

As of the petition filing date, the claim is: Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim: __Utilities Farm #1 Ag Well__
Is the claim subject to offset? ■ No ☐ Yes
$3,985.16

**3.17** Nonpriority creditor's name and mailing address
**Richard Harriman**
**1078 Via Verona Drive**
**Chico, CA 95973**
Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim: __Legal Services__
Is the claim subject to offset? ■ No ☐ Yes
$2,500.00

**3.18** Nonpriority creditor's name and mailing address
**Shannon Pump Co.**
**P.O. Box 686**
**275 S. Highway 59**
**Merced, CA 95341**
Date(s) debt was incurred _
Last 4 digits of account number _

As of the petition filing date, the claim is: Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim: __New Pump and Motor at Farm #3 Ag Well__
Is the claim subject to offset? ■ No ☐ Yes
$12,836.63

**3.19** Nonpriority creditor's name and mailing address
**Spain Air Chemical, Inc.**
**P.O. Box 217**
**Dos Palos, CA 93620**
Date(s) debt was incurred _
Last 4 digits of account number __F201__

As of the petition filing date, the claim is: Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim: __Chemicals__
Is the claim subject to offset? ■ No ☐ Yes
$51,378.72

**3.20** Nonpriority creditor's name and mailing address
**Tesei Petroleum, Inc.**
**P.O. Box 1263**
**Madera, CA 93639**
Date(s) debt was incurred _
Last 4 digits of account number __0108__

As of the petition filing date, the claim is: Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
Basis for the claim: __Fuel__
Is the claim subject to offset? ■ No ☐ Yes
$1,505.66

**3.21** Nonpriority creditor's name and mailing address
**The Almond Company**
**2900 Airport Drive**
**Chowchilla, CA 93610**
Date(s) debt was incurred __2016__
Last 4 digits of account number _

As of the petition filing date, the claim is: Check all that apply.
☐ Contingent
☐ Unliquidated
■ Disputed
Basis for the claim: __Processing Costs__
Is the claim subject to offset? ■ No ☐ Yes
$75,000.00

| Debtor | **LJB FARMS, LLC** | Case number (if known) | **17-12998** |
|---|---|---|---|
| | Name | | |

| 3.22 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$5,000.00** |
|---|---|---|---|
| | **Tom Garcia** | ☐ Contingent | |
| | **2325 Indian Springs Drive** | ☐ Unliquidated | |
| | **Brentwood, CA 94513** | ☐ Disputed | |
| | Date(s) debt was incurred _ | Basis for the claim: **Personal Loan** | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.23 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$1,737.75** |
|---|---|---|---|
| | **Ultra Gro, LLC** | ☐ Contingent | |
| | **1043 S. Granada Drive** | ☐ Unliquidated | |
| | **Madera, CA 93637** | ☐ Disputed | |
| | Date(s) debt was incurred _ | Basis for the claim: **Chemicals** | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

| 3.24 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$5,838.44** |
|---|---|---|---|
| | **Walter Wilhelm Law Group** | ☐ Contingent | |
| | **The Tower, 205 E. River Park Circle #410** | ☐ Unliquidated | |
| | **Fresno, CA 93720** | ☐ Disputed | |
| | Date(s) debt was incurred _ | Basis for the claim: **Professional Fees** | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

**Part 3: List Others to Be Notified About Unsecured Claims**

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.1 **The Almond Company** | | |
| **PO Box 787** | Line **3.21** | _ |
| **Chowchilla, CA 93610** | ☐ Not listed. Explain ___ | |

**Part 4: Total Amounts of the Priority and Nonpriority Unsecured Claims**

5. Add the amounts of priority and nonpriority unsecured claims.

| | | Total of claim amounts |
|---|---|---|
| 5a. Total claims from Part 1 | 5a. | $ 6,415.71 |
| 5b. Total claims from Part 2 | 5b. + $ | 409,862.32 |
| 5c. Total of Parts 1 and 2 Lines 5a + 5b = 5c. | 5c. | $ 416,278.03 |

Exhibit 1 to
Request for Judicial Notice
Page 26

Fill in this information to identify the case:

Debtor name      **LJB FARMS, LLC**

United States Bankruptcy Court for the:   EASTERN DISTRICT OF CALIFORNIA

Case number (if known)   **17-12998**

☐ Check if this is an
amended filing

## Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases                                12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.

1.  **Does the debtor have any executory contracts or unexpired leases?**
    ☐ No. Check this box and file this form with the debtor's other schedules. There is nothing else to report on this form.
    ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal*     *Property*
    (Official Form 206A/B).

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

| 2.1. | State what the contract or lease is for and the nature of the debtor's interest | **Lease Agreement for 100% use of Dodge Ram Truck in exchange for payment of $900 per month, repairs and maintenence, all DMV fees and insurance to be paid by LJB Farms, LLC.** | |
|---|---|---|---|
| | State the term remaining | month to month | **Joanna Botelho** |
| | List the contract number of any government contract | | **13610 Avenue 21 1/2**
**Chowchilla, CA 93610** |

Exhibit 1 to
Request for Judicial Notice
Page 27

Fill in this information to identify the case:

Debtor name    **LJB FARMS, LLC**

United States Bankruptcy Court for the:   EASTERN DISTRICT OF CALIFORNIA

Case number (if known)   **17-12998**

☐ Check if this is an amended filing

## Official Form 206H
## Schedule H: Your Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

1. Do you have any codebtors?

☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.
■ Yes

2. In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, Schedules D-G. Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

*Column 1: Codebtor*             *Column 2: Creditor*

| | Name | Mailing Address | Name | Check all schedules that apply: |
|---|---|---|---|---|
| 2.1 | Joanna Botelho | 13610 Avenue 21 1/2 Chowchilla, CA 93610-8919 | Community West Bank | ■ D __2.3__ ☐ E/F ____ ☐ G ____ |
| 2.2 | Joanna Botelho | 13610 Avenue 21 1/2 Chowchilla, CA 93610-8919 | CenCal Pollination, LLC | ☐ D ____ ■ E/F __3.7__ ☐ G ____ |
| 2.3 | Tom Garcia | 13610 Avenue 21 1/2 Chowchilla, CA 93610 | CenCal Pollination, LLC | ☐ D ____ ■ E/F __3.7__ ☐ G ____ |

Fill in this information to identify the case:

Debtor name    **LJB FARMS, LLC**

United States Bankruptcy Court for the:    **EASTERN DISTRICT OF CALIFORNIA**

Case number (if known)   **17-12998**

☐ Check if this is an amended filing

## Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                     04/16

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

### Part 1:    Income

**1.  Gross revenue from business**

☐ None.

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
|---|---|---|
| From the beginning of the fiscal year to filing date:<br>From **1/01/2017** to **Filing Date** | ☐ Operating a business<br>■ Other  **Business Operations** | **$164,803.00** |
| For prior year:<br>From **1/01/2016** to **12/31/2016** | ☐ Operating a business<br>■ Other  **Business Operations** | **$210,786.00** |
| For year before that:<br>From **1/01/2015** to **12/31/2015** | ☐ Operating a business<br>■ Other  **Business Operations** | **$0.00** |

**2.  Non-business revenue**
Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

■ None.

| | Description of sources of revenue | Gross revenue from<br>each source<br>(before deductions and<br>exclusions) |
|---|---|---|

### Part 2:    List Certain Transfers Made Before Filing for Bankruptcy

**3.  Certain payments or transfers to creditors within 90 days before filing this case**
List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None.

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>Check all that apply |
|---|---|---|---|

Exhibit 1 to
Request for Judicial Notice
Page 29

Debtor  **LJB FARMS, LLC**                    Case number *(if known)* **17-12998**

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>Check all that apply |
|---|---|---|---|
| 3.1.<br>**American AgCredit**<br>**711 W. 19th Street**<br>**Merced, CA 95340** | 05/09/2017 -<br>$108,356.25<br>06/12/2017 -<br>$127,347.80 | $235,704.05 | ■ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other___ |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
   List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

   ■ None.

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|

5. **Repossessions, foreclosures, and returns**
   List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

   ■ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

6. **Setoffs**
   List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

   ■ None

| Creditor's name and address | Description of the action creditor took | Date action was<br>taken | Amount |
|---|---|---|---|

| Part 3: | Legal Actions or Assignments |
|---|---|

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
   List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

   ■ None.

| Case title<br>Case number | Nature of case | Court or agency's name and<br>address | Status of case |
|---|---|---|---|

8. **Assignments and receivership**
   List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

   ■ None

| Part 4: | Certain Gifts and Charitable Contributions |
|---|---|

9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000

   ■ None

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com        Best Case Bankruptcy

Exhibit 1 to<br>Request for Judicial Notice<br>Page 30

| Debtor | **LJB FARMS, LLC** | | Case number *(if known)* **17-12998** |

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |

### Part 5:    Certain Losses

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ **None**

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Dates of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B *(Schedule A/B: Assets – Real and Personal Property).* | | |

### Part 6:    Certain Payments or Transfers

**11. Payments related to bankruptcy**
List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ **None.**

| | Who was paid or who received the transfer? Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | Klein DeNatale 4550 California Avenue Second Floor Bakersfield, CA 93309 | Klein, DeNatale received a $20,000.00 retainer on July 18, 2017. Klein, DeNatale applied $7,817.50 to fees and $275.00 in costs incurred pre-petition. The Balance of $12,182.50 is being held by Klein DeNatale in the attorney-client trust account. | 7/18/2017 | $20,000.00 |

Email or website address

_____

Who made the payment, if not debtor?
Joanna Botelho

**12. Self-settled trusts of which the debtor is a beneficiary**
List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

☑ **None.**

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |

**13. Transfers not already listed on this statement**
List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ **None.**

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |

### Part 7:    Previous Locations

**14. Previous addresses**

Official Form 207                Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                page 3

Exhibit 1 to
Request for Judicial Notice
Page 31

Debtor   **LJB FARMS, LLC**_____      Case number *(if known)* **17-12998**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

■ Does not apply

|  **Address** | **Dates of occupancy**<br>**From-To** |
|---|---|

---

**Part 8:   Health Care Bankruptcies**

**15. Health Care bankruptcies**
Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

■   No. Go to Part 9.
☐   Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

---

**Part 9:   Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

■   No.
☐   Yes. State the nature of the information collected and retained.

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

■   No. Go to Part 10.
☐   Yes. Does the debtor serve as plan administrator?

---

**Part 10:   Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

**18. Closed financial accounts**
Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

■ None

| Financial institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

**19. Safe deposit boxes**
List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

■ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Do you still have it? |
|---|---|---|---|

**20. Off-premises storage**
List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

Exhibit 1 to
Request for Judicial Notice
Page 32

Debtor　**LJB FARMS, LLC**　　　　　　　　　　　　Case number *(if known)* **17-12998**

■ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Do you still have it? |
|---|---|---|---|

## Part 11: Property the Debtor Holds or Controls That the Debtor Does Not Own

**21. Property held for another**
List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

■ None

## Part 12: Details About Environment Information

For the purpose of Part 12, the following definitions apply:
*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

Report all notices, releases, and proceedings known, regardless of when they occurred.

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

■ No.
☐ Yes. Provide details below.

| Case title Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

## Part 13: Details About the Debtor's Business or Connections to Any Business

**25. Other businesses in which the debtor has or has had an interest**
List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

■ None

| Business name address | Describe the nature of the business | Employer identification number Do not include Social Security number or ITIN. |
|---|---|---|
| | | Dates business existed |

Official Form 207　　　Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy　　　　　　page 5

Exhibit 1 to
Request for Judicial Notice
Page 33

Debtor   **LJB FARMS, LLC**      Case number *(if known)* **17-12998**

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| Name and address | Date of service From-To |
|---|---|
| 26a.1.   Joanna Botelho 13610 Avenue 21 1/2 Chowchilla, CA 93610 | At all times during the last two years. |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☐ None

| Name and address | Date of service From-To |
|---|---|
| 26b.1.   Joanna Botelho 13610 Avenue 21 1/2 Chowchilla, CA 93610 | Prepared all financial statements for Debtor during the last two years. |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| 26c.1.   Joanna Botelho 13610 Avenue 21 1/2 Chowchilla, CA 93610 | ALL BOOKS AND RECORDS ARE AVAILABLE. |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☐ None

**Name and address**

26d.1.   Community West Bank 2615 So. Miller Street, Ste. 110 Santa Maria, CA 93455

26d.2.   America AgCredit 711 West 19th Street Merced, CA 95340

26d.3.   USDA FSA - FARM LOAN PROGRAM

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

■ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28.** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

Official Form 207      Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy      page 6

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com      Best Case Bankruptcy

Exhibit 1 to
Request for Judicial Notice
Page 34

Debtor    **LJB FARMS, LLC**                                    Case number *(if known)* **17-12998**

| Name | Address | Position and nature of any interest | % of interest, if any |
|------|---------|-------------------------------------|------------------------|
| Joanna Botelho | 13610 Avenue 21 1/2 Chowchilla, CA 93610 | **Member and Manager** | 100% |

29. Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?

■   No
☐   Yes. Identify below.

30. Payments, distributions, or withdrawals credited or given to insiders
Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

■   No
☐   Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|-------------------------------|------------------------------------------------------|-------|-------------------------------|

31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?

■   No
☐   Yes. Identify below.

Name of the parent corporation                                    Employer Identification number of the parent corporation

32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?

■   No
☐   Yes. Identify below.

Name of the parent corporation                                    Employer Identification number of the parent corporation

Software Copyright (c) 1996-2017 Best Case, LLC - www.bestcase.com                                    Best Case Bankruptcy

Exhibit 1 to
Request for Judicial Notice
Page 35

Debtor   **LJB FARMS, LLC**                              Case number (if known)   **17-12998**

**Part 14:**   **Signature and Declaration**

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on     **August 31, 2017**

/s/ Joanna Botelho                              Joanna Botelho
Signature of individual signing on behalf of the debtor        Printed name

Position or relationship to debtor     **Managing Member**

Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?
■ No
☐ Yes

ORIGINAL

Exhibit 1 to
Request for Judicial Notice
Page 36

# EXHIBIT 2

Exhibit 2 to
Request for Judicial Notice
Page 37

| | |
|---|---|
| Fill in this information to identify the case: | |
| **Debtor 1** | **LJB Farms, LLC** |
| **Debtor 2** (Spouse, if filing) | |
| United States Bankruptcy Court for the:  Eastern District of California | |
| **Case number**  17-12998-B-12 | |

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:  Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | **American AgCredit, PCA** <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor _____ |
| **2. Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes.  From whom? _____ |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Tom Mouzes, Boutin Jones Inc.
Name

555 Capitol Mall, Suite 1500
Number        Street

Sacramento        CA        95693
City                State        ZIP Code

Contact phone  916-321-4444

Contact email  tmouzes@boutinjones.com

Where should payments to the creditor be sent? (if different)

American AgCredit, PCA
Name

400 Aviation Blvd., Suite 100
Number        Street

Santa Rosa        CA        95403
City                State        ZIP Code

Contact phone  (707) 521-6179

Contact email  SClifton@agloan.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| | |
|---|---|
| **4. Does this claim amend one already filed?** | ☑ No <br> ☐ Yes.  Claim number on court claims registry (if known) _____      Filed on _____ <br> MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes.  Who made the earlier filing? _____ |

Official Form 410                    **Proof of Claim**                    page 1

Exhibit 2 to<br>Request for Judicial Notice<br>Page 38

**Part 2:   Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☐ No<br>☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  9   5   0   5 |
| 7. How much is the claim? | $_____ 334,059.30 . Does this amount include interest or other charges?<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Money loaned, See attached. |
| 9. Is all or part of the claim secured? | ☐ No<br>☑ Yes.  The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☑ Other. Describe:        Personal Property, See attached.<br><br>**Basis for perfection:**        UCC filings<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property:              $_____<br>Amount of the claim that is secured:    $    334,059.30<br>Amount of the claim that is unsecured: $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition;    $_____<br><br>Annual Interest Rate (when case was filed)  6.75 %<br>☐ Fixed<br>☑ Variable |
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____ |
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

Exhibit 2 to
Request for Judicial Notice
Page 39

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. Check one: | Amount entitled to priority |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 8/23/2017

Print the name of the person who is completing and signing this claim:

| Name | Scott Clifton | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Vice President--Credit Resolution | | |
| Company | American AgCredit, PCA | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 400 Aviation Blvd., Suite 100 | | |
| | Number    Street | | |
| | Santa Rosa | CA | 95403 |
| | City | State | ZIP Code |
| Contact phone | (707) 521-6179 | Email | SClifton@agloan.com |

## ATTACHMENT TO PROOF OF CLAIM
### In re LJB Farms, LLC
### United States Bankruptcy Court,
### Eastern District of California, Fresno Division.
### Case No.: 17-12998-B-12

American AgCredit, PCA, ("<u>American</u>"), submits this attachment to the proof of claim, which is incorporated therein. The following is a summary only and does not fully describe the financial accommodations extended to debtor and is not intended to restrict, alter, waive and/or modify any note, agreement, instrument, document, lien, security interest, encumbrance, right, remedy, interest and/or other matter of American in any form whatsoever. This proof of claim is based on the information currently available and is subject, from time to time, to changes, amendments and/or modifications including without limitation, concerning the amounts, obligations, duties and/or indebtedness due American and to assert additional claims, whether legal or equitable. In addition, this proof of claim is subject to changes, amendments and/or modification including to set forth additional amounts, indebtedness, liabilities, obligations or other matters due American.

On or about June 18, 2013, LJB, Farms, LLC ("<u>LJB</u>") executed the Master Loan And Membership Agreement, a copy of which is attached hereto as **Exhibit A**. On or about August 12, 2013, LJB executed a Security Agreement, a copy of which is attached hereto as **Exhibit B**. On or about March 7, 2016, LJB executed a Credit Agreement to evidence a loan in the original principal amount of $325,000, a redacted copy of which is attached hereto as **Exhibit C**. On February 9, 2017, LJB executed the Restructure Agreement, a copy of which is attached hereto as **Exhibit D**, the Amendment to Credit Agreement, a redacted copy of which is attached hereto as **Exhibit E**, the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing recorded in Madera County, a copy of which is attached hereto as **Exhibit F**, and the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing recorded in Merced County, a copy of which is attached hereto as **Exhibit G**. The loan of American is secured by the personal property of LJB more fully described in the Security Agreement including, without limitation, all livestock, machinery, Equipment, farm equipment, tools and Fixtures, all Goods, crops, harvested crops, Farm Products, Inventory, parts, supplies, Deposit Accounts, capital stock issued under the Farm Credit Act of 1971, as amended, all rights to payment, payment of money or payment in kind, Accounts, contract rights, patronage dividends, Chattel Paper, Documents, Instruments, General Intangibles, warehouse receipts, and rights under any government or other loan or price support, General Intangibles, all rights in and claims to any insurance policy, all rights to any statutory or common law lien or trust, all books, records, computer data and information related to the Collateral and all proceeds and products of the thereof and all renewals, replacements, substitutions, additions, accessions, rents, issues, royalties and profits. The loan of American is also secured by the real property more fully described in the attached record Deeds of Trust. Attached hereto as **Exhibit H** is a copy of the Notice of Assignment dated August 12, 2013.

As of the filing of this bankruptcy case on August 3, 2017, the amount due, owing and unpaid to American under the loan was **$334,059.30**. This sum consists of principal of

<div align="center">
1<br/>
Attachment to<br/>
Proof of Claim by AMERICAN AGCREDIT
</div>

889810.2

Exhibit 2 to
Request for Judicial Notice
Page 41

Filed 09/07/17      Case 17-12998         Doc 48

Filed 08/29/17      Case 17-12998         Claim 9

**$298,832.06**, accrued and unpaid interest of **$2,824.81**, legal fees of **$27,642.43**, and a restructure fee of **$4,750.00**. Interest, attorney fees and other costs are continuing to accrue thereof in accordance with the loan documents. American is informed that its claim in this case is fully secured and that it is an over-secured creditor. A loan history as of August 18, 2017, is attached hereto as **Exhibit I**. Copies of the filed UCC-1s are attached hereto collectively as **Exhibit J**.

    Nothing herein nor in any other appearance, pleading, claim, suit, motion, complaint, or any other writing or conduct shall constitute a waiver by American of any procedural and/or substantive rights, remedies and/or defenses including, without limitation: (a) the right to have any and all final orders in any and all matters entered only after de novo review by a United States District Court Judge; (b) the right to have any matter heard and tried before an Article III court; (c) the right to trial by jury in any proceeding as to any and all matters so triable therein, whether or not the same be designated legal or private rights, or in any case, controversy or proceeding related hereto, whether or not such jury trial right is pursuant to statute or the United States Constitution; (d) the right to have the reference of this matter withdrawn by the United States District Court in any matter or proceeding subject to mandatory or discretionary withdrawal; (e) other rights, claims, actions, remedies, defenses, setoffs, recoupments or other matters to which American is entitled under any agreements or at law or in equity or under the United States Constitution; or (f) the right to be served directly with pleadings commencing an adversary proceeding, contested matter and/or lawsuit. Nothing herein or in any other pleading or paper filed by American is or is to be construed as any waiver of the right to jury trial which American has or may have under the applicable law.

    Nothing herein nor in any other pleading or paper filed by American is or is to be construed as any waiver of the right or ability of American to demand or require alternative dispute resolution, mediation or similar process which it has or may have available under the applicable agreements, law or otherwise. Nothing herein nor in any other pleading or paper filed by American shall limit or impair any right, remedy, claim or interest, whether legal or equitable, including under the applicable law or otherwise, including against any person or entity, including LJB or any guarantor.

    American reserves the right to file a request for allowance and payment of administrative claims and expenses, including in accordance with section 503 and 507 of the Bankruptcy Code, including for any use of cash collateral by LJB. American reserves the right to attach or rely upon additional documents or evidence in support of this Proof of Claim including if, as, and when such additional documents or evidence become available.

    All of the above rights and/or remedies are hereby expressly reserved. Filing of this Proof of Claim or participating in the bankruptcy case shall not be deemed to constitute a concession or admission of jurisdiction in the case or cases or before this Court or any other court. Nor does American waive, and specifically preserves, any procedural and/or substantive defenses to any claim that may be asserted against American by the debtor, by any trustee of the debtor's estate, by any official committee appointed in this case, or by any other party, person, entity or group. The filing of this Proof of Claim shall not constitute an election of remedies or

889810.2

Exhibit 2 to
Request for Judicial Notice
Page 42

choice of law or a waiver of any such rights relating thereto. Nothing contained in this Proof of Claim shall limit any right of American to commence or continue any proceeding or take any action to the extent permitted by the Bankruptcy Code, applicable non-bankruptcy law, or order of a court of competent jurisdiction.

3
**Attachment to**
**Proof of Claim by AMERICAN AGCREDIT**

889810.2

Exhibit 2 to
Request for Judicial Notice
Page 43

# Exhibit A

## MASTER LOAN AND MEMBERSHIP AGREEMENT

### American AgCredit, ACA and its Subsidiaries

This Master Loan and Membership Agreement (the "Master Agreement") is entered into and made effective this
. June 18, 2013 by LJB Farms, LLC, a California limited liability company (collectively, whether one or more,
"Borrower") and American AgCredit, ACA ("ACA") and/or any of its now or hereinafter existing subsidiaries
(collectively, "Subsidiaries"). As of date of this Master Agreement, Subsidiaries are American AgCredit, FLCA
("FLCA") and American AgCredit, PCA ("PCA").

From time to time Borrower may have applied for and received, or apply for and receive in the future, loans or other
financial accommodations, services or products (collectively referred to as "Loans") from ACA and/or its
Subsidiaries (each hereinafter referred to individually and collectively as "Lender" or "Lenders"). In addition,
Borrower may request other financial services or products from one or more Lenders. The parties wish to set forth
in this Master Agreement the general terms and conditions applicable to any loans or financial services that may be
approved by any Lender. In addition, this Master Agreement contains general provisions applicable to required
stock ownership and membership in ACA. Notwithstanding the foregoing, Borrower acknowledges that Lender has
not committed and does not commit hereby to make any loan to or financial services available to Borrower and that
Lenders shall not be obligated to make any Loan(s) to Borrower until full satisfaction of the requirements of
Section 2 below.

**ACCORDINGLY, the parties agree as follows:**

### 1.      RULES OF CONSTRUCTION AND DEFINITIONS.

        1.1     Rules of Construction. In this and any other documents evidencing Loans by Lender to Borrower,
wherever it appears appropriate from the context, each term stated in either the single or the plural shall include both
the single and the plural, and pronouns in the masculine, feminine or neuter gender shall include the masculine,
feminine and neuter. Unless stated to the contrary, the word "or" means "and/or" and not "either/or."

        1.2     UCC Definitions. Except as expressly provided in any Loan Document, the following terms shall
have the meanings set forth in Section 9-102 of Article 9 of the Uniform Commercial Code in effect from time to
time in the state in which Borrower is domiciled: Accounts, Cash, Chattel Paper, Crops, Deposit Accounts,
Documents, Equipment, Farm Products, General Intangibles, Goods, Instruments, Inventory, Payment Intangibles,
and Proceeds.

        1.3     Other Definitions. The capitalized terms not otherwise defined herein are defined as set forth
below. In the case of a conflicting definition contained in a subsequent Loan Document, the definition in the
subsequent document shall control for purposes of that document.

        "Act" shall mean the Farm Credit Act of 1971 as amended from time to time.

        "Affiliate" means any Person directly or indirectly controlling, controlled by, or under common control
with, Borrower. For the purposes of this definition "control" (including the terms "controlled by" and
"under common control with") shall mean the possession, directly, or indirectly, of the power to direct or
cause the direction of the management and policies of Borrower, or such person or entity, whether through
the ownership of voting shares or by contract, or otherwise.

        "Annual Financial Information" means annual income statements, balance sheets, federal tax returns, ·
and all such other financial information as required by Lender annually in connection with any Loans.

        "Authorized Payment" means any of the payments referred to in Section 5.1.5.

"**Business Day**" means any day on which Lender is open for business except for (i) Saturdays and Sundays and (ii) other days on which banks in California are required or permitted to be closed.

"**Claims**" means all claims, suits, damages, foreseeable and unforeseeable consequential damages, liens, losses, liabilities, interest, judgments, cleanup costs, demands, actions, causes of action, injuries, administrative proceedings and orders, consent agreements and orders, penalties, costs and expenses (including fees and expenses related to claims, including, but not limited to, any out-of-pocket litigation costs, sums paid in settlement of claims, and all consultant, expert and the reasonable fees and expenses of counsel, including in-house legal services) of any kind whatsoever.

"**Collateral**" means all personal property and real property, whether now owned or hereafter acquired, in which the Lender now holds or hereafter acquires a security interest or lien for the purpose of securing performance of Borrower's obligations to Lender.

"**Deed of Trust**" shall mean a mortgage, deed of trust or similar real estate lien document given to secure any Loan.

"**Default**" means the occurrence of any event or circumstance that, with the passage of time or the giving of notice or both, would become an Event of Default.

"**Default Rate**" or "**default rate**" means the increased rate payable under a given Loan Document following the occurrence of an Event of Default.

"**Disbursement Account**" means a bank account at a bank chosen by Borrower and reasonably acceptable to Lender, having the following characteristics: (a) the account will be in the name of Borrower, (b) the account will be an account in which Lender will either electronically make advances under the Loan or Borrower will deposit loan fund checks from Lender, and (c) the bank will be instructed by Lender to transfer funds into an account designated by Borrower.

"**Distributions**" means any shareholder dividends, payments to members of a limited liability company, payments to partners of any type of partnership or similar payments and loans, advances or guarantees of third party indebtedness to, or on behalf of, shareholders and Affiliates, partners, or members of a limited liability company.

"**Effective Date**" means the date on which all conditions precedent to Lender's obligation to close or fund a Loan have been satisfied.

"**Environmental Laws**" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation).

"**Environmental Liabilities**" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, environmental permits, or in connection with any release or threatened release or presence of a Hazardous Substance whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, together with all regulations issued pursuant thereto.

"Event of Default" means any Standard Event of Default and any event designated as an Event of Default in any Loan Document.

"Farm Products" shall have the meaning set forth in the UCC.

"FCA" means the Farm Credit Administration.

"Fiscal Year" means the 12-month period of Borrower or Guarantor ending December 31 of each year or on any other date established and consistently used by the Borrower.

"Funds Held Account" means a restricted account maintained by Borrower with Lender in accordance with the terms and conditions set forth in Section 12 of this Agreement or in a separate Funds Held Account Agreement.

"Funds Held Account Agreement" means an agreement between the Borrower and Lender governing the deposit of funds by Borrower with Lender.

"General Financing Agreement" means the agreement between Lender and CoBank, FCB under which Lender obtains funds to make loans to borrowers.

"GAAP" means Generally Accepted Accounting Principles, consistently applied, as in effect from time to time.

"Generally Accepted Accounting Principles" means the financial accounting guidelines established and administered by the American Institute of Certified Public Accountants and the Financial Accounting Standards Board.

"Guaranty(ies)" means one or more, as the context requires, of the guaranties executed and delivered to Lender in connection with a Loan.

"Guaranty Collateral" means any and all real and personal property that is or becomes security for any Guaranty Obligations.

"Guaranty Obligations" means all obligations and covenants to be performed under a Guaranty by a Guarantor.

"Guarantor" means any Person who signs a guaranty agreement guarantying the payment of Indebtedness of the Borrower or performance of obligations of Borrower to Lenders, or any party other than the Borrower who pledges real or personal property to secure repayment of the Indebtedness or performance of obligations of Borrower to Lenders.

"Hazardous Substance" means any substance, material or waste that is regulated by or forms the basis of liability now or hereafter under any Environmental Laws, including any material or substance that is (a) defined as a "solid waste", "hazardous waste", "hazardous material", "hazardous substance", "extremely hazardous waste", "restricted hazardous waste", "pollutant", "contaminant", "hazardous constituent", "special waste", "toxic substance" or other similar term or phrase under any Environmental Laws, (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"H Stock" means any preferred stock issued by ACA to Borrower.

"**Indebtedness**" means any and all Loans, advances, obligations, covenants and duties owing to each Lender by Borrower, whether now existing or hereinafter arising, of any kind or nature, absolute or contingent, due or to become due, whether or not evidenced by a note or other instrument or agreement in writing, including all interest, charges, fees, attorney's fees, expenses, and any other sums chargeable by any Lender to Borrower under this or any other agreement except to the extent that any future Loan Document limits this definition.

"**Interest Rate Product**" means a methodology for calculating the interest rate or prepayment provisions and/or the ability to convert to another interest rate product.

"**Lien**" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing).

"**Loan Application**" means any application for a Loan from a Lender submitted to a Lender by Borrower or Guarantor and any and all information in support of such application.

"**Loan Document(s)**" means one or more, as the context requires, of this Master Agreement, the documents signed by or on behalf of the Borrower to evidence a Loan, and any other documents given in connection with or to secure a Loan such as security agreements, Guaranties, and Deeds of Trust and all amendments, modifications or supplements thereto.

"**Maturity Date**" shall mean the date any Loan matures and is fully due and payable.

"**Member Stock**" means the participation certificates or capital stock required under the Act to be purchased as determined from time to time pursuant to ACA's bylaws and federal regulations.

"**Note**" or "**Notes**" means collectively, all promissory notes executed and delivered in connection with any Loan and any and all amendments or modifications thereto.

"**Obligations**" means all Loans and other obligations for payment or performance owed by Borrower to Lender (whether or not such performance is then required or contingent, or amounts are liquidated or determinable and whether or not allowed as a claim in any insolvency or bankruptcy proceeding) of any kind or nature whatsoever arising under the Loan Documents or otherwise.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"**Prepayment**" shall mean a principal payment in advance of a scheduled principal payment as set forth in the repayment section of the Loan Documents or a principal payment in advance of an applicable Maturity Date (as defined in the Loan Documents), whether such payment is voluntary or is involuntary (as a result of sale of collateral, operation of law or otherwise) and shall also include any reamortization or rescheduling of the loan balance.

"**Professional Fees**" means the fees and expenses charged for services described in Section 13 entitled "Fees and Charges of Attorneys and Others."

"**Release**" means as any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment, including continuing migration, of Hazardous Substances into, onto or through the soil, surface water or groundwater of the property, whether or not caused by, contributed to, permitted by, acquiesced to or known to Borrower.

Master Loan and Membership Agreement (09-12) Page 4 of 24

"**Rents**" means all the rents, royalties, issues, profits, revenue, income and other benefits of real property arising from the use or enjoyment of all or any portion thereof, or from any lease, mineral lease, or agreement pertaining to real property.

"**Standard Affirmative Covenants**" means the affirmative covenants set forth in Section 5.2.1.

"**Standard Disbursement Requirements**" means the disbursement requirements set forth in Section 6.

"**Standard Event(s) of Default**" means any one or more, as the context requires, of the Events of Default set forth in Section 5.3.

"**Standard Negative Covenants**" means the negative covenants set forth in Section 5.2.2.

"**Standard Representations and Warranties**" means the representations and warranties set forth in Section 4.

"**Stock**" means Member Stock and H Stock and any other stock issued by ACA to Borrower from time to time.

"**Transaction Summary**" means the periodic summary of transactions that Borrower has with Lender that is transmitted to Borrower from time to time.

"**UCC**" means Article 9 of the Uniform Commercial Code in effect from time to time in the state in which Borrower is domiciled.

2.      **CONDITIONS PRECEDENT.**

   2.1     Preamble.  The obligation of Lender to make any Loan is subject to the following conditions precedent (the "Standard Conditions Precedent").  These Standard Conditions Precedent must be satisfied separately and completely as to such Loan in addition to any other and further conditions precedent set forth in any loan approval, including, but not limited to, any renewal or restructure of any existing Loan.  Lender, in its sole and absolute discretion, may waive or modify any one or more of these Standard Conditions Precedent and/or provide that all or any part of any one or more of the Standard Conditions Precedent shall be changed to be a condition subsequent to the closing or funding of any Loan.  Failure of Borrower to satisfy any such condition subsequent shall be a default under this Master Agreement and the applicable Loan Documents.  Any such agreement by Lender to waive or modify shall not be valid and enforceable unless in writing and signed by Lender.

   2.2     Lender Approval.  Lender shall have received all applications, documents, instruments, and representations as Lender in its sole discretion deems appropriate and Lender shall have obtained all such internal and external approvals, as Lender requires prior to making any Loan.  In connection with such approval process, Borrower understands and agrees that:

      2.2.1    Application Process.  Borrower may apply for Loans from a Lender in accordance with the application procedures of the Lender.  The Lender will evaluate each application in accordance with its then existing standards and guidelines.  The Lender will notify Borrower in writing of its decision on each application.  Nothing in this Master Agreement is intended as a commitment to approve or make a specific Loan or to renew or refinance any Loan or part thereof.

      2.2.2    Written Loan Approvals, Terms and Conditions, No Oral Commitments.  Approval, terms and conditions and loan terms and conditions all are at the sole and absolute discretion of Lender.  To the extent that terms and conditions applicable to a particular loan differ from those stated in this Master Agreement, those terms and conditions must be set forth in writing and signed by the Lender to be effective.  Directors, employees, officers, and agents of any Lender are not authorized to make oral commitments.

**2.3** Authority. Receipt by Lender of corporate and/or partnership resolutions, certificates, or other appropriate evidence of the authority of Borrower and any Guarantor to execute, deliver, and perform their respective obligations under the Loan Documents and to execute and deliver all Loan Documents.

**2.4** Documents. Borrower shall have executed and delivered to Lender all Loan Documents required by Lender, including, but not limited to all Deeds of Trust required to evidence liens against real property, and all such other documents as requested by Lender to maintain and confirm Lender's currently existing liens and to carry out the terms of this Master Agreement and any other Loan Documents.

**2.5** No Default. There does not exist any Event of Default or any condition that would with the giving of notice or passage of time or both, constitute an Event of Default under this Master Agreement or any Loan Document.

**2.6** Lien Priority. Lender shall have received such assurance as Lender may require that the validity and priority of any liens on personal property and/or liens on real property under any Deeds of Trust are acceptable to Lender including, but not limited to, any policies of title insurance, in form and content acceptable to Lender.

**2.7** Fees. Borrower shall have paid all loan fees, commitment fees, documentation fees, recording fees, or other fees or charges required in connection with any Loan.

**2.8** Stock. Borrower shall have paid all amounts required for Borrower to acquire and maintain Member Stock in the amount required by FCA regulations and the Lender's board of directors from time to time.

**2.9** No Material Adverse Change. Since the date of this Master Agreement, no material adverse change shall have occurred in (a) the business, assets, operations, prospects, or financial or other condition of a Borrower or Guarantor, (b) a Borrower's ability to pay Obligations as and when due, or (c) the Collateral or Lender's Liens on the Collateral or the priority of any such Lien, or (d) Lender's rights and remedies under this Agreement and the other Loan Documents.

**2.10** Agreement. Borrower and any Guarantor shall have executed and delivered this Master Agreement to Lender.

**2.11** Representations and Warranties Are True. The representations and warranties set forth in this Master Agreement and any other Loan Documents are true and correct.

**2.12** Reaffirmation of Standard Representations and Warranties. Borrower shall have re-affirmed in writing to Lender the continued accuracy of the representations and warranties set forth in Section 4 below as of the date of the Loan Documents.

**3.**     APPLICABILITY OF MASTER AGREEMENT. Unless otherwise expressly stated in writing to the contrary in connection with a specific loan, this Master Agreement applies to all Loans that may have been or may now or hereafter be entered into by and between Borrower and any Lender. This Master Agreement also applies to Borrower's required membership in the ACA. This Master Agreement and any amendments or modifications shall remain in full force and effect until all Indebtedness of Borrower to Lender is fully performed. In the event of a conflict between the terms of this Master Agreement and any prior Loan Documents, the terms contained herein shall control. In the event of a conflict between the terms and conditions contained herein and any subsequent or simultaneously executed Loan Documents, the terms of this Master Agreement shall control unless the subsequent or simultaneously executed Loan Document specifically states otherwise.

**4.**     STANDARD REPRESENTATION AND WARRANTIES. Borrower represents and warrants as of the date of this Master Agreement as follows:

**4.1** Authority and Power. Borrower has the right and is duly authorized to borrow the sums requested from Lender, to enter into any other agreement for leases, financial products, accommodations or services and to

execute, deliver to Lender, and perform the terms of this Master Agreement and any Loan Documents delivered to Lender.

   **4.2    Qualified to Do Business.** Borrower is qualified to do business in all jurisdictions in which the Borrower transacts business and has all necessary licenses and permits required by any such jurisdictions.

   **4.3    Due Organization.**

       **4.3.1    For each Borrower that is a corporation, the Borrower is duly organized, existing and in good standing under the laws of the state of its incorporation; the officers executing this Master Agreement and all instruments and agreements relating to the Indebtedness are duly in office and fully authorized to execute them; and the corporate and organizational documents presented to Lender have not been altered, amended, revoked or replaced.

       **4.3.2    For each Borrower that is a general or limited partnership, limited liability company or limited liability partnership, such Borrower is duly organized and existing under applicable state law; the individuals executing this Master Agreement and all instruments and agreements relating to the Indebtedness are fully authorized to execute the same and no other signature is necessary in order to bind such Borrower; and the partnership, limited liability company, or limited liability partnership agreement and related documents provided to Lender have not been altered, amended, revoked or replaced.

       **4.3.3    For each Borrower that is a trust, the trust remains in full force and effect; the trust documents provided to Lender, if any, have not been altered, amended, revoked or replaced; and the representations and warranties contained in any certificate of trust delivered by one or more trustees to Lender remain true and correct.

   **4.4    True, Complete and Correct Information.** All information contained in or provided in connection with any Loan Application and in any financial statements submitted to any Lender is true and correct in all material respects, and any financial statement fairly and completely presents the financial condition of Borrower as of its effective date, and since its effective date there has been no Material Adverse Change in the financial condition or operations of Borrower.

   **4.5    Litigation, Governmental Action.** Except as disclosed to Lender in writing, there is no litigation with any person or any proceedings before a governmental agency now pending or threatened against Borrower.

   **4.6    Title to Collateral.** All real and personal property pledged as collateral for any Loan is owned by the Borrower, Guarantor, or other Person pledging such collateral; such pledgor has the right and authority to pledge such collateral; and such pledge does not require any consent or approval or operate as a default under any other document.

   **4.7    Authorization.** The execution, delivery, and performance of this Master Agreement and any Loan Documents have been duly authorized by all necessary actions of Borrowers and/or Guarantors, do not require the consent or approval of any other person, regulatory authority, or governmental body, and do not conflict with, result in the violation of, or constitute a default under: (a) any provision of its articles of incorporation or organization, bylaws, partnership agreement, trust agreement or any other agreement or instrument binding upon Borrower and/or any Guarantor; or (b) any law, governmental regulation, court decree, or order applicable to Borrower or any Guarantor.

   **4.8    Taxes.** All tax returns and reports of Borrower that are required as of the date of this Master Agreement, or as of the date of any Loan Document, have been filed, and all taxes due as of the date of this Master Agreement, or as of the date of any Loan Document, have been paid, except as previously disclosed in writing to Lender.

   **4.9    Anti-Terrorism Laws.** Neither Borrower nor any of its Affiliates is in violation of (a) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as

amended) or any enabling legislation or executive order relating thereto, (b) Executive Order No. 13,224, 66 Fed. Reg. 49,079 (2001), issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) or (c) the anti-money laundering provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Public Law 107-56 (October 26, 2001) amending the Bank Secrecy Act, 31 U.S.C. Section 5311 *et seq.*

## 5.    TERMS AND CONDITIONS OF LOANS.

5.1    Loan Terms. Except as expressly provided to the contrary in Loan Documents for specific Loans, the following terms shall apply to each and every loan made by a Lender to Borrower:

5.1.1    Loan Funding and Disbursements Conditions and Procedures. Each Lender's obligation to disburse loan proceeds of an approved Loan is conditioned on the Borrower's satisfaction of the Standard Conditions Precedent and subsequently on Borrower's continuing compliance with terms and conditions set forth herein and in the Loan Documents pertaining to each loan. Loan proceeds shall be used only for the purposes approved in writing by the applicable Lender. Before making any disbursement, a Lender may require assurances from Borrower that Borrower is in compliance with all terms and conditions and that the disbursement will be used for approved purposes. A Lender shall not be obligated to make any disbursement if an Event of Default has occurred and unless all legal requirements incident to the Loan are performed. Except as provided to the contrary in Loan Documents, loan proceeds shall be disbursed in accordance with the instructions contained in Section 6 below.

5.1.2    Repayment. Borrower shall pay each Loan in accordance with the terms and conditions as set forth herein and in the Loan Documents as to each Loan. At the option of the Lender, installment amounts will be increased or decreased to reflect any increase or decrease in the interest rate applicable to the Loan. Prepayments are permitted on any Loan subject to the payment of any prepayment fees, premiums or other obligations set forth in the Loan Documents applicable to each such Loan.

5.1.3    Fees. Each Lender may charge and collect loan fees, commitment fees or other fees, including Professional Fees, incurred by Lender in connection with any Loan.

5.1.4    Interest. Borrower promises to pay interest on all principal sums included in the Indebtedness at the applicable interest rate or rates as described in Loan Documents. If applicable law sets maximum charges for a particular loan and that law is interpreted so that the interest or other charges collected or to be collected in connection with the Loan exceed the permitted limit, then (i) any such charge or interest shall be reduced by the amount necessary to reduce the charge or interest to the permitted limit; and (ii) any sums already collected which exceed the permitted limits shall be refunded to Borrower, without interest thereon. At the sole and absolute discretion of the Lender, such refund may be directly refunded to Borrower or may be applied to reduce the principal or interest portion of the Indebtedness.

5.1.5    Authorized Payments. Each Lender is authorized, but not obligated, to pay any or all of the following items:

(i)    Collateral Protection, Insurance, Other Obligations. Any amounts required to satisfy liens or otherwise protect any interest such Lender might have in any Collateral, to maintain insurance, or to perform any other obligation of Borrower under this Master Agreement or any other agreements with such Lender.

(ii)    Services. The costs of any services provided by or through such Lender and requested by Borrower, such as leasing, credit life, disability insurance, or crop or property insurance.

(iii)    Bill of Sale. Any bill of sale, sight or expense drafts drawn by Borrower and presented to such Lender for payment of purchases or expenses authorized by such Lender.

Master Loan and Membership Agreement (09-12) Page 8 of 24

    (iv) Member Stock. Any amounts required for Borrower to acquire and maintain Member Stock.

(v) Recording Fees, Etc. Any amounts for expenses, fees, Professional Fees, service charges, recording fees, escrow fees, title fees, filing fees, title insurance premiums, and all other expenses and costs incurred in connection with the negotiation, preparation, execution, recordation, filing, insurance, and enforcements of this Master Agreement and any other agreements in connection with the Indebtedness.

At Lender's sole and absolute discretion, such Authorized Payment may be disbursed by Lender as loan proceeds to a third party payee or, if payable to Lender, by ledger entry on the books of Lender, and Lender may deduct that amount from the unused credit available to Borrower, or in the event that no unused credit is available, add that amount to the Indebtedness as determined by Lender. Amounts added to the Indebtedness shall accrue interest at the same rate as the portion of the Indebtedness to which it is added.

5.1.6 Application of Payments. Each Lender may apply any payment received from or on behalf of Borrower and any proceeds of Collateral to principal, interest, or any part of the Indebtedness owing to such Lender as such Lender, in its sole discretion, may choose. Any payment received by a Lender on a non-Business Day or after 2:00 P.M. Pacific Time on a Business Day will be applied on the subsequent Business Day.

5.1.7 Transaction Summary. All disbursements and payments of Indebtedness shall be posted on Lenders' accounting records. Periodically, each Lender shall send Borrower a Transaction Summary or a similar accounting. If Borrower fails to object to the accounting in writing within thirty (30) days of its mailing by such Lender, Borrower shall have waived any right to object to the accuracy of the accounting and the account may be admitted into evidence by such Lender for the purposes of establishing the balance due such Lender in any legal proceeding arising between the parties.

5.1.8 Disputed Payments. All communications concerning disputed payment amounts, including any loan or other payment tendered as "payment in full" or in "full satisfaction" of the indebtedness, must be sent to Lender at the following address: American AgCredit, Disputed Accounts, 200 Concourse Blvd., Santa Rosa, California 95403. Any such payment must be marked accordingly and must indicate the Borrower's loan number. Lender reserves the right to reject any such payment by returning the payment to the Borrower.

5.2 Loan Covenants and Conditions. Except as expressly provided to the contrary in Loan Documents for specific loans, the following covenants and conditions apply to each loan:

5.2.1 Standard Affirmative Covenants. Borrower agrees that until the full payment of all Indebtedness, it will, unless the Lender waives compliance in advance in writing:

(i) Repay Indebtedness. Repay each Loan as and when due or declared due according to the terms of the Loan.

(ii) Use of Loan Proceeds. Use proceeds of all Loans for the purposes approved by the Lender.

(iii) Remittance of Collateral Proceeds. Promptly remit to each Lender in the form received, appropriately endorsed, all monies and proceeds from sale of Collateral securing the applicable Loans made by such Lender except to the extent any Loan Document provides to the contrary.

(iv) Notices. Promptly give written notice to each Lender of:

(a)   **Bankruptcy, Liquidation, or Litigation Proceedings.** Any voluntary or involuntary proceedings under federal bankruptcy laws or any state receiverships, assignments for the benefit of creditors, or similar state actions or proceedings affecting any Borrower or Guarantor and any litigation or court proceedings affecting Borrower or the Collateral.

    (b)   **Litigation.** Any pending or threatened litigation or court proceeding brought against Borrower or any Guarantor.

    (c)   **Death or Disability.** The death or disability of any Borrower or Guarantor.

    (d)   **Governmental or Regulatory Matters.** Any claim by or dispute with any governmental regulatory or law enforcement agency (including but not limited to state or federal taxing, labor relations, environmental protection or other agencies) involving or affecting the Borrower, any Guarantor or any Collateral.

    (e)   **Material Adverse Change.** Any material adverse change in the Collateral or in the financial condition of Borrower or any Guarantor.

    (f)   **Events of Default.** Any Event of Default and any event that, with the passage of time or the giving of notice would, unless waived or remedied within the time permitted, become an Event of Default.

    (v)   **Business Permits and Licenses.** Maintain its existence and good standing in all states in which it conducts business and all rights, privileges, leases, permits, licenses, trademarks, copyrights, and franchises necessary to conduct its business as currently conducted.

    (vi)   **Agricultural and Agribusiness Operations.** Conduct its business and maintain the Collateral in an orderly and efficient manner, consistent with good and sound agricultural practices for the area in which the operation is located and maintain all property in working order and good repair.

    (vii)   **Maintain Accurate Books, Records and Permit Inspections.** Maintain, on a timely and regular basis, accurate books and records and prepare all financial statements submitted to Lender in accordance with: (a) GAAP, or (b) any reasonable accounting method (approved in writing and) otherwise acceptable to Lender. Permit Lender or any agents of Lender to examine and inspect during normal business hours the property, books, and records of each Borrower and Guarantor as and when required by Lender.

    (viii)   **Financial and Business Information.** Promptly provide Lender with information concerning the financial and business operations and property of each Borrower and Guarantor, including but not limited to financial reports, in form, manner and frequency required by Lender and also including the submission of the financial information as required in the most recent Covenant and Condition Rider to this Master Agreement.

    (ix)   **Insurance.** Maintain policies of insurance, including without limitation required flood insurance, in types, amounts, and with companies satisfactory to Lender and, if requested by Lender, obtain with respect to such insurance, in forms satisfactory to Lender, lender's loss payable endorsements or loss payee clauses in favor of Lender.

    (x)   **Payment of Tax Obligation.** Pay all tax obligations when due, unless the obligation to make the payment is being disputed in good faith and is being diligently contested in all appropriate proceedings, in which event Borrower shall notify Lender of such dispute.

(xi)    Performance of All Obligations.  Perform all obligations, including obligations to pay money, as and when performance is due, whether such obligation is owed to Lender or to other parties.

(xii)    Compliance with ERISA.    To the extent applicable, comply with the requirements of ERISA together with all regulations issued pursuant thereto.

(xiii)    Farm Products.  If Borrower acquires any Collateral which may have constituted Farm Products in the possession of the seller or supplier thereof, Borrower will, at its sole expense, use its best efforts to take such steps to insure that all Liens (except the security interests granted to Lender) in such acquired Collateral are terminated or released, including, without limitation, in the case of such Farm Products produced in a state which has established a Central Filing System (as defined in the Food Security Act), registering with the Secretary of State of such state (or such other party or office designed by such state) and otherwise take such reasonable actions necessary, as prescribed by the Food Security Act, to purchase Farm Products free of liens, security interest and encumbrances of any kind (except the security interests granted to Lender); *provided, however,* that Borrower may contest and need not obtain the release or termination of any lien, security interest or encumbrance asserted by any creditor of any seller of such Farm Products, so long as it contests the same by proper proceedings and maintain appropriate accruals and reserves therefore in accordance with GAAP.  Upon the Lender's request, Borrower agrees to forward to Lender promptly after receipt copies of all notices of Liens and master lists of effective financing statements delivered to Borrower pursuant to the Food Security Act, which notices and/or lists pertain to any of the Collateral.  Upon Lender's request, Borrower agrees to provide Lender with the names of Persons who supply Borrower with such Farm Products and such other information as Lender may reasonably request with respect to such Persons.

(xiv)    Compliance with Terms and Conditions.  Comply with all terms and conditions of all Loan Documents.

(xv)    Execution of Additional Documents.  Execute such additional documents as Lenders may lawfully require in connection with any Loan or Obligation.

5.2.2    Standard Negative Covenants.  Borrower agrees that so long as Borrower owes any indebtedness to Lender, Borrower will not, without prior written consent of Lender:

(i)    Restrictions on Additional Debt.  Incur debt other than (a) the Indebtedness; (b) debt previously disclosed to Lender and approved by Lender in writing, either as part of an approved budget or otherwise; (c) trade payables in the ordinary course of Borrower's business; (d) unsecured individual consumer debt; and (e) current liabilities for taxes and assessments incurred in the ordinary course of business.

(ii)    Restrictions on Distributions, Loans, Guaranties, Salaries etc.  Make or become obligated to make distributions, loans or guarantees to or for the benefit of related parties (i.e. relatives, partners, employees, shareholders, members of limited liability companies, etc.), except for normal personal, family, and household expenses and for those items previously approved in writing by Lender, either as part of the approved budget or otherwise; or pay or become obligated to pay salaries or bonuses except in the ordinary course of Borrower's business.

(iii)    Further Encumbrance.  For loans made by the PCA, encumber, pledge, mortgage, or grant a security interest in any asset of Borrower now owned or hereafter acquired except for liens in favor of the PCA, liens arising by operation of law or for purchase money security interests in equipment.

    (iv)    **Material Change to Business.** Dissolve or liquidate, sell, assign, lease, or transfer all or any material part of its assets or business, or enter into any merger, consolidation, pool, joint venture, or other combination.

    (v)    **Change Location of Business or Collateral.** Without giving prior notice of at least thirty (30) days, change principal residence, principal place of business or chief executive office of the Borrower or anyone pledging Collateral or change the physical location of any Collateral except in the ordinary course of Borrower's business.

    (vi)    **Transfer or Sale of Collateral.** Transfer or sell any Collateral without the written consent of Lender, except for transfers in the ordinary course of Borrower's business.

    (vii)    **Change in Fiscal Year.** Borrower or Guarantor shall not change their Fiscal Year, unless Lender shall consent in writing to such change.

**5.3**    **Events of Default.** The occurrence of any one or more of the following events, unless remedied or waived by Lender, shall constitute an "Event of Default":

**5.3.1**    **Failure to Pay.** Borrower shall fail to pay all or any portion of the Indebtedness owed to Lender as and when due or declared due.

**5.3.2**    **Breach of Covenants.** Borrower shall breach any covenant, term or condition, or fail to perform any obligation under this Master Agreement or any other agreement with Lender and such breach or failure to perform such breach or failure shall continue for thirty (30) days from its occurrence.

**5.3.3**    **Breach of Warranties and Representations.** Any warranty, representation, or statement now or hereafter furnished by or on behalf of Borrower or Guarantors to Lender to induce Lender to take or refrain from taking any action is proved to be false or inaccurate in any material respect when furnished.

**5.3.4**    **Judgments, etc.** Any judgment, writ, levy, lien, attachment, notice of tax lien, or similar process shall be entered or filed against Borrower or any Guarantor or their property and is not vacated, bonded, or stayed to the satisfaction of Lender within 30 days.

**5.3.5**    **Material Adverse Change.** Any material adverse change in the financial condition of Borrower, Guarantor or in the value of Collateral that would in Lender's reasonable business judgment, adversely affect the ability of the Borrower to repay the Indebtedness.

**5.3.6**    **Termination, Default of Guarantor.** Any event of default shall occur under any guaranty or any guaranty shall be terminated by death or dissolution of a Guarantor.

**5.3.7**    **Repudiation.** Borrower or any Guarantor shall purport to terminate, repudiate or revoke any Loan Document, including any guaranty.

**5.3.8**    **Failure to Pay Other Debts, etc.** The failure to pay debts to others as and when due or to perform obligations owed to others as and when due.

**5.3.9**    **Bankruptcy, Insolvency Proceedings, Materiality.** The commencement by or against Borrower or any Guarantor of a voluntary or involuntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or another applicable federal or state bankruptcy, insolvency or similar law, provided that in the case of an involuntary bankruptcy case, such proceeding continues undischarged or stayed for more than ninety (90) days; or the consent by Borrower or any Guarantor to the appointment of or the taking possession with or without Borrower's or such Guarantor's consent by a receiver, liquidator, assignee, trustee, custodian, agent or other similar official of Borrower or such Guarantor or of any substantial part of its property, provided that in the case of any such proceeding without the consent of Borrower or Guarantor, such proceeding continues undischarged or stayed for more than ninety (90) days;

the dissolution, liquidation, or winding up of Borrower's or any Guarantor's affairs; the making by Borrower of any assignment for the benefit of its creditors; the failure by Borrower or any Guarantor generally to pay their debts as they become due; or the taking of any action by or on behalf of Borrower or any Guarantor in furtherance of any of the foregoing.

5.3.10   Loss of Permits, Licenses, etc.   The loss, termination, revocation of or failure to renew any lease, license and/or permit, or any agreement with respect to water, grazing, timber, or marketing rights, now held or hereafter acquired by Borrower which, in the reasonable business judgment of any Lender, is necessary for the continued operation of Borrower's business as it is now conducted;

5.3.11   Death, Dissolution, Termination.   Any Borrower or Guarantor shall die, dissolve, or otherwise terminate its existence.

5.3.12   Wetlands and Highly Erodible Lands.   The use of any portion of any Loan proceeds for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce or to make possible the production of an agricultural commodity, as described in 7 CFR part 1940, Subpart G, exhibit M.

5.3.13   Transfer of Water Rights.   Borrower sells, leases, conveys, alienates, or transfers, or enters into any agreement for the sale, lease, conveyance, alienation, transfer or nonuse of any water or water right, or similar term such as water asset, as may be defined in any deed of trust, mortgage, security agreement or other agreement relating to the pledge of water or water rights.

5.4   Rights and Remedies, Late Charges, Increased Interest.   Upon the occurrence of any Event of Default, Lender may, at its option and without notice to Borrower, declare all or any part of the Indebtedness owed to Lender to be immediately due and payable, without the necessity of any prior recourse to any Collateral. Lender shall have all rights, powers, and remedies available under this Master Agreement and under any Loan Document including without limitation any security agreement, mortgage, deed of trust, guaranty, or any other document between Borrower and Lender relating to the Indebtedness owed, or accorded by law or equity, including the right to foreclose on any and all Collateral; all of which rights and remedies shall be cumulative and not exclusive. All rights, powers, and remedies of Lender may be exercised at any time by Lender and from time to time after the occurrence of an event of default. All rights, powers, and remedies of Lender in connection with any Note and any loan document are cumulative and not exclusive and shall be in addition to any other rights, powers, or remedies provided by law or equity. Lender may enforce any security interest or lien given or provided for under any Note or any other document in such manner and in such order, as to all or any part of the collateral as Lender, in its sole judgment, deems necessary or appropriate, and Borrower, to the extent Borrower can, waives any and all rights, obligations, or defenses now or hereafter established by law relating to the foregoing. Each Lender shall be entitled to charge late fees or charges and any increased interest rate as set forth in the Loan Documents applicable to each Loan. In addition, to the maximum extent permitted by law, Lenders shall be entitled to recover all attorneys' fees, costs, and expenses. All rights, powers and remedies may be exercised at any time and from time to time after any Event of Default. The security documents used by Lender provide that advances made by Lender shall become part of the principal evidenced by any Note, and also state additional conditions under which any Note may be accelerated and become immediately due and payable and will become subject to interest and acceleration or default interest.

5.4.1   Acceleration.   On Borrower's default and at Lender's option, all amounts not yet due on any Note or Obligation, including without limitation, unpaid principal, including amounts advanced for taxes, insurance, and other expenses provided herein, accrued unpaid interest and late charges, shall become immediately due and payable without presentment, demand, notice of non-payment, or protest.

5.5   Waivers.   Any delay, failure, forbearance or discontinuance of Lender in exercising any right or remedy shall not waive that right or remedy. To be effective any waiver of default or remedies must be in writing and signed by the Lender. No waiver of default by Lender shall operate as a waiver of any other default or of the same default on a future occasion.

5.6    <u>Transfer by Lender</u>. Lender may sell, transfer or assign the Indebtedness owed to Lender or a portion thereof, and any Collateral or portion thereof in support of the Loan, to any transferee and the transferee shall thereupon become vested with all rights and powers that Lender has with respect thereto and upon such transfer the term "Lender" as used herein shall include said transferee and the transferring Lender shall thereafter be forever relieved and fully discharged from any and all liability or responsibility to Borrower or to any Guarantor, but the transferring Lender shall retain all rights and powers hereby given with respect to Collateral not transferred and Indebtedness retained.

5.7    <u>Loan Charges</u>. If a law which applies to any Note or Obligation and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with any Note or Obligation exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected which exceeded the permitted limits will be refunded to Borrower, without interest thereon. Lender may choose to make this refund by reducing the principal Borrower owes under any affected Note or Obligation or by making a direct payment to Borrower. If a refund reduces principal of any Note or Obligation, the reduction will be treated as a partial prepayment.

6.    **LOAN DISBURSEMENT INSTRUCTIONS**. The Borrower instructs Lender as follows:

6.1    <u>Authorized Personnel</u>. Until notified in writing to the contrary, any one of the following individuals are authorized to make oral, electronic or written requests for disbursements of loan funds and to direct who will receive the loan funds (subject to the terms and conditions of this Agreement and any supplemental loan documents):

| Name | Title |
|---|---|
| Joanna L Botelho | Manager |

6.2    <u>ACH, Check/Wire Disbursement Instructions and Bank Deposit Information</u>. Unless otherwise notified in writing ACH transfers shall be made in accordance with the information provided in the most current ACH Direct Deposit/Withdrawal Authorization Agreement(s) completed by Borrower and received by Lender. Check and wire transfer disbursements shall be made in accordance with instructions received from authorized personnel identified in Section 6.1 above and received by Lender, or any other supplemental loan documents, as they may be amended.

Any deposits made to the Borrower's account(s) shall be conclusively presumed to have been to or for the benefit of the Borrower regardless of the fact that persons other than those authorized to request advances may have the authority to draw against such account(s).

6.3    <u>Authorized Requests</u>. All requests made by those authorized pursuant to Section 6.1 above or by another writing signed by the Borrower shall be irrevocable when made. The Transaction Summary delivered periodically to the Borrower shall record all disbursements and payments made by or for the account of the Borrower.

## 7.    APPOINTMENT OF AGENT TO RECEIVE LOAN DOCUMENTS.

**7.1    Appointment of Agent.** The Borrower hereby designates and appoints Joanna L. Botelho as its special agent, with full power and authority to receive on its behalf copies of all Loan Documents related to any Loan it might have with the Lenders including renewal and repeat Loan Documents and any subsequent amendments or modifications to such Loan Documents. In addition, and to the extent permitted by law and regulations, the special agent shall also have the authority to receive on behalf of the Borrower all other records or documents required to be provided to Borrower.

**7.2    Receipt of Loan Documents by Agent.** Borrower acknowledges that its agent will receive copies of Loan Documents at the time of execution of each Loan and any subsequent amendment or modification of each Loan contract. Borrower further acknowledges that if it does not designate an agent, then each and every Borrower will receive copies of all Loan Documents at the time of the execution of each Loan or any subsequent amendment or modification thereto and copies of all renewal and repeat Loan Documents.

**7.3    Right to Receive Loan Documents on Request.** Each Borrower, or the legal representative thereof, is entitled to receive copies of the Loan Documents as well as any other documents which have been delivered by the requesting party to the Lender at any time upon its or its legal representative's written request.

## 8.    MEMBERSHIP AND VOTING AUTHORIZATION.

**8.1    Membership in the ACA.** As a condition of borrowing or obtaining other services from or through the ACA, PCA or FLCA, Borrower must become a member of the ACA by purchasing Member Stock in the form and in the amounts required by the ACA bylaws, as they may be amended from time to time, and by the ACA Board of Directors. Membership in the ACA is subject to the provisions in the ACA bylaws, articles of incorporation and applicable laws and regulations and this Master Agreement, as the same may be amended from time to time.

**8.2    Member Stock.** Member Stock is at risk and may be retired only at the discretion of the Board of Directors and only if capital adequacy regulations have been satisfied.

**8.3    Member Stock Ownership.** The ownership of Member Stock will be registered on the Lender's records in the names of all Borrowers as joint tenants, unless Lender receives written authorization signed by all Borrowers instructing Lender otherwise.

**8.4    Member Stock Authorization.** The Borrower(s) hereby authorize(s): Joanna L. Botelho to exercise Borrower's voting rights and to request a conversion of Member Stock from one class to another or the retirement or transfer of all or part of Member Stock. Borrower(s) hereby authorize Lender to make checks for any dividends which may be declared or checks for canceled Member Stock proceeds payable to the individual(s) named above as sole payee(s). If, however, the entire interest in the Member Stock is held by one or more corporations, partnerships, or limited liability companies, checks for any dividends or canceled Member Stock proceeds will be made payable to the business entities. If the Member Stock is held in the name of a person as representative of an estate or as guardian, conservator, or trustee of a revocable trust, checks for any dividends or canceled Member Stock proceeds will be payable to such person in their fiduciary capacity. (If no name is inserted above, all proceeds, dividends, or other payments related to the Member Stock, will be made payable jointly to all Borrowers.) Unless otherwise authorized in writing by Borrower, Lender will issue Internal Revenue Service Form 1099-PATR in the name of the single party authorized to receive dividends hereinabove.

**8.5    Security Interest.** Pursuant to Federal statute and regulation, the ACA and its Subsidiaries have a lien on all of the Borrower's Member Stock and any dividends payable thereon to secure all Indebtedness. In addition, the Borrower hereby grants to the ACA and its Subsidiaries a security interest in its Member Stock and any dividends thereon to secure any now existing or hereafter-arising Indebtedness. In the Event of Default, in addition to all other rights and remedies the Lender may have, at the sole and absolute discretion of the Lender, the Lender may retire the Borrower's Member Stock and apply the proceeds to reduce the Indebtedness. Other important terms governing the Member Stock are contained in the ACA bylaws and the brochure with respect thereto that Borrower hereby acknowledges having previously received. Borrower also hereby acknowledges that pursuant to Federal

statute and regulations the Member Stock cannot be transferred, sold or retired by Borrower or by any successor-in-interest to Borrower.

8.6    Transfer or Retirement of Borrower's Stock.    Borrower's Member Stock will be retired or transferred only pursuant to the ACA bylaws and applicable laws and subject to the direction of the Board of Directors. Unless otherwise notified to the contrary in writing, on the satisfaction of all Indebtedness and at the discretion of the Board of Directors, Member Stock will be automatically retired. On retirement of the Member Stock, the right to vote on ACA matters will be terminated.

## 9.    AUTHORIZATION TO OBTAIN AND SHARE INFORMATION.

9.1    Information Requests.    Borrower hereby authorizes each Lender to make such inquiries and gather such information as the Lender deems necessary and reasonable, from time to time, concerning any information provided to the Lender. Each Lender is also authorized to make credit inquiries, verify credit, verify employment and obtain credit agency reports regarding Borrower.

9.2    Sharing Information with other Farm Credit Institutions and other Financial Institutions.    As authorized by federal regulations, Lenders will make available to any other Farm Credit institution, for its confidential use, any information concerning the Indebtedness, including financial statements, credit history, and transactions with Lenders. Federal regulations also permit the Lenders to furnish to any reliable organization impersonal information based solely on transactions or experience the Lenders have had with Borrower. Borrower authorizes the Lenders to provide credit information and their credit experience to other creditors.

9.3    USA PATRIOT Act.    Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107 56 (signed into law October 26, 2001)) (the "Act"), Lender is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow Lender to identify the Borrower in accordance with the Act. Borrower shall, promptly following a request by Lender, provide all documentation and other information that Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

## 10.    AUTHORIZATION TO USE E-MAIL AND OTHER ELECTRONIC FORMATS.

10.1    Authorization and Procedures.    Borrower hereby acknowledges that from time to time it may communicate with Lender in electronic format (e.g. e-mail, internet, intranet or means of transmission, storage, retrieval, or communication other than a paper bearing an inked signature), by telephone or by facsimile. Unless otherwise agreed by the parties, the Lender may rely on electronic communications in the same manner as it relies on written forms of communication. The following shall apply to e-mail and other forms of electronic communications:

10.1.1    Electronic Signatures.    Any transmission that bears any of the signatures or symbols set forth in the Loan Disbursement Instructions contained herein shall be deemed to be signed by the Borrower with the intent of being bound thereby. The Lender's authorized signature for purposes of electronic communications shall be the name of the applicable Lender followed by the name and title of the individual sending the communication. If the Lender adopts a particular authentication program, any document bearing the proper authentication of the Borrower shall be deemed to have been executed by the Borrower.

10.1.2    Authorization.    The Borrower also hereby agrees, unless otherwise indicated to the contrary herein, that the Lenders and Borrower may communicate with each other through notices, offers, proposals, acceptances, agreements and modifications by any tangible or electronic medium, including writings, faxes, or e-mail messages.

10.1.3    Procedures.    Unless agreed to the contrary by record authenticated by both the Lender and the Borrower, the following procedures will apply to electronic communications:

Master Loan and Membership Agreement (09-12) Page 16 of 24

(i)      The Lender must establish to its sole and absolute satisfaction that the Lender and the Borrower can communicate effectively and reliably.

(ii)     In the event that either party learns that the electronic means of communication is malfunctioning, it shall use other forms of communication and shall promptly notify the other party of the problem.

(iii)    Confirmation of receipt of the transmission may be required at the option of the Lender.

10.1.4  Disclosures.  Disclosures required by law or regulation may be made by e-mail or through access to the internet or intranet to the extent that law permits such disclosures.

10.2    Revocation.  Borrower may notify Lender that it no longer wishes to communicate electronically and the Lender shall stop electronic communications upon receipt of such notice. Communications sent or received prior to receipt of such notice shall remain effective.

10.3    Record Preservation.  Lenders reserve the right to record and retain telephonic requests and other forms of data transmissions for their records. In the event of a conflict between Borrower's records and Lenders' records, the Lenders' records will govern.

10.4    Use of Electronic Documents.  Electronically stored copies of this Master Agreement or other documents related to transactions with Lender are considered to be the true, complete, valid, authentic and enforceable records of this Agreement and the Borrower's other transactions with Lender, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated and maintained in printed form. Borrower agrees not to contest the admissibility or enforceability of Lender's electronically stored copies of this Master Agreement or any other documents generated with respect to any existing or future loans.

11.    **INTEREST RATE CONVERSIONS.**

11.1    Appointment of Agent to Negotiate and Agree to Interest Rate Conversions.  Borrower hereby appoints(s): Joanna L. Botelho, as "Interest Rate Pricing and Conversion Agent" to take the following actions on behalf of the Borrower collectively and each Borrower individually:

11.1.1  Interest Rate Conversions.  Request, negotiate and enter into one or more agreements with Lender for: (a) choosing an interest rate product or option and an interest rate quote to be made applicable to loans now existing or to be made in the future; (b) options to lock specific interest rates in accordance with Lender's procedures; (c) payment of fees in order to lock rates and/or convert or otherwise obtain the negotiated rate; (d) compensating Lender for losses and costs incurred by Lender as a result of Borrower's failure to accept loans in full or in part with the committed interest rates and interest options negotiated by the Interest Rate Pricing and Conversion Agent; and (e) the conversion of the rate(s) of interest and/or methodologies for calculating the rate(s) of interest applicable to existing loans, loans made contemporaneously herewith or loans to be made in the future by Lender to Borrower to such other interest rates and/or interest methodologies as may from time to time be offered by Lender, subject to terms and conditions set forth by Lender.

11.1.2  Execute Agreements.  Execute additional documents as Lender may require giving full force and effect to any act or action authorized by Section 11 of this Master Agreement and to any interest rates and/or interest rate methodologies negotiated by the Interest Rate Pricing and Conversion Agent on behalf of the Borrower.

11.2    Indemnity.  Borrower hereby agrees to indemnify and hold the Lenders free and harmless from any and all liability, costs, fees, and damages Lenders may incur as a result of or in relation to Lenders' reliance on the appointment contained in this Section 11.

Master Loan and Membership Agreement (09-12) Page 17 of 24

## 12.     FUNDS HELD ACCOUNTS.

12.1     Establishing Funds Held Accounts, Maximum Amounts. With the consent of Lender and upon execution of this Master Agreement, Borrower may establish one or more accounts (each of which accounts shall hereafter be referred to as a "Funds Held Account") by providing Lender with funds for deposit and instructions requesting that Lender place such funds in a Funds Held Account. Section 12 of this Master Agreement and Lender's Funds Held Policy, as the same may be modified from time to time, shall govern Funds Held Accounts. The maximum aggregated balance of the Borrower's Funds Held Account(s), including compounded interest, shall not exceed an amount equal to the aggregate of all of Borrower's combined Loan commitments and Loan balances and shall be consistent with federal laws and the Lender's policies, as may be amended from time to time. Absent the occurrence of an Event of Default, amounts in excess of the maximum balance will be remitted to Borrower or other parties designated in the Loan Documents to receive loan proceeds unless Borrower and Lender agree otherwise in writing.

12.2     Rate of Interest. The rate of interest applicable to Funds Held Accounts is a variable rate that may be changed by the Lender effective on the first day of each month. The rate of interest is a per annum rate equal to the sum of the Index and the Spread. For purposes of this Section 12, the term "Index" shall mean the unpublished annualized interest rate charged to the Lender by CoBank or its successor in interest under the terms of the General Financing Agreement, as the same may be amended from time to time. The term "Spread" shall mean the basis points determined by Lender, in its sole and absolute discretion. Interest shall compound monthly and be calculated on the basis of a 365 day year, for actual number of days elapsed. Interest will begin to accrue on the day funds are credited to the account if the funds are received before 2:00 P.M. Pacific Time on a Business Day and on the next Business Day after funds are received if the funds are received after 2:00 P.M. Pacific Time.

12.3     Funds Held Statements. Interest earned on the Funds Held Account is reported periodically in the Transaction Summary and annually to the Internal Revenue Service on Form 1099-I. Additionally, deposits, withdrawals, and amounts in the Funds Held Account will be reflected on the Transaction Summary. Unless Borrowers object to the Transaction Summary within thirty (30) days after the Transaction Summary has been sent, the information contained in the Transaction Summary shall constitute evidence of the information stated therein.

12.4     Withdrawal. The Borrower or party authorized in Section 12.9 below may withdraw funds from the Funds Held Account in accordance with the terms and conditions set forth below and any other restrictions that Lender and the Borrower may agree to by a signed writing or other authenticated record. Provided that the Borrower, under the terms and conditions of this Master Agreement and any Loan Documents or other agreements with Lender, is not then in default and there is no event which would become, unless waived or remedied, an Event of Default with the passage of time or the giving of notice or both, Borrower may withdraw funds from the Funds Held Account for the following purposes and under the following conditions:

12.4.1   For application against the Loans or for other agricultural purposes. Withdrawals may be made for non-agricultural purposes under extenuating circumstances subject to the prior written approval of Lender. Such purposes would include medical emergencies, disaster losses and dissolution of Borrower.

12.4.2   Funds to be withdrawn must have been in the Funds Held Account for longer than seven (7) days or until such time as the Lender determines that such funds are good funds. In the event that, for whatever reason, funds in the Funds Held Account are withdrawn and such funds are subsequently discovered not to have been good funds, the funds must be returned to the Lender immediately, without the necessity of demand or presentment by the Lender. Failure to return said funds shall constitute an Event of Default on all Obligations owed by Borrower to Lender.

12.4.3   Unless otherwise agreed to in this Master Agreement or in another writing signed by the Borrower and the Lender, all funds withdrawn or disbursed from Borrower's Funds Held Account will be made payable to the Borrower or other parties designated in the Loan Documents to receive loan proceeds and in the manner set forth therein.

12.4.4   Withdrawal requests may be made in writing, by telephone, by fax or in an electronic form acceptable to Lender. (E-mail requests will be permitted only with the prior written consent of the

Master Loan and Membership Agreement (09-12) Page 18 of 24

Lender.) Requests must be made at least twenty-four (24) hours prior to withdrawal. Withdrawals may be made only on a Business Day.

12.4.5   Lender, with the written agreement of the Borrower may agree to further restrictions on the Borrower's ability to withdraw funds from the Funds Held Account.

12.5   Automatic Application of Funds Held in the Event of Default. In the event that the Borrower is in default on any Obligations to Lender, the Lender, in its sole and absolute discretion, may apply the funds in the Funds Held Account to the Indebtedness in any order deemed appropriate by the Lender, in its sole and absolute discretion. In addition, unless the Borrower and the Lender agree in writing to the contrary, the Lender may, in its sole and absolute discretion, automatically apply amounts in the Funds Held Account to scheduled loan payments if a loan payment has not been paid on the last day before any late charge is permitted to be charged. Application of funds in the Funds Held Account will not relieve the Borrower of its obligation to pay any remaining Obligations to Lender. If the amount in the Funds Held Account is insufficient to make all such payments, the Lender shall apply the amounts in any order that it deems appropriate, in its sole and absolute discretion.

12.6   Security Interest and Liens. Borrower hereby grants to Lenders a security interest in the Funds Held Account to secure the obligations of Borrower to Lenders. Lenders will not accept liens or claims on the Funds Held Account from other creditors of the Borrower. Borrower acknowledges that there are no other claims against the Funds Held Account as of the date of this Master Agreement. For so long as funds are on deposit in the Funds Held Account, the Borrower hereby appoints the Lenders and each of them as its attorneys-in-fact for the following purposes: to do all acts and things which the Lenders may deem necessary or advisable to perfect and continue to perfect the security interest created by this Agreement and, upon an Event of Default to preserve, process, develop, maintain and protect the collateral, to protect the Lenders' security interest therein and to take such actions as will enable the Lenders to receive the benefit of their security interest in the funds in the Funds Held Account.

12.7   Amendments to Funds Held Account Terms and Conditions. The terms and conditions set forth in Section 12 of this Master Agreement are subject to amendment by the Board of Directors of the Lender or pursuant to law or regulations. Amendments to this Section 12 required by law or regulation will become effective immediately. For all such other changes, the change will become effective on the first day of the month after the change has been authorized or on such other date as the Board of Directors may authorize. Lender shall provide written notice of such change in accordance with Section 14.1 of this Agreement.

12.8   Funds Held Account Termination. Lender reserves the right to terminate the provisions of Section 12 of this Master Agreement at any time.

12.9   Appointment of Agent – Funds Held Account. Borrower hereby appoints Joanna L. Botelho as its attorney-in-fact for the purpose of making deposits and withdrawals from any Funds Held Account of Borrower. The Lender, however, may in its sole discretion, require the signatures of all Borrowers. This appointment may be revoked by a record authenticated by the Borrower delivered to Lenders in accordance with Section 14.21 of this Master Agreement.

12.10   Funds at Risk. The funds deposited in the Funds Held Account are at risk and are not insured. Borrower is solely dependent on the commitment and financial condition of the Lender with respect to the Lender's ability to honor the terms and conditions contained in Section 12 of this Master Agreement, including the repayment of all funds in the Funds Held Account and the payment of any interest on said funds.

13.   FEES AND CHARGES OF ATTORNEYS AND OTHERS. If Lender employs attorneys, accountants, appraisers, consultants, or other professional assistance, including the services of any such person who is a direct employee of Lender, in connection with any of the following, then, to the extent permitted by law, the reasonable amount of costs, expenses and fees incurred by Lender shall be payable on demand, or each Lender may, as its option, add the amount of such costs, expenses and reasonable fees to the principal amount of the Loan and an appropriate amount of Member Stock as required by such Lender's bylaws and FCA regulations. Each Lender thereafter may charge interest on such amount at the interest rate then applicable to the principal.

Master Loan and Membership Agreement (09-12) Page 19 of 24

Costs, expenses and reasonable fees of professionals covered by this provision include such charges for the following:

13.1    **Loan Documentation.** The negotiation, preparation, modification, or renewal of this Master Agreement or Loan Documents;

13.2    **Enforcement of Rights and Remedies.** Advising Lender concerning rights and obligations with regard to the Indebtedness, or Collateral, including advising Lender with regard to Borrower's exercise of any rights under any federal or state law, regulation, policy or program;

13.3    **Litigation, Etc.** Any litigation, dispute, proceeding or action, whether instituted by Lender, Borrower, or any other Person, relating to or affecting the Indebtedness, the Collateral, Guarantor or Borrower's affairs, including representation of Lender in any bankruptcy, insolvency, or reorganization case or proceeding instituted by or against Borrower or any Guarantor, and any attempt by a Lender to enforce any rights against Borrower;

13.4    **Collateral.** The inspection, verification, protection, collection, processing, sale, liquidation, disposition or exercise of enforcement of rights with respect to the Collateral;

13.5    **Appraisal.** The cost of any appraisal or evaluation of Collateral, which Lender may from time to time obtain as part of Lender's reasonable administration of the Indebtedness; and

13.6    **Guaranties.** Any of the type of expenses referred to in Sections 13.1 through 13.5 above incurred by a Lender in connection with any Guaranty.

14.    **MISCELLANEOUS.**

14.1    **Notices.** Any notice, demand, or communication required or permitted to be given by any provision of this Master Agreement will be in writing or electronic form and will be deemed to have been given when delivered personally or by facsimile receipt confirmed to the party designated to receive such notice or on the date following the date sent by overnight courier or on the third business day after the same is sent by United States mail, postage and charges prepaid, directed to the following addresses or to such other or additional addresses as any party might designate by written notice to the other party:

> **If to the Lender:**
> 711 W. 19th Street
> Merced, California 95340
> Facsimile: (209) 384-7061
> E-mail address: mercedbranch@agloan.com

> **If to the Borrower:**
> 13610 Avenue 21 1/2
> Chowchilla, California 93610

14.2    **Effectiveness.** The authorizations contained herein shall remain in effect for all transactions with the Lender until Borrower revokes the authorizations in a signed writing and delivers the revocation to the Lender. Such revocation shall not be effective until thirty (30) days after receipt by the applicable Lender. Such revocation shall be prospective only and shall not have retroactive effect.

14.3    **Amendments.** This Master Agreement may only be amended in writing signed by both Borrower and Lender except that Lender may unilaterally waive conditions or provisions favorable to it by giving Borrower notice of such waiver in a manner consistent with Section 14.1 above. If a Borrower is a partnership, joint venture or similar entity, and the composition of the entity changes, then a new member or partner of the entity may be added to and bound by this Master Agreement without the consent of the other Borrowers. Notwithstanding the

foregoing, the addition or deletion of a Borrower shall not result in a change of any of the authorizations contained herein unless all of the Borrowers consent.

14.4    **Signatures, Documents Signed in Counterparts, Facsimile Signatures.**  Borrower acknowledges that any of the signatures or symbols set forth on this Master Agreement will constitute Borrower's signature for the purpose of evidencing Borrower's intent to be bound by this Master Agreement and any other documents delivered to Lender and Lender shall have no obligation to inquire further into the authenticity of said signatures. If Borrower is a corporation, partnership, limited liability company, etc., Borrower may change the signatures authorized herein by delivering to Lender the appropriate forms evidencing a change in signatories. Any form used to authorize additional or changed signatures must include sample signatures of those persons authorized to sign on behalf of the Borrower.  Once accepted by Lender, such signatures will supersede those affixed to this Master Agreement. Borrower and Lender agree that, unless otherwise expressly stated, all agreements to be signed by Borrower or any Guarantor may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Facsimile signatures by Borrower or any Guarantor will be acceptable; however, Lender in its sole and absolute discretion may require original signatures.

14.5    **MUTUAL WAIVER OF JURY TRIAL.    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING (i) BROUGHT BY BORROWER, ANY LENDER, OR ANY PERSON RELATING TO (a) THE LOANS OR ANY UNDERSTANDINGS OR PRIOR DEALINGS BETWEEN THE PARTIES OR (b) THE LOAN DOCUMENTS, OR, (ii) TO WHICH ANY LENDER OR BORROWER IS A PARTY.**

14.6    **Hazardous Substance Indemnity.**  Borrower indemnifies and agrees to hold Lender harmless for, from and against any losses or damages suffered by such Lender that arise from the Release, threatened release, discharge, manufacture, use, storage, transportation or presence of any Hazardous Substance in connection with the business of Borrower or on any real property owned or occupied by Borrower, whether pledged as security for any loan or not.  The indemnity covers the officers, directors, agents, and attorneys of Lender and extends to attorneys' fees and other costs and expenses incurred by Lender in connection with the foregoing.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS MASTER AGREEMENT OR THE LOAN DOCUMENTS, THIS INDEMNITY SHALL SURVIVE REPAYMENT OF THE INDEBTEDNESS.

14.7    **Obligations of Each Person Under This Master Agreement.**  The liability of each Borrower executing this Master Agreement shall be that of co-maker and not that of an endorser, guarantor or accommodation party and shall be joint and several.  The separate property of any married person executing this Master Agreement shall be liable for the indebtedness evidenced by this Master Agreement and the Loan Documents.

14.8    **Specific Waiver of Each Borrower or Any Guarantor.**  The Indebtedness of each Borrower or Guarantor of any type under any Loan Document is independent of the Indebtedness of all other Borrowers and Guarantors. Each Borrower expressly waives any right to require Lender to proceed against any other Borrower or Guarantor, to proceed against or exhaust any Collateral, to pursue any remedy Lender may have at any time, and the benefit of any statute of limitations affecting its liability under this Master Agreement or any other Loan Document. Each Borrower waives any and all defenses arising by reason of (i) any disability or other defense of any other Borrower or Guarantor with respect to the Indebtedness owed to Lender, (ii) the termination for any reason whatsoever of the liability of any other Borrower or Guarantor, (iii) any act or omission of Lender that directly or indirectly results in or aids the discharge or release of any other Borrower, any Guarantor, or any security interest or lien provided by any Borrower or Guarantor, (iv) the failure by Lender to perfect any security interest or lien on any Collateral, and (v) an election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to Collateral for this Master Agreement, has destroyed the Borrower's or Guarantor's rights of subrogation, contribution, reimbursement, indemnity, set off, or other recourse against another Borrower or Guarantor by the operation of any applicable anti-deficiency statutes.

Each Borrower agrees that Lender may at any time, without notice, release all or any part of the security for the Indebtedness (including all or any part of the premises covered by the referenced mortgage or deed of trust), grant extensions, change terms of payment, deferments, renewals or reamortizations of any part of the Indebtedness, and release from personal liability any one or more of the parties who are or may become liable for the

Master Loan and Membership Agreement (09-12) Page 21 of 24

Indebtedness; all without affecting the personal liability of any other party. Borrower and any endorsers of the Indebtedness also severally waive any and all other defense or right of offset against the holder thereof. No Borrower or Guarantor shall have any right of subrogation, contribution, reimbursement, indemnity, set off, or other recourse and waives the benefit of, or any right to participate in, any Collateral until such time as all of the Obligations owed by Borrower to any Lender under any Loan shall have been paid in full. Each Borrower, to the extent it may lawfully do so, waives any defense under any applicable anti-deficiency statutes relating to the recovery of a deficiency after a foreclosure sale of such property.

Each Borrower represents and warrants to Lender that it has established adequate means of obtaining from each other Borrower or Guarantor, on a continuing basis, information pertaining to the businesses, operations and conditions (financial or otherwise) of each other Borrower and Guarantor and their respective properties, and each Borrower now is and will be familiar with the businesses, operations and conditions (financial or otherwise) of each other Borrower and its properties. Each Borrower waives and relinquishes any duty on the part of Lender (if such duty exists) to disclose to any Borrower any matter, fact or thing related to the businesses, operations, or conditions (financial or otherwise) of any other Borrower or Guarantor or its properties. Without limiting the generality of the foregoing, each Borrower waives any defenses or rights arising under or of the kind described in California Civil Code sections 2795, 2808, 2809, 2810, 2815, 2819 through 2825 (inclusive), 2832, 2839, and 2845 through 2850 (inclusive) and similar laws in other jurisdictions.

Each Borrower agrees that nothing shall discharge or satisfy the liability of such Borrower to Lender except the full and indefeasible payment and performance of all Borrowers' indebtedness and obligations to Lender with interest. Borrowers' indebtedness and obligations to Lender shall not be considered indefeasibly paid until all payments to Lender are no longer subject to any right, by any person, to invalidate or set aside such payments or to seek to recoup the amount of such payments or to declare such payments to be fraudulent or preferential. In the event any portion of any such payments shall be set aside or restored, then each Borrower shall be liable for the full amount Lender is required to repay, plus any costs and expenses (including attorneys fees) paid by Lender in connection therewith. Each Borrower and Guarantor waives notice of any and all favorable and unfavorable information, financial or other, about any other Borrower, heretofore, now, or hereafter learned or acquired by Lender, and all other notices to which any Borrower might otherwise be entitled. Each Borrower understands and agrees that the foregoing waivers are waivers of substantive rights and defenses to which such Borrower might otherwise be entitled under state and/or federal law. The rights and defenses waived include, without limitation, those provided by any and all applicable laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code. Each Borrower acknowledges that it has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender.

14.9    Applicable Law. Enforcement of this Master Agreement, and any other Loan Document executed in connection herewith shall be governed by and construed in accordance with federal laws to the extent applicable, and shall otherwise be governed by the laws of the state in which Borrower is domiciled or, if more than one or in not a state of the United States of America, then the state in which this Master Agreement was executed by Lender.

14.10    Choice of Forum. Any dispute that arises under or relates to this Master Agreement or any Loan Document (whether contract, tort, or both) shall be resolved in a forum selected by the applicable Lender. Unless otherwise required by law or requirements for enforcing of rights, the forum in which any branch office of Lender is located shall be deemed appropriate.

14.11    Integration Clause. Amendments Must Be In Writing. This Master Agreement, all Notes, any Loan Documents, and any and all modifications thereof, executed by any Lender and Borrower in connection herewith or hereafter, or as required by this Master Agreement are the final expression of and constitute the entire agreement between Borrower and the applicable Lender and supersede all prior negotiations, communications, discussions, oral agreements, and promises concerning this Master Agreement, the Notes, and Loan Documents. The Master Agreement, Notes, and Loan Documents do not include any loan application or any written correspondence submitted by Borrower to Lender that has not been agreed to by Lender in writing. This Master Agreement, the Notes contemplated hereby, and any other Loan Documents may be amended or modified only by a written instrument executed by each party hereto and may not be contradicted by evidence of any prior or contemporaneous oral agreement between the applicable parties.

Master Loan and Membership Agreement (09-12) Page 22 of 24

14.12   Severability.  If one or more of the provisions of this Master Agreement or any other Loan Document is deemed or held to be invalid, illegal, unenforceable or against public policy in any respect, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired.

14.13   Captions.  Captions used in this Master Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope or intent of any term or provision.

14.14   Counterparts.  This Master Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, but all of which together constitute one and the same agreement.

14.15   No Waiver.  No waiver of any action or default by any party will be implied from the failure or delay by any other party to take any action in respect of such action or default.  The express waiver of any condition precedent or default will not affect any other default or extend any period of time for performance other than as specified in such express waiver.  One or more waivers of any default or performance of any provision of this Master Agreement will not be deemed a waiver of any subsequent default or the performance of the same provision or any other provision.  The consent to or approval of any act or request by any party will not be deemed to waive or render unnecessary the consent to or approval of any subsequent or similar act or request.  The partial exercise of any right or remedy under this Master Agreement will not preclude any other or further exercise thereof or the exercise of any other right or remedy.  The course of dealing between the parties will not be deemed to amend the terms of this Master Agreement or to preclude any party from exercising the rights and remedies herein contained notwithstanding such course of dealing.  The rights and remedies provided in this Master Agreement are cumulative, and no right or remedy will be exclusive of any other or of any other right or remedy at law or in equity which any party might otherwise have by virtue of a default under this Master Agreement; and the exercise of any right or remedy by any party will not impair such party's standing to exercise any other rights and remedies.

14.16   Survival.  All representations and warranties of Borrower contained in any of the Loan Documents or this Master Agreement will survive the execution and delivery of such Loan Document and this Master Agreement.

14.17   Binding Effect.  This Master Agreement will inure to the benefit of and bind the respective successors and permitted assigns of the parties.

14.18   No Joint Venture.  Nothing contained in this Agreement will be construed to constitute the Lender as a joint venturer with the Borrowers or any Guarantor or to constitute a partnership.

14.19   No Third Party Beneficiaries.  Borrower and Lender agree that anything herein to the contrary notwithstanding, there are no third party beneficiaries of this Master Agreement or any Loan Document.

14.20   Cooperation.  Borrower shall execute and deliver all such additional documents, instruments, and agreements and take all such other actions as necessary to create, ratify, protect, evidence and defend Lender's rights under this Master Agreement, all Loan Documents and, in particular, Lender's liens or security interest in personal property or real property.  Borrower also authorizes Lender to record UCC-1 Financing Statements and amendments as appropriate to perfect and protect the security interests created by any Loan Documents.  In addition, Borrower, as appropriate, shall execute and deliver at any time and from time to time upon Lender's request any notifications to third parties as are necessary to evidence the security interest provided for in any Loan Documents, and to provide for payment of any accounts or other amounts receivable which are Collateral or the proceeds of Collateral.

14.21   Termination or Revocation of Authorizations.  All directions, authorizations and appointments contained herein are effective as of the date of this Master Agreement and shall remain in full force and effect until revoked or terminated as set forth herein.  Revocations by Borrower of any of these directions, authorizations or appointments shall be in writing signed and dated by the Borrower(s).  The revocation shall not be effective until thirty (30) days after the Lender has received the revocation notice.  The death or dissolution of any Borrower shall terminate the directions, authorizations or appointments set forth herein and such termination shall take effect thirty (30) days after Lender receives notice of the death or dissolution.  All such terminations and revocations shall be

prospective only. The authorizations and instructions contained herein are intended to facilitate transactions. Lender may, in its sole and absolute discretion, from time to time require re-authorization or reappointments.

In witness whereof, the parties have signed this on the date first set forth above.

Borrower:

LJB Farms, LLC, a California limited liability company

By: _____
Joanna L. Botelho, Manager

Lender:

American AgCredit, ACA
American AgCredit, FLCA
American AgCredit, PCA

By: _____
Scott Collins, Vice President

Master Loan and Membership Agreement (09-12) Page 24 of 24

# Exhibit B

## SECURITY AGREEMENT

This SECURITY AGREEMENT ("Agreement") is made on August 12, 2013 by LJB Farms, LLC, a California limited liability company (collectively, whether one or more, "Debtor"), in favor of American AgCredit, PCA ("Lender").

1. **The Indebtedness.** "Indebtedness" shall mean any and all loans, advances, obligations, letter of credit obligations, obligations arising under swap contracts, covenants, and duties owing to Lender by Debtor of any kind or nature, absolute or contingent, due or to become due, whether now existing or hereafter arising, whether or not evidenced by any note, guaranty, non-recourse guaranty or other instrument, agreement or writing, including, without limitation, all interest, charges, fees, attorneys' fees, expenses, and any other sum chargeable by Lender to Debtor under this or any other agreement.

2. **Security.** As security for all Indebtedness of Debtor to Lender, Debtor grants to Lender a security interest in all of the following property in which the Debtor now has or subsequently acquires any rights (the "Collateral"):

    2.1    All livestock, including poultry, all additions, replacements, natural increases and subsequent purchases by bill of sale, draft or otherwise. It is the intention of Lender and Debtor that the security interest granted herein include all livestock now owned or hereafter acquired without limitation and the specific description or listing of Collateral or the failure to specifically describe or list some or all of the Collateral is not intended to limit or restrict the security interest granted herein. Debtor agrees that all livestock, either used in a farming or ranching operation or in any other business in which the Debtor is engaged, shall be classified as farm products for UCC purposes.

    2.2    All machinery, Equipment, farm equipment, irrigation equipment, tools, and Fixtures, now owned or hereafter acquired. It is the intention of Lender and Debtor that the security interest granted herein include all machinery, equipment, farm equipment, and fixtures now owned or hereafter acquired, without limitation, and the specific description or listing of Collateral or the failure to specifically describe or list some or all of the Collateral is not intended to limit or restrict the security interest granted herein.

    2.3    All Goods, crops, harvested crops, wherever stored, Farm Products, Inventory, milk, milk products, eggs, feed, hay, grain, fodder, ensilage, chemicals, fertilizers, medicines, parts, supplies, Deposit Accounts, Cash, letters of credit, and capital stock and other securities of and claims against any corporation, cooperative, water company, joint venture or partnership, including all capital stock and participation certificates issued pursuant to the Farm Credit Act of 1971, as amended.

    2.4    All rights to payment, payment of money or payment in kind, whether due or to become due and whether or not earned by performance, Accounts, contract rights, revolving fund credits, patronage dividends, Chattel Paper, including both electronic and tangible Chattel Paper, leases, conditional sales contracts, Documents, warehouse receipts, weight or scale tickets, Instruments, General Intangibles, and rights under any government or other loan, reserve, disaster, diversion, deficiency, soil conservation, or other production control or price support program ("Receivables").

    2.5    All General Intangibles, including, but not limited to, all tax refunds, vendor and other rebates, licenses, franchises, trademarks, trade names, trade styles, labels, copyrights, patent rights, technical processes, leases, grazing privileges, permits, water rights, brands, milk base or quota rights, revolving fund credits, patronage dividends, marketing agreements, and rights, including quota rights, under any government or other loan, reserve, disaster, diversion, deficiency, soil conservation, or other production control, price support, disaster assistance, or other similar governmental or nongovernmental program.

    2.6    All rights in and claims to any policy of insurance, including unearned premiums, and the proceeds thereof, from insurance policies covering the Collateral, key man policies, and business interruption insurance, and crop insurance, whether governmental or nongovernmental.

    2.7    All rights Debtor may have or hereafter acquire with respect to any statutory or common law lien or trust, including but not limited to any mechanic's or materialman's lien, packer's lien, or producer's lien.

    2.8    All books, records, customer lists, credit files, computer hardware, computer software, computer data, computer storage media or the equipment containing such information or data, printouts and any other written document or computer program evidencing any transactions related to the operation of Debtor's business, as it may relate to the Collateral.

2.9    All Proceeds and products of the foregoing whether due to voluntary or involuntary disposition, and all renewals, replacements, substitutions, additions, natural increases, subsequent purchases, accessions, rents, issues, royalties and profits of or to the foregoing.

**3.  Debtor's Covenants and Warranties.** Debtor covenants with and warrants to Lender that:

3.1    Except as specifically disclosed to Lender in writing, Debtor is the sole and absolute owner of all Collateral listed in Section 2 of this Agreement and any financial statement or other document delivered to Lender. Debtor's ownership of the Collateral is free and clear of all liens, claims, and encumbrances except those disclosed by Debtor to Lender and approved by Lender in writing. Debtor shall not encumber, pledge, mortgage, or grant a security interest in any Collateral without Lender's prior written approval.

3.2    Debtor shall inform Lender in writing of the legal description of any land upon which timber is located, fixtures are or will be located and/or crops are to be grown prior to the planting thereof. Debtor shall deliver to Lender such additional security documentation and items of Collateral as and when Lender requests to effect the purposes of this Agreement.

3.3    Until Lender exercises its rights to make collection, Debtor will diligently collect all Receivables and proceeds of Collateral and keep accurate books and records of Collateral and all collections thereof. Debtor will segregate and identify to Lender's satisfaction all collections and proceeds of Collateral as and when received. Debtor shall pay all proceeds of Collateral to Lender. Until the proceeds of Collateral have been paid to Lender, Debtor shall hold the entire proceeds, in the same form as received, in trust for Lender.

3.4    Debtor will defend the Collateral against and indemnify and hold Lender harmless from, any claim or demand adverse to Lender's interest in the Collateral.

3.5    Debtor will maintain the Collateral in an orderly and efficient manner and in good working order and will care for and develop all crops and livestock in accordance with standards of good husbandry. Except to the extent specifically consented to by Lender in writing, Debtor will not sell or dispose of any Collateral, except in the ordinary course of business, and will keep in good standing, and not permit the lapse or termination of, any brands, registrations, water rights, rights to rangeland, grazing privileges, timber permits, and any other permits, licenses, or leases now or hereafter owned by Debtor that are necessary to the continued operation of Debtor's business.

3.6    Debtor will obtain and maintain policies of insurance covering the Collateral in types, amounts, and with companies satisfactory to Lender; and, if requested by Lender, Debtor shall obtain loss payable endorsements in favor of Lender or cause Lender to be named as loss payee under any such insurance policies.

3.7    Debtor shall immediately pay all taxes and assessments upon the Collateral or for its use or operation, and Debtor shall immediately pay and cause the discharge of any liens or encumbrances which may be levied upon the Collateral.

3.8    Debtor will promptly notify Lender in writing of any material adverse change in Debtor's financial condition and of any event which affects the value of the Collateral, or the rights or remedies of Lender in relation thereto, including, without limitation, the levy of any legal process against Collateral, the loss or threat of loss of any rights to brands, water, rangeland, grazing privileges, timber permits, and any other permits, licenses, or leases now or hereafter owned by Debtor, or the adoption of any marketing order, arrangement or procedure affecting Collateral, whether governmental or otherwise.

3.9    Debtor will not change the physical location of Collateral, except in the ordinary course of business, and will not change Debtor's principal place of business or its place of residence, registration or incorporation without giving Lender at least thirty (30) days prior written notice of such change.

3.10    Debtor shall deliver to Lender a list setting forth all buyers, commission merchants, and selling agents to or through whom Debtor shall sell or deliver any crops, livestock, or other farm products. After delivery of any such list, Debtor shall advise Lender in writing of any additions to or changes to such list and Debtor shall not sell or deliver any crops, livestock, or other Farm Products to any person not on the current list delivered by Debtor to Lender, nor shall Debtor deliver any Collateral under any consignment or bailment without first obtaining the consent of the Lender and executing such additional documents as Lender may require to continue and perfect the security interest granted herein. Debtor agrees to cooperate with Lender in obtaining

control agreements, bailee acknowledgements and/or other acknowledgments and agreements deemed necessary or advisable by Lender.

3.11   As and when requested by Lender, Debtor will deliver to Lender financial statements, schedules and lists of property and accounts, budgets, books and records, forecasts, reports, tax returns, contracts and such other financial information relating in any manner to the Collateral.

3.12   Debtor will permit Lender to inspect and verify the Collateral and all books and records, including any electronically stored data relating thereto.

3.13   Debtor will deliver to Lender any Instruments or Chattel Paper which evidence Receivables, and if any Collateral becomes the subject of any document of title, including any warehouse receipt or bill of lading, Debtor shall promptly deliver such document to Lender, all of which Debtor shall endorse or assign to Lender's satisfaction.

3.14   If Debtor at any time holds or acquires an interest in any electronic chattel paper or any "transferable record" as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act (FESGNCA), or in Section 16 of the Uniform Electronic Transactions Act (UETA) as in effect in any relevant jurisdiction, Debtor will promptly notify Lender thereof and, at the request of Lender, will take such action as Lender may reasonably request to vest control in Lender, under Section 9-105 of the Uniform Commercial Code, of such electronic chattel paper or control under Section 201 of the FESGNCA or, as the case may be, Section 16 of UETA, as in effect in such jurisdiction, of such transferable record. Lender agrees with Debtor that Lender will arrange, pursuant to procedures satisfactory to Lender and so long as such procedures will not result in Lender's loss of control, for Debtor to make alterations to the electronic chattel paper or transferable record permitted under UCC Section 9-105 or, as the case may be, Section 201 of FESGNCA or Section 16 of UETA for a party in control to make without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by Debtor with respect to such electronic chattel paper or transferable record.

3.15   If Debtor is at any time a beneficiary under a letter of credit now or hereafter issued in favor of Debtor, Debtor will promptly notify Lender thereof and, at the request and option of Lender, Debtor will, pursuant to an agreement in form and substance satisfactory to Lender, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Lender of the proceeds of any drawing under the letter of credit or (ii) arrange for Lender to become the transferee beneficiary of the letter of credit.

3.16   If Debtor at any time holds or acquires a commercial tort claim, Debtor will immediately notify Lender, in a writing signed by Debtor, of the brief details thereof and grant to Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement with such writing to be in form and substance satisfactory to Lender.

3.17   To the extent that any Debtor is a partnership, joint venture, or limited liability company (LLC), its name and state of organization or registration as stated in the introductory paragraph of this Agreement is its exact legal name and state of organization or registration, it is duly organized and existing under the laws of said state, and the individuals executing this Agreement and all agreements relating to the Indebtedness are fully authorized to execute the same and no other signature is necessary in order to bind Debtor.

4.   Additional Terms and Conditions.  Debtor agrees to comply fully and on a timely basis with the following terms and conditions, whether or not Debtor is in default and whether or not Lender has demanded payment.

4.1   Lender may notify, and Lender may require Debtor to notify, any account debtors, any buyers of Collateral or any other person or entity of Lender's interest in Collateral, and the proceeds and products thereof, may require account debtors or others obligated on Receivables to make payments to a post office lock box under Lender's sole control; and may make direct demand for and collect any Receivables and proceeds of Collateral. To effectuate this Agreement, Debtor irrevocably authorizes Lender to endorse or sign Debtor's name on all collections, receipts or other documents, take possession of and open the mail addressed to Debtor and remove therefrom payments of Receivables and proceeds of Collateral.

4.2   If Debtor fails to pay any taxes, assessments, or insurance with respect to, or fails to discharge any encumbrance upon, the Collateral, Lender may, in its sole discretion, and without waiving any Event of Default, pay such item, discharge such encumbrance, or take any other action with respect to Collateral that Lender deems advisable and Lender may add the amount of any expenses so incurred to any portion of the Indebtedness.

Security Agreement (04-13) Page 3 of 6

4.3    Lender may apply any proceeds of Collateral to principal, interest, or any part of the Indebtedness as Lender, in its sole discretion, may choose.

4.4    Debtor hereby authorizes Lender to file the required Uniform Commercial Code financing statements, amendments, continuation statements and/or termination statements to perfect, amend, continue or terminate its security interest in the Collateral or any part thereof, or in any agricultural liens or statutory liens.

5.    **Default.** The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

5.1    Debtor shall fail to pay any portion of the Indebtedness as and when due or declared due.

5.2    Debtor shall breach any term or fail to perform any obligation under this Agreement or any loan agreement, guaranty, non-recourse guaranty, mortgage, deed of trust, or other agreement between Debtor and Lender.

5.3    The loss, theft, damage or destruction of any Collateral not fully covered by insurance to the extent required hereunder.

5.4    The issuance or filing of any lien, levy, writ, attachment, execution, seizure, notice of tax lien, notice of lien filing under the Employee Retirement Income Security Act of 1974 ("ERISA") as now enacted or hereafter amended, or similar process against Debtor and/or Collateral, which is not released, bonded, or stayed to the satisfaction of Lender within thirty (30) days thereof.

5.5    Any material adverse change in the financial condition of Debtor, or in the value of Collateral, that would, in Lender's reasonable business judgment, adversely affect the ability of Debtor to repay the Indebtedness.

5.6    The commencement by or against Debtor of a voluntary or involuntary case under the Federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable Federal or state bankruptcy, insolvency or similar law; the consent by Debtor to the appointment of, or the taking possession with or without Debtor's consent by, a receiver, liquidator, assignee, trustee, custodian, sequestrator, agent or similar official for Debtor or for any substantial part of its property; the dissolution, liquidation, or winding up of Debtor's affairs; the making by Debtor of any assignment for the benefit of its creditors; the failure by Debtor generally to pay its debts as they become due; or the taking of any action by or on behalf of Debtor in furtherance of any of the foregoing.

5.7    The loss, termination, revocation of or failure to renew any lease, license, and/or permit, or any agreement with respect to water, grazing, timber, or marketing rights, now held or hereafter acquired by Debtor which, in the reasonable business judgment of Lender, is necessary for the continued operation of Debtor's business.

5.8    Death of the Debtor.

5.9    Lender in good faith deems itself to be insecure.

5.10    Any warranty, representation or statement made or furnished to Lender by Debtor under this Agreement, or any loan agreement, guaranty, non-recourse guaranty, mortgage, deed of trust, or other agreement between Debtor and Lender is false or misleading in any material respect, either now or at the time made or furnished to Lender.

6.    **Rights and Remedies.** Upon the occurrence of an Event of Default or the termination of this Agreement, Lender shall have, in addition to all of the rights and remedies of a secured party under the Uniform Commercial Code and applicable law, all of its rights and remedies under this Agreement, which rights and remedies shall be cumulative and shall include the following:

6.1    Lender may, without notice or demand, declare all or any portion of the Indebtedness to be immediately due and payable.

6.2    Lender may enforce its security interest in and its rights to any or all Collateral pursuant to the Uniform Commercial Code and any applicable law.

Security Agreement (04-13) Page 4 of 6

6.3　Lender may require Debtor to assemble the Collateral and all books and records pertaining thereto and make them available to Lender at a place designated by Lender.

6.4　Lender may enter upon the premises of Debtor and take possession of the Collateral and of the books and records pertaining thereto.

6.5　Lender may use, assemble, complete, produce, grow, raise, develop, harvest, process, market or operate the Collateral to the extent that it deems appropriate for the purpose of caring for, preserving, or disposing of the Collateral or for any other purpose which Lender deems appropriate. Lender shall have no obligation to Debtor to maintain or preserve the rights of Debtor in and to the Collateral as against the claims of third parties while the Collateral is in the possession, custody, or control of Lender. Lender has no obligation to clean-up or otherwise prepare the Collateral for sale.

6.6　Lender may seek the appointment of a receiver, trustee, examiner, or other similar official to take possession of the Collateral and to enforce any of Lender's remedies with respect thereto.

6.7　Lender may use, sell, or dispose of, in connection with any assembly, use or disposition of Collateral, any brand, water right, timber permit, grazing privilege, license, permit, franchise, trademark, trade name, trade style, copyright, patent right or technical process or information of Debtor with respect to Collateral. If Lender elects to sell all or any portion of the Collateral, Lender is authorized to disclaim all warranties in connection with said sale.

6.8　Lender may grant extensions, compromise claims, and settle amounts due on Receivables for less than face value, all without prior notice to Debtor.

6.9　Lender may sell the Collateral at a location to be determined by Lender in its discretion. If the Collateral is livestock, Lender may sell the Collateral through a livestock market or through a licensed sale company and such sale shall be deemed to be upon a "recognized market" as used in the Uniform Commercial Code.

6.10　Debtor waives all right it may have to require Lender to pursue any third person for the Indebtedness or any part thereof.

7.　Attorney-In-Fact. Debtor hereby nominates and appoints Lender as attorney-in-fact for the following purposes: (a) to do all acts and things which Lender may deem necessary or advisable to perfect and continue perfected the security interest created by this Agreement, and (b) upon default hereunder: (i) to preserve, process, develop, maintain and protect the Collateral, and (ii) to do any and every act which Debtor is obligated to do under this Agreement, at Debtor's expense; provided, however, that Lender shall be under no obligation whatsoever to take any of the foregoing actions, and Lender shall have no liability or responsibility for any act or omission taken with respect thereto.

8.　Miscellaneous.

8.1　Capitalized terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the California Uniform Commercial Code, as amended from time to time.

8.2　Lender's failure at any time to require strict compliance with any provision of this Agreement shall not affect Lender's continuing right thereafter to require strict compliance. Any suspension or waiver by Lender of any Event of Default shall not affect any other Event of Default and Lender's remedies with respect thereto, regardless of when said Event of Default occurs and the nature of said Event of Default. Any waiver, suspension, or consent by Lender with respect to Debtor's compliance with this Agreement, the occurrence of any Event of Default, and Lender's rights and remedies under this Agreement, must be in writing and shall be effective only to the extent specifically set forth therein.

8.3　In the event that one or more of the provisions of this Agreement should be deemed or held to be invalid, illegal, unenforceable or against public policy in any respect, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

8.4　This Agreement shall bind and inure to the benefit of Lender, its affiliates, successors and assigns. Debtor shall not assign, in whole or in part, this Agreement or any of the rights, duties or obligations of Debtor hereunder. Any such assignment or attempted assignment by Debtor shall be void and of no effect with respect to Lender.

8.5    In the event that Lender employs attorneys, accountants, appraisers, consultants, or other professional or outside assistance, including the services of any attorney who is a direct employee of Lender, in connection with:

(A)    The preparation, modification, or renewal of this Agreement or any promissory note, loan agreement, deed of trust, mortgage, or any other document incident to the Indebtedness;

(B)    Advising Lender concerning its legal rights and obligations with regard to the Indebtedness, or the Collateral, including advising Lender with regard to Debtor's exercise of any rights under the provisions of the Farm Credit Act, any policy or program of Lender, or any state or federal law;

(C)    Any litigation, dispute, proceeding, or action, whether instituted by Lender, Debtor, or any other person, relating to the Indebtedness, the Collateral, or Debtor's affairs, including representation of Lender in any bankruptcy, insolvency, or reorganization case or proceeding instituted by or against Debtor, and any attempt by Lender to enforce any rights against Debtor;

(D)    The inspection, verification, protection, collection, processing, sale, liquidation, or disposition of Collateral;

The reasonable amount of expenses so incurred by Lender shall be payable on demand and Lender may, at its option, add the amount thereof to any portion of the Indebtedness, and thereafter charge interest on such amount at the interest rate applicable to such portion of the Indebtedness.

8.6    The term of this Agreement shall be, and this Agreement shall remain in effect, commencing on the date first written above and continuing until amended, replaced, released or terminated in writing by Lender, and if at any time during the term of this Agreement there may not be an outstanding secured obligation or commitment to make advances, such events or either of them shall not affect the validity of this Agreement as security for subsequent loans and advances hereunder.

8.7    This Agreement and any other agreement in connection with the Indebtedness shall be governed by and construed under the laws of the State of California.

LJB Farms, LLC, a California limited liability company

By: 
Joanna L. Botelho, Manager

**Exhibit C**

Exhibit C
Page 1   Exhibit 2 to
Request for Judicial Notice
Page 76


**AMERICAN AGCREDIT**
MONEY FOR AGRICULTURE

LJB Farms, LLC

Loan No.        6955

## CREDIT AGREEMENT
(Containing: Promissory Note and Loan Agreement)

This Credit Agreement ("Agreement") is made and entered into as of March 7, 2016 by and between American AgCredit, FCA ("Lender") and the undersigned borrower(s) (hereinafter collectively, whether one or more, "Borrower").

### A. PROMISSORY NOTE AND LOAN AGREEMENT

1.    **Promise to Pay and Purpose.** Borrower unconditionally promises to pay to Lender, or order, at the times, place and in the manner designated herein, in lawful money of the United States of America and in immediately available funds, the principal amount of $325,000.00, or such lesser principal amount as may be from time to time advanced by Lender to Borrower pursuant to this Agreement, together with interest on the unpaid principal amount of this Agreement outstanding from time to time from the date of this Agreement and at the rate provided in this Agreement for the primary purpose of operating (the "Loan"). The Loan shall be the joint and several obligation of all Borrowers, and each Borrower expressly waives any right to first require Lender to proceed against any other Borrower or Guarantor, or to first proceed against or exhaust any Collateral under this Agreement or any other Loan Document.

2.    **Collateral.** This Loan and this Agreement evidencing the Loan shall be secured by the following:

   2.1   First lien on the personal property described in the Security Agreement.

   2.2   This Loan is also secured by a lien on Borrower's stock investment in American AgCredit, ACA.

The collateral for this Loan also secures the obligations related to loan number(s)        5735 with this Lender. Additionally, the collateral related to loan number(s)   5735 with Lender will be collateral for this Loan.

3.    **Disbursement of Loan Funds.** Funds will be disbursed as follows:

   3.1   Funds in the amount of $324,250.00 will be disbursed per Borrower's request.

   3.2   Funds in the amount of $750.00 will be disbursed directly to Lender for payment of the Loan Fee incurred in connection with this Loan. In the alternative you may pay this loan fee concurrently with the execution of the Loan Documents.

   3.3   **Expiration of Draw Period.** Funds will be available for disbursement until April 30, 2017. Any funds not disbursed by this date will not be available for disbursement to Borrower.

4.    **Repayment.** All amounts owing on the Loan including unpaid principal, accrued and unpaid interest and fees shall be paid on the Maturity Date.

5.    **Interest.**

   5.1   **Association Variable Rate.** Commencing on the date that loan funds are disbursed by Lender, the rate of interest shall be a per annum variable interest rate equal to the Association Reference Rate plus the Applicable Margin as determined by Lender as set forth below.

      5.1.1   **Initial Rate.** The initial interest rate as of the date of this Agreement is calculated as follows:

| | |
|---|---|
| Association Reference Rate | 4.75% |
| Applicable Margin | 1.25% |
| Initial Per Annum Rate | 6.00% |

The rate of interest is subject to change in accordance with the change procedures set forth in Section 5.1.2.

      5.1.2   **Changes in Interest Rate.** The rate of interest applicable to this Loan shall change whenever the Association Reference Rate or the Applicable Margin changes. Any change to the Association Reference Rate shall be effective as of the date announced by Lender. The Applicable Margin may be adjusted from time to time based on changes in the Borrower's credit quality, quality of collateral, costs of servicing the Loan and other factors which are set forth in Lender's interest rate policy in effect at that time as determined by Lender in its sole and absolute judgment and based on such financial information as may be required by Lender. Failure to meet the financial information as and when required by Lender may result in substantially higher Applicable Margins.

   5.2   **Interest Rate Computation.** Interest will be charged on that part of the outstanding principal balance that has not been paid and shall be calculated on the basis of the actual number of days elapsed over a three hundred sixty-five day (365) calendar year.

   5.3   **Unavailability of Association Reference Rate.** In the event that the Association Reference Rate is not available, Lender may substitute a reasonably similar index.

   5.4   **Notice.** If Lender changes Borrower's interest rate, Lender will give Borrower such notice of the change in rate as may be required by applicable law.

   5.5   **Prepayment.**

      5.5.1   **Definitions.** As used in this Section 5.5: "Prepayment" shall mean a principal payment in advance of a scheduled principal payment or the Maturity Date, whether such payment is voluntary or is involuntary (as a result of sale of collateral, operation of law or otherwise) and shall also include any renegotiation or restructurings of the loan balance. "Prepayment Period" shall mean the period commencing on the date that loan funds are disbursed by Lender and continuing until the Maturity Date.

Credit Agreement (01-16) Page 1 of 5

Exhibit C
Page 2   Exhibit 2 to
Request for Judicial Notice
Page 77

5.5.2 Application of Prepayments. Effect on Scheduled Payments. Irrevocability. Etc. Unless Borrower and Lender agree otherwise in writing: (i) Lender may apply all Prepayments to principal, interest or any part of the Loan in its sole and absolute discretion, (ii) if Borrower makes a partial Prepayment, there will be no delay in the due date of Borrower's installment payments and (iii) Lender at its sole discretion may reamortize this Agreement on the basis of the new principal balance; otherwise, the making of a Prepayment will operate only to discharge this Agreement at an earlier date. Once a Prepayment has been made, it may not be revoked. In addition, any directions regarding the application of the Prepayment are irrevocable, unless both the Borrower and the Lender agree to such revocation in writing.

5.5.3 Voluntary Prepayment Procedures. Borrower may voluntarily make a full or partial Prepayment at any time or from time to time without premium or penalty.

6. Interest on Acceleration and on Matured Amounts. Upon (i) the occurrence of an Event of Default and/or (ii) maturity of the Loan (whether maturity occurs by demand, acceleration, lapse of time or otherwise), the unpaid principal and interest due on the Loan and all other sums owed by Borrower to Lender shall, at Lender's sole and absolute discretion, bear interest until paid at the Default Rate, but not in excess of the maximum interest rate provided by law. Borrower agrees that should Lender fail to immediately assess the Default Rate upon the occurrence of an Event of Default and/or maturity of the Loan, such act does not prevent Lender from assessing the Default Rate at a later date (assuming that the Event of Default or maturity of the Loan continues) and in no event is such failure a waiver of Lender's ability to assess and collect the Default Rate in the future.

7. Covenants and Conditions. In addition to the covenants and conditions contained in the Loan Documents, the following terms and conditions apply to this Loan:

7.1 Submission of Financial Information. The following financial information is to be submitted to Lender:

7.1.1 Borrower shall promptly provide Lender with information concerning the financial and business operations and property of each Borrower and Guarantor, including but not limited to financial reports, in form, manner and frequency required by Lender.

7.2 Continuing Guaranty. The Continuing Guaranty(ies) previously executed by the Guarantor(s) is/are to remain in full force and effect.

7.3 Maintenance of Assignment(s) of Proceeds of Sale of Crops. The previously executed Assignment(s) of Proceeds of Sale of Crops is/are to remain in full force and effect.

7.4 Copies of Contracts. Borrower shall provide Lender with copies of all contracts entered into for the sale of crops, as said contracts are entered into. Lender reserves the right to require the execution of crop assignments with each party with whom these contracts are executed.

7.5 Payment of Tax Obligation. Borrower agrees to pay all tax obligations when due, unless the obligation to make the payment is being disputed in good faith and is being diligently contested in all appropriate proceedings, in which event Borrower shall notify Lender of such dispute.

7.6 Further Assurances. At Lender's request and at Borrower's expense, Borrower will execute, acknowledge, and deliver all other instruments and perform all other acts necessary, desirable, or proper to carry out the purposes of the Loan Documents or to perfect and preserve any liens created by the Loan Documents.

7.7 Waiver of Defenses. Each Borrower waives any and all defenses arising by reason of (i) any disability or other defense of any other Borrower or Guarantor with respect to the amounts owed to Lender, (ii) the termination for any reason whatsoever of the liability of any other Borrower or Guarantor, (iii) any act or omission of Lender that directly or indirectly results in or aids the discharge or release of any other Borrower, any Guarantor, or any security interest or lien provided by any Borrower or Guarantor, (iv) the failure by Lender to perfect any security interest or lien on any Collateral, and (v) an election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to Collateral for this Agreement, has destroyed the Borrower's or Guarantor's rights of subrogation, contribution, reimbursement, indemnity, set off, or other recourse against another Borrower or Guarantor by the operation of any applicable anti-deficiency statutes.

7.8 Material Change in Debt. Without obtaining Lender's prior written consent, Borrower agrees not to materially change its debt structure in a manner that would negatively impact the Borrower's ability to repay the Loan as determined in the Lender's sole discretion.

7.9 Use of Loan Proceeds. Borrower agrees to use loan proceeds for the purpose approved by the Lender. In no event shall Borrower use any loan proceeds for any purpose that is not permitted under either federal or state law.

8. Event of Default. The occurrence of any one or more of the following events, unless remedied or waived by Lender, shall constitute an "Event of Default": (i) Failure to Pay. Borrower shall fail to pay all or any portion of the Loan owed to Lender as and when due or declared due; (ii) Breach of Covenants. Borrower shall breach any covenant, term or condition, or fail to perform any obligation under this Agreement or any other agreement with Lender and such breach or failure to perform such breach or failure shall continue for thirty (30) days from its occurrence; (iii) Breach of Warranties and Representations. Any warranty, representation, or statement now or hereafter furnished by or on behalf of Borrower or Guarantor to Lender to induce Lender to take or retain from taking any action that is false or inaccurate in any material respect when furnished; (iv) Judgment, etc. Any judgment, writ, levy, lien, attachment, order of tax lien, or similar process shall be entered or filed against Borrower or any Guarantor or their property and is not vacated, bonded, or stayed to the satisfaction of Lender within 30 days; (v) Material Adverse Change. Any material adverse change in the financial condition of Borrower, Guarantor or in the value of Collateral as determined by Borrower to Induce Lender to enter into this Agreement, or thereafter, that would in Lender's reasonable business judgment, adversely affect the ability of the Borrower to repay the Loan; (vi) Dissolution, Default of Guarantor. Any event of default shall occur under any guaranty or any guaranty shall be terminated by death or dissolution of a Guarantor; (vii) Insolvency. Borrower or any Guarantor shall permit to terminate, repudiate or revoke any Loan Document, including any guaranty; (viii) Failure to Pay Other Debts, etc. The failure to pay debts to others as and when due or to perform obligations owed to others as and when due; (ix) Bankruptcy, Insolvency Proceedings, Dissolution, etc. The commencement by or against Borrower or any Guarantor of a voluntary or involuntary case under the federal bankruptcy laws, the dissolution, liquidation, or winding up of Borrower or any Guarantor's affairs, the making by Borrower of any assignment for the benefit of its creditors or the taking of any action by or on behalf of Borrower or any Guarantor in furtherance of any of the foregoing; (x) Loss of Priority, Lien etc. The loss, termination, revocation of or failure to renew any lien, license and/or permit, or any agreement, which, in the reasonable business judgment of any Lender, is necessary for the continued operation of Borrower's business as it is now conducted; (xi) Abandonment of any Collateral by the Person pledging the Collateral,; (xii) Lender in good faith deems itself to be insecure; and, (xiii) Death, Dissolution, Termination. Any Borrower or Guarantor shall die, dissolve, or otherwise terminate its existence.

9. Remedies. If an Event of Default shall occur, Lender shall have all rights, powers and remedies available under this Agreement or any other loan document, or accorded by law or at equity, including the right to foreclose on any and all collateral. All rights, powers, and remedies of Lender in connection with this Agreement, and any loan document are cumulative and not exclusive and shall be in addition to any other rights, powers, or remedies provided by law or equity. Lender may enforce any security interest or lien given or provided for under this Agreement or any other document in such manner and in such order, as to all or any part of the collateral as Lender, in its sole judgment, deems to be necessary or appropriate, and Borrower, to the extent Borrower can, waives any and all rights, obligations, or defenses now or hereafter established by law relating to the foregoing.

Credit Agreement (01-16) Page 2 of 5

Exhibit C
Page 3   Exhibit 2 to
Request for Judicial Notice
Page 78

9.1   **Acceleration.** On Borrower's default, and at Lender's option, all amounts not yet due including without limitation: unpaid principal, including amounts advanced for taxes, insurance, and other expenses provided herein, accrued unpaid interest and amounts charged in Section 6 (collectively hereinafter referred to as "Accelerated Amounts"), shall become immediately due and payable without presentment, demand, notice of non-payment, or protest.

9.2   **No Waiver.** Any delay, failure or discontinuance of Lender in exercising any right or remedy shall not waive that right or remedy or any other right or remedy. Any explicit waiver of default by Lender must be in writing and signed by Lender. No waiver of default by Lender shall operate as a waiver of any other default or of the same default on a future occasion.

10. **Representations and Warranties.** Borrower makes the representations and warranties to Lender, which shall survive termination of this Agreement: (i) **Authority and Power.** Borrower has the right and is duly authorized to borrow the sums requested from Lender and to execute, deliver to Lender, and perform the terms of this Agreement and any Loan Documents delivered to Lender; (ii) **Qualified to Do Business.** Borrower is qualified to do business in all jurisdictions in which the Borrower transacts business and has all necessary licenses and permits required by any such jurisdiction; (iii) **Due Organization.** (a) For each Borrower that is a general or limited partnership, limited liability company, limited liability partnership or limited liability limited partnership, such Borrower is duly organized and existing under applicable state law; the individuals executing this Agreement and all instruments and documents relating to the Loan are fully authorized to execute the same and no other signature is necessary in order to bind such Borrower; and the partnership, limited liability company, limited liability partnership agreement or limited liability limited partnership and related documents provided to Lender have not been altered, amended, revoked or replaced; (iv) **True, Complete and Correct Information.** All information contained in or provided in connection with the application for this Loan and in any financial statements submitted to any Lender is true and correct in all material respects, and any financial statement fairly and completely presents the financial condition of Borrower as of its effective date, and since its effective date there has been no material adverse change in the financial condition or operations of Borrower; (v) **Litigation, Governmental Action.** Except as disclosed to Lender in writing, there is no litigation with any person or any proceedings before a governmental agency now pending or threatened against Borrower; (vi) **Title to Collateral.** All real and personal property pledged as Collateral is owned by the Borrower, Guarantor or other Person pledging such collateral; such pledgor has the right and authority to pledge the Collateral; and such pledge does not require any consent or approval or operate as a default under any other document. The ownership of the Collateral is free and clear of all liens, claims, and encumbrances except those disclosed by Borrower to Lender and approved by Lender in writing. Borrower, Guarantor or other Person pledging such collateral shall not encumber, pledge, mortgage, or grant a security interest in any Collateral without Lender's prior written approval; (vii) **Authorization.** The execution, delivery, and performance of this Agreement and any Loan Documents have been duly authorized by all necessary actions of Borrower and/or Guarantor, do not require the consent or approval of any other person, regulatory authority, or governmental body, and do not conflict with, result in the violation of, or constitute a default under: (a) any provision of its articles of incorporation or organization, bylaws, partnership agreement, trust agreement or any other agreement or instrument binding upon Borrower and/or any Guarantor; or (b) any law, governmental regulation, court decree, or order applicable to Borrower or any Guarantor; (viii) **Taxes.** All tax returns and reports of Borrower that are required to be filed as of the date of this Agreement, or as of the date of any Loan Document, have been filed, and all taxes due as of the date of this Agreement, or as of the date of any Loan Document, have been paid, except as previously disclosed in writing to Lender.

## B.   MISCELLANEOUS

1.   **General Provisions.** Borrower hereby severally waives diligence, presentment for payment or acceptance, demand, protest and notice of protest, notice of dishonor, notice of non-payment, and notice of any other kind whatsoever, and all defenses on the grounds of any extension of time of payment or release of collateral or parties. To the extent that the CoBank, FCB ("Bank") or similar funding bank gives or has given value to Lender in reliance upon this Agreement, Borrower severally waives any and all defenses or rights of offset which Borrower may have against Lender when this Agreement is held by such Bank or its successors or assigns. Borrower further agrees that failure on the part of Lender to exercise any power, right or privilege hereunder, or to insist upon prompt compliance with the terms hereof, shall not constitute a waiver thereof.

2.   **Acknowledgment of Receipt of Loan Documents.** In accordance with federal regulations, the undersigned acknowledge that Jeanne L. Botelho, as Borrower's authorized agent to receive loan documents has received a complete set of copies of the Loan Documents.

3.   **Severability.** Any provision of this Agreement, the security documents or any other documents contemplated herein which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining provisions of such loan documents or affecting the validity or enforcement of such provision in any other jurisdiction.

4.   **Loan Charges.** If a law, which applies to this Agreement, and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this Agreement exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected which exceeded permitted limits will be refunded to Borrower, without interest thereon. Lender may choose to make this refund by reducing the principal Borrower owes under this Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment.

5.   **Disputed Payments.** All communications concerning disputed payment amounts, including any item or other payment tendered as "payment in full" or in "full satisfaction" of the indebtedness, must be sent to Lender at the following address: American AgCredit, Disputed Accounts, P.O. Box 1120, Santa Rosa, California 95402-1120. Any such payment must be marked accordingly and must indicate the Borrower's loan number. Lender reserves the right to reject any such payment by returning the payment to the Borrower.

6.   **Time.** Time is of the essence.

7.   **Survival of Warranties and Covenants.** The warranties, representations, conditions, covenants, and agreements in this Agreement and in the other Loan Documents will survive the making of the Loan and the execution and delivery of this Agreement and will continue in full force until the Loan has been paid in full. Nothing in this Paragraph 7 is intended to limit any other provision of the Loan Documents that by their stated terms survive the repayment of the Loan or the termination of any Loan Document.

8.   **Integration and Interpretation.** The Loan Documents contain or expressly incorporate by reference the entire agreement between Lender and Borrower with respect to the covered matters and supersede all prior negotiations. Any reference to the Loan Documents themselves in any of the Loan Documents will include all amendments, renewals, or extensions approved by Lender.

9.   **Number.** When the context and construction so require, all words used in the singular will be deemed to have been used in the plural and vice versa.

10.   **No Offset.** Borrower will pay to Lender all amounts owing under this Agreement, or any of the other Loan Documents, and perform all other conditions and obligations to be performed by Borrower, without deduction, offset, or counterclaim of any kind.

11.   **Attorney's Fees.** If Lender employs attorneys, accountants, appraisers, consultants, or other professional assistance, including the services of any such person who is a direct employee of Lender, in connection with enforcement of the Loan Documents, then, to the extent permitted by law, the reasonable amount of costs, expenses

Credit Agreement (01-16) Page 3 of 5

Exhibit C
**Page 4** Exhibit 2 to
Request for Judicial Notice
Page 79

and those incurred by Lender shall be payable on demand, or each Lender may, as its option, add the amount of such costs, expenses and reasonable fees to the principal amount of the Loan. Lender thereafter may charge interest on such amount at the interest rate then applicable to the principal.

12. **MUTUAL WAIVER OF JURY TRIAL.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING (i) BROUGHT BY BORROWER, ANY LENDER, OR ANY PERSON RELATING TO (a) THE LOANS OR ANY UNDERSTANDINGS OR PRIOR DEALINGS BETWEEN THE PARTIES OR (b) THE LOAN DOCUMENTS, OR, (ii) TO WHICH ANY LENDER OR BORROWER IS A PARTY. IN THE EVENT THAT ANY OF THE FOREGOING LANGUAGE IS DEEMED TO BE UNENFORCEABLE, THE PARTIES SHALL SUBMIT ANY DISPUTE ARISING OUT OF THE AFOREMENTIONED ACTIONS OR PROCEEDINGS FOR RESOLUTION BY ARBITRATION IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1282.2, OR SIMILAR STATUTE, UNDER THE PROVISIONS OF THE JAMS COMPREHENSIVE ARBITRATION RULES AND PROCEDURES.

13. **Notice, Communications and Use of E-Mail and Other Electronic Formats.**

13.1 **Notice, Execution and Communications.** Unless otherwise expressly provided herein or in the Loan Documents, all notices and other communications provided for hereunder shall be in writing (including by FAX or email transmission). All such written notices shall be mailed, faxed, emailed or delivered to the applicable address, FAX number or email as each party provides to the other from time to time. Loan Documents may be signed and delivered by FAX, telecopy, emailed pdf or any other electronic means that reproduces an image of the actual executed signature. The effectiveness of any such documents and signatures shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on Borrower, Guarantor and Lender. Lender may also require that any such document and signature be confirmed by manually-signed original thereof; provided however, that the failure to request or deliver the same shall not limit the effectiveness of any electronically delivered document. Email, internet or intranet whether may be used only to distribute routine communications, such as financial statements, billing statements and other like information and to distribute Loan Documents for execution by the parties thereto and may not be used for any other purpose, unless approved by Lender and the parties hereto.

13.2 **Use of Electronic Documents.** Electronically stored copies of this Agreement or other documents related to transactions with Lender are considered to be the true, complete, valid, authentic and enforceable records of this Agreement and the Borrower's other transactions with Lender, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated and maintained in printed form. Borrower agrees not to contest the admissibility or enforceability of Lender's electronically stored copies of this Agreement or any other documents generated with respect to any existing or future loans.

14. **Definitions.** As used herein, the following terms are defined as follows:

"Applicable Margin" shall mean a number of basis points expressed as a percentage added to the Association Reference Rate to obtain a variable interest rate. The Applicable Margin is variable and may change in accordance with the procedures set forth in the paragraph entitled "Changes to Interest Rate" of Section 5.1 above. The Applicable Margin may be a positive or negative number.

"Association Reference Rate" shall mean a per annum rate which is the then most recent rate announced by the Lender at its principal office as the Association Reference Rate and is set by Lender based upon various factors, including Lender's costs, desired return, general economic factors and is used as a reference point for pricing some loans. Lender may price loans at, above or below the Association Reference Rate.

"Date of Disbursement" shall mean the date that loan funds are disbursed by Lender.

"Default Rate" shall mean a rate of interest charged on the outstanding principal balance of the Loan equal to five (5) percentage points per annum above the interest rate otherwise applicable pursuant to Section 5, but not in excess of the maximum interest rate permitted by law.

"Guarantor" or "Guarantors" shall include: Joanna L. Botelho.

"Guaranty(ies)" means one or more, as the context requires, of the guaranties executed and delivered to Lender in connection with this Loan.

"Loan Document(s)" shall mean one or more, as the context requires, of this Agreement and the documents signed by or on behalf of the Borrower and Guarantor to evidence or secure this Loan and all amendments, modifications or supplements thereto.

"Maturity Date" shall mean May 1, 2017.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Potential Default" shall mean the occurrence of an event that with the passage of time or the giving of notice, or both, would constitute an Event of Default under any of the Loan Documents, and, if applicable, with respect to non-monetary defaults only, where Borrower is not, within the applicable grace period, diligently prosecuting a cure (satisfactory in all respects to Lender).

"Security Agreement" shall mean collectively, whether one or more, the following Security Agreement(s), as the same may be amended, modified, supplemented, revised, restated and replaced from time to time:

| Dated | Debtor |
| --- | --- |
| August 12, 2013 | Borrower |

"Subsidiary" shall mean any corporation, association or business entity of which Borrower owns, directly or indirectly, more than fifty percent of the voting securities or which Borrower otherwise controls.

15. **Applicable Law.** Enforcement of this Agreement, and any other Loan Document executed in connection herewith shall be governed by and construed in accordance with federal laws to the extent applicable, and shall otherwise be governed by the laws of the state in which Borrower is domiciled at the time the Loan Documents are executed or, if more than one or is not a state of the United States of America, then the state in which this Agreement was executed by Lender.

16. **Choice of Forum.** Any dispute that arises under or relates to this Agreement or any Loan Document (whether contract, tort, or both) shall be resolved in the forum in which the branch office of Lender originating the Loan is located.

17. **Counterparts.** The Loan Documents may be executed in any number of counterparts and by different parties in separate counterparts, each of which when executed and delivered will be deemed an original and all of which counterparts taken together will constitute one and the same instrument. The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signatures thereon provided that any such signature page is attached to any other counterpart identical thereto having additional signature pages executed by any other party.

THIS AGREEMENT AND THE EXHIBITS AND DOCUMENTS REFERRED TO HEREIN ARE INTENDED BY THE PARTIES AS THE FINAL EXPRESSION OF THIS AGREEMENT AND ARE INTENDED AS A COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS AND CONDITIONS THEREOF. THIS AGREEMENT AND THE AGREEMENTS AND DOCUMENTS REFERRED TO HEREIN MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR ORAL AGREEMENT OR OF A CONTEMPORANEOUS ORAL AGREEMENT BETWEEN LENDER AND BORROWER. BY SIGNING THIS AGREEMENT, BORROWER AFFIRMS THAT NO UNWRITTEN ORAL AGREEMENT BETWEEN THE PARTIES EXISTS AS OF THE DATE THIS AGREEMENT IS SIGNED.

Credit Agreement (01-16) Page 4 of 5

Exhibit C
Page 5 Exhibit 2 to
Request for Judicial Notice
Page 80

**BORROWER:**

LJB Farms, LLC, a California limited liability company

By: _LJB Farms LLC by_

Joanna L. Botelho, Manager

**GUARANTOR:**

The undersigned Guarantor hereby consents to the terms and conditions of this Agreement and affirm the obligations under the Continuing Guaranty(ies).

Joanna L. Botelho

Exhibit C
Page 6  Exhibit 2 to
Request for Judicial Notice
Page 81

# Exhibit D

## RESTRUCTURE AGREEMENT

This Restructure Agreement (this "Agreement") is entered into and made effective by and between American AgCredit, PCA (the "Association"), and LJB Farms, LLC, a California limited liability company (collectively, whether one or more, "Borrower"), and Joanna L. Botelho (collectively, whether one or more, "Guarantor") as of the 9ᵗʰ day of February, 2017.

### RECITALS

A.　On or about April 20, 2015, the Association made a loan to Borrower in the initial principal amount of One Hundred Fifty Thousand Dollars ($150,000.00) (the "2015 Loan") pursuant to that certain Master Membership and Loan Agreement dated June 18, 2013, as supplemented by that certain Covenant and Condition Rider dated June 18, 2013 and by that certain Supplemental Loan Agreement dated April 20, 2015 (as supplemented and amended from time to time, the "2015 Loan Agreement") between Borrower and the Association. The Loan is evidenced by that certain Promissory Note (the "2015 Note"), dated as of April 20, 2015, and made by Borrower to the order of the Association, and secured by the secured by a security agreement dated August 12, 2013 (the "Security Agreement"), given by Borrower in favor of the Association.

B.　On or about March 7, 2016, the Association made a loan to Borrower in the initial principal amount of Three Hundred Twenty-Five Thousand Dollars ($325,000.00) (the "2016 Loan"), evidenced by that certain Credit Agreement dated March 7, 2016 (the "2016 Credit Agreement"), made by Borrower to the order of the Association, and secured by the Security Agreement. The 2015 Loan and the 2016 Loan are sometimes hereinafter referred to together as the "Loans".

C.　The Loans are further supported by that certain Continuing Guaranty -- Recourse dated August 12, 2013 (the "Guaranty") executed by Guarantor in favor of the Association.

D.　The 2015 Loan Agreement, the 2015 Note, the 2016 Credit Agreement, the Security Agreement, the Guaranty and all other documents executed and delivered by Borrower and/or Guarantor in connection with any of such documents prior to the date hereof are hereinafter collectively referred to as the "Loan Documents."

E.　As of the date hereof the total balances due under the Loans (the "Indebtedness") are as follows:

| 2015 Loan: | |
|---|---|
| Principal Balance | $150,000.00 |
| Interest to 2/9/2017 | 21,992.38 |
| Total | $171,992.38 |
| 2016 Loan: | |
| Principal Balance | $325,000.00 |
| Interest to 2/9/2017 | 24,465.95 |
| Total | $349,465.95 |

These amounts will be increased by interest continuing to accrue as well as other fees charged to the Loans according to the Loan Documents and by operation of law.

F.　The 2015 Loan is in default for failure to pay the 2015 Loan in full when it matured on July 1, 2016.

G.　Due to cross-default language included in the Loan Documents, the 2016 Loan is also in default.

H.      The Association has demanded that the Loans be paid in full but the Loans remain in default. Therefore, the Association now has the right to pursue its remedies on default, including, without limitation, the right to foreclose on its liens, judicially or non-judicially.

I.      In accordance with the Association's Distressed Loan Policy, Borrower and Guarantor requested that Lender refinance the Loans and advance additional funds.

J.      In further accordance with the Association's Distressed Loan Policy, the Association denied the Borrower's request, and provided a counterproposal as set forth in this Agreement.

K.      The Association is willing to modify the terms of repayment of the Loans subject to and in accordance with this terms, covenants, conditions and provisions of Agreement.

### AGREEMENT

In consideration of the above Recitals, for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, the parties agree as follows:

1.      Incorporation of Recitals; Defined Terms. The Recitals of this Agreement are hereby incorporated by reference as though fully set forth at this point and Borrower and the Association acknowledge those recitals to be true and correct. Any terms with initial capitalization used but not otherwise defined in this Agreement shall have the meanings assigned to them in the Loan Documents.

2.      Changes to Terms of Repayment. Subject to satisfaction of the Conditions of Restructure (defined in Paragraph 3 below), Lender agrees to modify the terms of repayment of the Loans as follows:

    (a)     The maturity dates of both Loans shall be extended to April 1, 2022.

    (b)     An interest-only payment will be due on both Loans on April 1, 2018.

    (c)     Beginning on April 1, 2019 and continuing on the first day of every April thereafter, the Loans will be payable in equal annual installments of principal and interest in amounts necessary to fully amortize the Loans by April 1, 2022, at which time the Loans will be due and payable in full.

3.      Conditions of Restructure. The Association's agreements to modify the terms of repayment of the Loans are conditioned upon and subject to timely (and continuing) satisfaction of each of the following conditions ("Conditions of Restructure"):

    (a)     As consideration for this Agreement, Borrower will pay to the Association a restructure fee in the amount of $4,750.00 (the "Restructure Fee"). The Restructure Fee is fully earned upon mutual execution and delivery of this Agreement by the Association and Borrower, and will not under any circumstances be applied to the indebtedness or to any other sums presently or hereafter owned to the Association under the Loan Documents, but instead will be retained by the Association as a fee for the financial accommodations provided by the Association pursuant to this Agreement. The Restructure Fee is due and payable on or before April 1, 2017 or when the Association next receives crop proceeds from Borrower's almond processor for the account of Borrower, whichever occurs first.

    (b) On or before March 31, 2017, Borrower shall have executed, acknowledged (as applicable) and delivered to Lender the following loan modification documents and security instruments:

        (i)      This Agreement;

FORBEARANCE AGREEMENT                    2

    (ii)    Amendment to Promissory Note (2015 Loan);

    (iii)   Amendment to Supplemental Loan Agreement (2015 Loan);

    (iv)   Amendment to Credit Agreement (2016 Loan);

    (v)    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, covering the real property commonly known as 13610 Avenue 21 ½, Chowchilla, Madera County, California, to be given by Borrower to secure both Loans; and

    (vi)   Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, covering the real property commonly known as 4035 & 4261 Clausen Rd., Le Grand, Merced County, California, to be given by Borrower to secure both Loans.

    (c)    No Event of Default (other than the failure to pay the 2015 Loan in full on the Maturity Date) shall exist under any of the Loan Documents, and Borrower and each Obligor (hereinafter defined) shall be and remain in compliance with all of the terms and provisions of all Loan Documents, as modified by this Agreement, during the term of this Agreement.

    (d)    All representations and warranties made by Borrower to the Association under this Agreement shall remain true and correct.

    (e)    Borrower shall not breach any promise or covenant contained in this Agreement and shall not be in default under any provision of this Agreement.

    (f)    Borrower shall pay to the Association upon demand (and by execution hereof, Borrower agrees to pay) all costs and expenses incurred by the Association in connection with the Loan Documents and this Agreement, including without limitation recording, mailing, publication and other costs of foreclosure, title inspection reports, appraisals, the Association's attorneys' fees, and any other fees and expenses incurred by the Association in connection with the Loan Documents or this Agreement.

    4.    **Certain Acknowledgments and Agreements by Borrower for the Association's Benefit.** Borrower acknowledges and agrees as follows:

    (a)    Without limiting other defaults that may occur under this Agreement or the Loan Documents, Borrower's failure to timely make any of the payments described in Paragraph 2 above shall constitute an Event of Default (defined below) under this Agreement.

    (b)    The Association has granted valuable financial accommodations to Borrower under this Agreement.

    (c)    Borrower hereby waives any right to claim that any action taken by the Association in connection with this Agreement constitutes an action by the Association under Section 726 of the California Code of Civil Procedure.

    5.    **Releases, Covenants Not to Litigate, Assignments and Indemnification.** Effective as of the time of its actual execution of this Agreement, in consideration for this modification, each Borrower agrees as follows:

    (a)    Each Borrower, jointly and severally, hereby: (i) fully and finally acquits, quitclaims, releases and forever discharges each of the Released Parties (the term "Released Parties" shall be defined as Association and its officers, directors, shareholders, representatives, employees, agents and attorneys, and their respective successors and assigns) of and from any and all obligations, claims, liabilities, damages, demands, debts, liens, deficiencies or cause or causes of action of whatever kind and character (whether such claims arise in contract or tort, and whether such claims are founded

FORBEARANCE AGREEMENT       3

upon statutory or common law, including but not limited to any duty of good faith and fair dealing, causes of action arising out of or construed to be deceptive trade practices, usury, unfair claim settlement practices, warranty, or any other cause of action whatsoever), at law or in equity, known or unknown, contingent or otherwise, whether asserted or unasserted, whether now known or hereafter discovered, arising out of or in any way related to or concerning, whether directly or indirectly, proximately or remotely the Loan, the transactions contemplated hereby, or any action or omission by any of the Released Parties in connection with the Loan or the transaction contemplated hereby, which Borrower may have against the Released Parties, to the extent such claims originated in whole or in part or, based on presently existing facts, could have originated in whole or in part on or before the date of actual execution hereof; (ii) waives any and all defenses to payment of the Loan for any reason; and (iii) waives any and all defenses, counterclaims or offsets to the Loan or security therefore (collectively, the "Released Claims").

(b)     Except as hereinabove limited, it is understood and agreed by Borrower that the claims released hereunder include all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, arising out of or related to any and all of the matters referred to in the immediately preceding paragraph, notwithstanding the provisions of Section 1542 of the California Civil Code, which Section provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in its favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Each Borrower acknowledges that it may hereafter discover facts different from, or in addition to, those which it now knows or believes to be true with respect to the claims released hereunder, and agrees that the foregoing release shall be and remain effective in all respects notwithstanding such different or additional facts or the discovery thereof, and waives application of the provisions of Section 1542 or similar state law with respect to the claims released hereunder.

(c)     Each Borrower, jointly and severally, understands and agrees that its agreement to the provisions of this Paragraph 5 is knowing and voluntary and is executed without reliance on any statement or representation by any of the Released Parties concerning the nature or extent of any claims, damages or legal liability therefore, that it has consulted with such attorneys, accountants, financial advisors, and other advisors as it has deemed necessary and appropriate in connection with the negotiation and execution of this Amendment and are fully aware of the legal and financial consequences of the execution of this Amendment (including this Paragraph 5).

6.     Distressed Loan Policy.  Borrower hereby acknowledges receipt of a copy of the Association's Distressed Loan Policy in accordance with the Agricultural Credit Act of 1987. Borrower further acknowledges and agrees that this Agreement constitutes the Borrower's entire restructure plan developed pursuant to the Distressed Loan Policy and Borrower's Application for Restructure and any modifications submitted pursuant to the Distressed Loan Policy.  Borrower further acknowledges and agrees that:

(a)     Borrower has substituted this Agreement as Borrower's final and complete restructure proposal and, consequently;

(b)     Borrower has withdrawn Borrower's initial restructure proposal, as set forth in Borrower's Application for Restructure;

(c)     Because Borrower has withdrawn Borrower's restructure proposal Borrower does not wish to have the Association's denial of Borrower's original proposal reviewed by a credit review committee.

7.     No Waiver of Rights. Except as expressly set forth herein, nothing contained herein shall be deemed a waiver of any of the Association's rights or remedies under the Loan Documents.

8.     Obligors. For purposes of this Agreement, the term "Obligor" shall mean each person or entity which is obligated to pay the indebtedness evidenced by the Note or to perform the obligations contained in the Deed of Trust. Each Obligor has executed a counterpart of this Agreement to evidence the consent of that Obligor to the terms of this Agreement and to acknowledge that the obligation of the Obligors shall remain in full force and effect and is not impaired, limited, or terminated as a result of this Agreement.

9.     Representations, Warranties and Covenants. In order to induce the Association to enter into this Agreement, Borrower makes the following representations, warranties and covenants:

(a)     The execution and performance of this Agreement by Borrower does not and will not violate any agreement to which Borrower is a party.

(b)     All financial and other information given by Borrower or any of its agents or representatives to the Association is and shall be true and accurate.

(c)     Borrower shall take no action that would impair Borrower's ability to perform its obligations hereunder or to satisfy any of the Conditions of Restructure.

(d)     Each of the Loan Documents entered into by Borrower is valid and enforceable against Borrower in accordance with the terms thereof. The Guaranty is valid and enforceable against Guarantor.

(e)     Except as described in the Recitals, no default has occurred and is continuing under the Loan Documents, and no event has occurred and is continuing, or will occur upon execution of this Agreement, which, with notice or the passage of time or both, would be a default, or event of default, under the Loan Documents.

(f)     Borrower is a validly existing limited liability company in good standing under the laws of the State of California and is duly qualified to conduct its business in all jurisdictions where it does conduct business.

(g)     Borrower is duly authorized and empowered to enter into and perform under this Agreement.

10.     Bankruptcy of Borrower. Borrower hereby agrees that in the event Borrower shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended (the "Bankruptcy Code"), (ii) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency or any other relief for debtors, (iii) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator, or (iv) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency or relief for debtors, the Association shall thereupon, subject to court approval, be entitled to exercise all rights and remedies, and in furtherance thereof, Borrower hereby agrees not to (i) contest, any motion by the Association for relief from any automatic stay imposed by Section 362 of the

FORBEARANCE AGREEMENT                              5

Bankruptcy Code, or otherwise, or to (ii) otherwise seek to prevent the exercise of the rights and remedies otherwise available to the Association as provided in the Loan Documents, this Agreement or as otherwise provided by law or in equity, and Borrower hereby irrevocably waives its respective rights to object to such relief.

11.　Effectiveness of the Loan Documents.　This Agreement shall not constitute a novation of the Note or any of the other Loan Documents, and the Note and other Loan Documents shall remain in full force and effect subject only to the Association's agreement to forbear as set forth herein.

12.　No Obligation to Extend Future Indulgences; No Waiver.　Borrower acknowledges and agrees that the Association is not obligated and does not agree to extend any other or future indulgences except as expressly set forth herein. This Agreement shall not constitute a waiver by the Association of any of Borrower's defaults under the Note and other Loan Documents. Except as expressly provided herein, the Association reserves all of its rights and remedies under the other Loan Documents.　No action or course of dealing on the part of the Association, its officers, employees, consultants, or agents, nor any extension of time for payment, nor failure or delay by the Association with respect to exercising any right, power or privilege of the Association under the Loan Documents or this Agreement, shall operate as a waiver thereof, except to the extent expressly provided herein.

13.　Construction.　This Agreement has been entered into by Borrower and the Association following consultation with advice from counsel to each of them, respectively, and shall not be construed against any party to it because of the fact that any particular draft or all drafts hereof were prepared by one party or its counsel rather than another. Each of Borrower and the Association acknowledge and agree that this Agreement is not an executory contract that may be assumed or assigned upon the filing of a bankruptcy or insolvency proceeding by or against Borrower.

14.　Severability.　If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and shall be enforced to the fullest extent permitted by law.

15.　Time of the Essence.　Borrower and the Association hereby acknowledge and agree that time is strictly of the essence with respect to each and every term, condition, obligation and provision hereof and that failure to timely perform any of the terms, conditions, obligations or provisions hereof by either party shall constitute a material breach of and a noncurable default under this Agreement by the party so failing to perform.

16.　Attorneys' Fees.　In the event any suit or proceeding is brought or other action commenced to enforce, construe, interpret, rescind or cancel this Agreement or any of its provisions, whether or not any lawsuit is actually filed or pursued, the prevailing party shall recover against the other party all of the prevailing party's attorneys' fees and costs incurred in connection with such action or proceeding, including any appeals, including, without limitation, fees and costs attributable to the Association's inside counsel.

17.　Miscellaneous.　This Agreement is intended to benefit and shall be deemed to benefit all of the parties to it and their respective successors and assigns, and no other person or entity. This Agreement may not be modified in any respect except in writing signed by the party or parties charged with such modification, and shall be governed by and construed in accordance with the laws of the State of California. This Agreement may be executed in counterparts, and all counterparts

FORBEARANCE AGREEMENT　　　　　　　　　6

shall constitute one original. This Agreement has been executed by Borrower after consultation with its legal counsel both prior to and in conjunction with, and at the time of the execution and delivery hereof.

18. Acknowledgement of Receipt. The undersigned, Joanna L. Botelho, as Special Agent to Receive Loan Documents, hereby acknowledges receipt of a copy of this Agreement.

19. Entire Agreement. This Agreement constitutes the entire agreement of the parties with respect to the matters stated herein. There are no oral agreements or understandings that have not been reduced to writing. The Borrower understands and agrees that the loan officers with whom Borrower has been dealing have no authority to enter into oral agreements or assurances and that the representatives of American AgCredit are not authorized to make any oral agreements or any oral modifications of the Loan Documents. DO NOT EXECUTE THIS AGREEMENT IF YOU BELIEVE THAT YOU HAVE ANY AGREEMENTS, OR HAVE RECEIVED ANY PROMISES OR ASSURANCES, THAT ARE NOT EMBODIED IN THIS AGREEMENT.

IN WITNESS WHEREOF, this Agreement has been executed by each of the parties to it as of the date set forth above.

LJB Farms, LLC, a California limited liability company

By: _____
Joanna L. Botelho, Manager

AMERICAN AGCREDIT, PCA

By: _____
Name: _____
Title: _____

FORBEARANCE AGREEMENT                    7

shall constitute one original. This Agreement has been executed by Borrower after consultation with its legal counsel both prior to and in conjunction with, and at the time of the execution and delivery hereof.

18. Acknowledgement of Receipt. The undersigned, Joanna L. Botelho, as Special Agent to Receive Loan Documents, hereby acknowledges receipt of a copy of this Agreement.

19. Entire Agreement. This Agreement constitutes the entire agreement of the parties with respect to the matters stated herein. There are no oral agreements or understandings that have not been reduced to writing. The Borrower understands and agrees that the loan officers with whom Borrower has been dealing have no authority to enter into oral agreements or assurances and that the representatives of American AgCredit are not authorized to make any oral agreements or any oral modifications of the Loan Documents. DO NOT EXECUTE THIS AGREEMENT IF YOU BELIEVE THAT YOU HAVE ANY AGREEMENTS, OR HAVE RECEIVED ANY PROMISES OR ASSURANCES, THAT ARE NOT EMBODIED IN THIS AGREEMENT.

IN WITNESS WHEREOF, this Agreement has been executed by each of the parties to it as of the date set forth above.

LJB Farms, LLC, a California limited liability company

By: _____
    Joanna L. Botelho, Manager


AMERICAN AGCREDIT, PCA

By: _____
Name: _____
Title: _____

## GUARANTOR'S CONSENT

The undersigned, Joanna L. Botelho ("Guarantor") hereby consents to the terms and provisions of the Restructure Agreement dated February 9, 2017, among AMERICAN AGCREDIT, PCA, as lender, and LJB Farms, LLC, a California limited liability company, as "Borrower". In addition, Guarantor hereby reaffirm her respective obligations under the Continuing Guaranty - Recourse made effective as of August 12, 2013 (as amended from time to time, the "Guaranty"), and reaffirm that (i) the obligations of Guarantor under the Guaranty shall continue notwithstanding the execution, delivery and performance by Borrower under the Restructure Agreement.

AGREED AND ACKNOWLEDGED:

Joanna L. Botelho

FORBEARANCE AGREEMENT                                        8

# Exhibit E

LJB Farms, LLC                                                                    Loan No.     6355

## AMENDMENT TO CREDIT AGREEMENT

This Amendment to Credit Agreement ("Amendment") is made and entered into as of February 9, 2017, by and between American AgCredit, PCA ("Lender") and LJB Farms, LLC, a California limited liability company (collectively, whether one or more, "Borrower").

### RECITALS

A.  On March 7, 2016, the Lender made Borrower a loan in the amount of $325,000.00 ("Loan") evidenced by a Credit Agreement dated March 7, 2016 ("Credit Agreement"), as well as other loan documents.

B.  As of the date of this Amendment the outstanding principal balance of the Loan is $325,000.00. Interest continues to accrue on this amount at the applicable rate. As of the date of this Amendment funds in the amount of $0.00 ("Available Commitment") are available to draw pursuant to the Loan Documents.

C.  The following parties, Joanna L. Botelho (collectively whether one or more, "Guarantor") executed a Continuing Guaranty(ies) of the indebtedness evidenced by the Loan Documents.

D.  In conjunction with the execution of the concurrent Restructure Agreement, Lender has agreed to the following:

a.  Change the Maturity Date from May 1, 2017 to April 1, 2022.
b.  Change the terms of the repayment of the Loan.

Accordingly the parties agree as follows:

Unless otherwise defined herein, capitalized terms used herein shall have the same meaning as in the Credit Agreement.

1.  The Borrower acknowledges that the recitals contained in this Amendment are true and correct.

2.  Amendment to Loan Documents. Effective as of February 9, 2017, the Credit Agreement is hereby amended as follows:

2.1.  Maturity Date. The Maturity Date as defined in the Credit Agreement shall mean April 1, 2022. The Borrower's ability to draw Available Commitment, if any, is hereby terminated.

2.2.  Repayment. Paragraph 4 of the Credit Agreement is hereby deleted and replaced with the following as of March 9, 2016:

2.2.1.  On April 1, 2018 Borrower shall pay all interest then accrued on said total sum or the unpaid balance thereof, and, thereafter, Borrower shall pay installments of principal and interest of One Hundred Five Thousand Three Hundred Thirty-Six and 43/100 Dollars ($105,336.43) each, commencing on April 1, 2019, and on the first day of each and every twelfth month thereafter. On the Maturity Date, Borrower shall pay the unpaid principal balance and all accrued interest in full.

3.  Other Changes. In consideration for the modifications set forth in Section 2, the following changes to the Credit Agreement will become effective on February 9, 2017:

3.1.  Collateral Amendment. The Collateral as described in paragraph 2 of the Credit Agreement is hereby amended to add the following:

2.3  A lien on the property as described in Deed of Trust, as well as any funds held for Borrower's accounts and on any goods, materials, equipment, furnishings, fixtures, and other personal property placed in, about, or appurtenant to the property as described in the Deed of Trust or used in connection therewith, now owned or hereafter acquired (the "Property").

3.2  Representations and Warranties. Paragraph 10 titled Representations and Warranties is hereby deleted in its entirety and replaced with the following:

10.  Representations and Warranties. Borrower makes the representations and warranties to Lender, which shall survive termination of this Agreement: (i) Authority and Power. Borrower has the right and is duly authorized to borrow the sums requested from Lender and to execute, deliver to Lender, and perform the terms of this Agreement and any Loan Documents delivered to Lender; (ii) Qualified to Do Business . Borrower is qualified to do business in all jurisdictions in which the Borrower transacts business and has all necessary licenses and permits required by any such jurisdictions. (iii) Due Organization. (a) For each Borrower that is a general or limited partnership, limited liability company, limited liability partnership or limited liability limited partnership, such Borrower is duly organized and existing under applicable state law, the individuals executing this Agreement and all instruments and agreements relating to the Loan are fully authorized to execute the same and no other signature is necessary in order to bind such Borrower; and the partnership, limited liability company, limited liability partnership agreement or limited liability limited partnership and related documents provided to Lender have not been altered, amended, revoked or replaced; (iv) True, Complete and Correct Information. All information contained in or provided in connection with the application for this Loan and in any financial statements submitted to any Lender is true and correct in all material respects, and any financial statement fairly and completely presents the financial condition of Borrower as of its effective date, and since its effective date there has been no material adverse change in the financial condition or operations of Borrower; (v) Litigation, Governmental Action. Except as disclosed to Lender in writing,

Amendment to Credit Agreement (12-16) (Page 1 of 4)

there is no litigation with any person or any proceedings before a governmental agency now pending or threatened against Borrower; (vi) Title to Collateral. All real and personal property pledged as Collateral is owned by the Borrower, Guarantor or other Person pledging such collateral; such pledgor has the right and authority to pledge the Collateral; and such pledge does not require any consent or approval or operate as a default under any other document. The ownership of the Collateral is free and clear of all liens, claims, and encumbrances except those disclosed by Borrower to Lender and approved by Lender in writing. Borrower, Guarantor or other Person pledging such collateral shall not encumber, pledge, mortgage, or grant a security interest in any Collateral without Lender's prior written approval; (vii) Authorization. The execution, delivery, and performance of this Agreement and any Loan Documents have been duly authorized by all necessary actions of Borrower and/or Guarantors, do not require the consent or approval of any other person, regulatory authority, or governmental body, and do not conflict with, result in the violation of, or constitute a default under: (a) any provision of its articles of incorporation or organization, bylaws, partnership agreement, trust agreement or any other agreement or instrument binding upon Borrower and/or any Guarantor; or (b) any law, governmental regulation, court decree, or order applicable to Borrower or any Guarantor; (viii) Commercial/Agricultural Use. Borrower acknowledges and agrees that: (a) the Property securing this Loan is to be used primarily for commercial/agricultural purposes; (b) any residence on the Property is incidental to its commercial/agricultural purpose; (c) Borrower depends upon the income from the commercial/agricultural operations of the Property in order to make payments pursuant to this Loan; (d) because of the commercial/agricultural nature of the transaction evidenced by this Agreement and the Loan Documents, the Loan does not fall within the scope of California Civil Code Section 2954.9(b); (e) each Borrower was represented by legal counsel of its choice with competency in the field of commercial real estate transactions or had the opportunity to do so; (f) Borrower is engaged in a commercial/agricultural enterprise and is familiar with commercial/agricultural transactions such as the transaction evidenced by this Agreement; and (g) while Borrower and Lender intend to enter into a commercial/agricultural transaction that does not fall within the scope of California Civil Code Section 2954.9(b), to the extent that a court of competent jurisdiction determines that the Loan does fall within such statute, each Borrower hereby affirmatively waives any and all protections to which he/she/it would be entitled under California Civil Code Section 2954.9(b); (ix) Taxes. All tax returns and reports of Borrower that are required as of the date of this Agreement, or as of the date of any Loan Document, have been filed, and all taxes due as of the date of this Agreement, or as of the date of any Loan Document, have been paid, except as previously disclosed in writing to Lender.

3.3     The following paragraph is hereby added to the Credit Agreement as Paragraph 18.

18.     Secured Note – Transfer of Security. This Agreement may be secured by one or more deeds of trust or similar security instrument. Per the purpose of this Section 0, each deed of trust or similar security instrument shall be referred to as the "Deed(s) of Trust". If this Agreement is secured by one or more Deed(s) of Trust, in addition to the protections given to Lender under this Agreement, the Deed(s) of Trust securing this Agreement protects Lender from possible losses which might result if Borrower does not keep the promises made in this Agreement. The Deed(s) of Trust contain provisions for acceleration of the maturity of this Agreement upon occurrence of certain events, including the transfer of collateral for the Loan. The following provisions relating to acceleration of the maturity of this Agreement upon transfer of collateral as described in the Deed(s) of Trust are as follows:

"10.     (a) In the event the herein-described Property, or any part thereof, or any interest therein, is sold, agreed to be sold, conveyed, alienated or further encumbered subject to any lien or charge, voluntarily or involuntarily, contractual or statutory, or transferred, including any sale of Carbon Credits or any water transfer as defined in subsection (b) below, by Trustor, or by operation of law or otherwise, without Beneficiary's prior written consent, all indebtedness, irrespective of the maturity dates, at the option of the holder hereof, and without demand or notice, shall immediately become due and payable. Failure to exercise such option shall not constitute a waiver of the right to exercise this option in the event of subsequent sale, agreement to sell, conveyance or alienation.

(b) A water transfer is any transfer, assignment, sale, agreement to sell, conveyance, exchange, gift, encumbrance, pledge, hypothecation, alienation, grant of option to purchase, or other disposition of, directly, indirectly or in trust, voluntarily or involuntarily, by operation of law or otherwise, or the entry into a binding agreement to do any of the foregoing with respect to all or any part of any existing or hereafter created or acquired Water Assets.

(c) Trustor shall provide to Beneficiary upon request copies of any and all instruments in its possession or control, or to which it has access, pursuant to which the Trustor, or any predecessor-in-interest to Trustor, reserved, conveyed or leased any coal, oil, petroleum, gas or other mineral rights (collectively, "mineral rights"), or any portion thereof, in, on or under the Property to any third party, including any modifications, amendments, or addenda to said instruments. Trustor shall provide to Beneficiary prompt notice of (a) any reservation, sale, lease or other transfer of any minerals in, on or under the Property occurring after the date hereof, and (b) the commencement by Trustor or any third party of any action to exploit any mineral rights in, on or under the Property, including the mining or other removal thereof and further including any preparatory work such as, without limitation, the installation of roads, wells, pipelines or other equipment (individually and collectively, a "Mineral Exploitation Event"). If any Mineral Exploitation Event occurs after the date hereof, Beneficiary shall have the right, at its sole option, exercisable by written notice to Trustor, to declare all Indebtedness, regardless of maturity date, immediately due and payable. Notwithstanding the foregoing, if the Regulated Parcel(s) constitute one or more separate legal parcels not necessary for the continuing use of the remainder of the Property, Beneficiary may at its sole option, exercisable by written notice to Trustor, to declare a portion of the Indebtedness (the "Accelerated Loan Amount") immediately due and payable equal to 110% of the value of the parcel or parcels (the "Exploited Parcels") overlying the mineral estate (whether owned by reservation, grant or lease) within which the Mineral Exploitation Event occurred or is occurring. The value of the Exploited Parcel(s) shall be determined by Beneficiary in its sole but reasonable discretion using any reasonable method of valuation.

Beneficiary shall, subject to receipt of the Accelerated Loan Amount, release the Exploited Parcels from the lien of this Deed of Trust.

11. If Trustor is an entity other than a natural person (such as a corporation or other organization), then any Indebtedness, regardless of the maturity date, at the option of the Beneficiary, and without demand or notice, shall become immediately due and payable if: (a) a beneficial interest in Trustor equal to 25% or more in the aggregate is sold or transferred; (b) there is a change in either the identity or number of the managing members, partners or managers of Trustor if Trustor is a partnership or similar entity; or (c) there is a change in ownership of more than 25% of the voting stock of Trustor if Trustor is a corporation or similar entity."

## 3.2. Definitions. :

### 3.2.1    The Deed of Trust definition is hereby deleted in its entirety and replaced with the following

"Deed of Trust" shall mean collectively, whether one or more, the following, as the same may be amended, modified, supplemented, revised, restated and replaced from time to time:

| Dated | Recording Date | Recording Information | County, State | Lien Position |
|---|---|---|---|---|
| February 9, 2017 | | To be recorded | Merced County, California | Third |
| February 9, 2017 | | To be recorded | Madera County, California | Second |

### 3.2.2    The following Water Asset definitions is hereby added as an additional definition:

"Water Asset" shall have the meaning as defined in the Deed of Trust securing this Agreement.

4. No Default. Borrower knows of no event which constitutes, or with the passage of time would constitute, an event of default under the terms and conditions of the Loan Documents.

5. Continuing Validity. Except as expressly modified or changed by this Amendment, the terms of the original Credit Agreement and all other related Loan Documents remain unchanged and in full force and effect. Consent by the Lender to the changes described herein does not waive Lender's right to strict performance of the terms and conditions contained in the Credit Agreement as amended, nor obligate the Lender to make future changes in terms. Nothing in this Amendment will constitute a satisfaction of the indebtedness represented by the Credit Agreement.

6. Miscellaneous.

6.1. Each Borrower and Guarantor acknowledges and agrees that the execution and delivery by the Lender of this Amendment shall not be deemed to create a course of dealing or an obligation to execute similar amendments or substitutions of collateral under the same or similar circumstances in the future.

6.2. This Amendment shall be binding upon and inure to the benefit of the Borrower, and Lender and their respective successors and assigns.

6.3. This Amendment shall be governed by and construed in accordance with the laws of the State of California.

6.4. This Amendment contains the entire agreement of the parties hereto with reference to the matters discussed herein.

6.5. If any term or provision of this Amendment shall be deemed prohibited or invalid under any applicable law, such provision shall be invalidated without affecting the remaining provisions of this Amendment, the Credit Agreement, or any related documents.

In witness whereof the parties have executed this Amendment on the date first above written.

THE UNDERSIGNED AGREE TO ALL THE TERMS AND CONDITIONS SET FORTH ABOVE.

Borrower:

LJB Farms, LLC, a California limited liability company

By: _____
Thomas L. Botelho, Manager

Amendment to Credit Agreement (12-16) (Page 3 of 4

**Guarantor:**

The undersigned Guarantor hereby consents to the terms and conditions of this Amendment and reaffirm their obligations under the Continuing Guaranty(ies).

_____
Joseph L. Botelho

**Lender:**

American AgCredit, FCA

By:_____
     Scott Clifton, Vice President

**Guarantor:**

The undersigned Guarantor hereby consents to the terms and conditions of this Amendment and reaffirm their obligations under the Continuing Guaranty(ies).

_____
Joanna L. Botelho

**Lender:**

American AgCredit, FCA

By: _____
Scott Clifton, Vice President

Amendment to Credit Agreement (12-16) (Page 4 of 4)

**Exhibit F**

Recorded in Official Records, Madera County
**REBECCA MARTINEZ**
Madera County Recorder
P Public

4/10/2017
11:04 AM
MP

Doc#:   2017009984

Titles:   3     Pages:   14

Fees     84.00
Taxes     0.00
Other     0.00
PAID     884.00

Recording Requested by:

WHEN RECORDED MAIL TO:

American AgCredit, PCA
711 W. 19th Street
Merced, California 95340

The undersigned hereby affirm that there is no Social
Security number contained in this document.

_____
Space Above This Line For Recorder's Use

### DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING

THIS DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING (hereinafter "Deed of Trust") is given this 9th day of February, 2017 by LJB Farms, LLC, a California limited liability company whose address is 13610 Avenue 21 1/2, Chowchilla, California 93610, as trustor ("Trustor"), to American AgCredit, PCA, as trustee ("Trustee"), for the benefit of American AgCredit, PCA, a corporation existing and operating under the Farm Credit Act of 1971, as amended, having an office at 711 W. 19th Street, Merced, California 95340, as beneficiary ("Beneficiary").

WITNESSETH: That Trustor IRREVOCABLY GRANTS, CONVEYS AND ASSIGNS unto said Trustee, in trust, with power of sale together with right of entry and possession the following described real property situated in the County of Madera, State of California:

Refer to Exhibit "A" attached hereto and incorporated herein by reference thereto.

### TOGETHER WITH:

(1) all buildings, structures, equipment, fixtures (including, but not limited to, trees, vines and shrubs), machinery and improvements of every kind and description now or hereafter constructed or placed thereon; all standing timber and timber to be cut located thereon; all pumping plants, electrical generators, wind machines, and fencing and storage tanks, now or hereafter used in connection with the Property, all of which are hereby declared to be fixtures;

Deed of Trust, etc. (09-16) (Page 1 of 12)

(2) all grazing rights, leases, permits and licenses; all oil, gas, and mineral leases to the extent owned by Trustor, permits and rights used with the Property; all oil, gas, and mineral interests to the extent owned by Trustor including royalty interests, rents, profits, bonus money, revenue, income, rights and benefits related to or arising out of the Property or the leasing thereof; and all tenements, hereditaments, easements, rights-of-way, and appurtenances to the Property;

(3) all carbon credits, carbon sequestration units, carbon financial instrument contracts, renewal energy credits and the like arising out of methane capture, carbon sequestration and renewal energy systems, including without limitation credits tradable under any greenhouse gases commodity exchange such as, by way of example and not limitation, trading units commonly referred to as Exchange Soil Offsets (XSOs), Exchange Methane Offsets (XMOs) and Exchange Forest Offsets (XFOs) under the Chicago Climate Exchange (CCX) (collectively, "Carbon Credits");

(4) the right, in the name of and on behalf of Trustor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Beneficiary in the Property;

(5) all proceeds, products, substitutions and accessions (including claims and demands therefor) of each of the elements of the Property;

(6) all Water Assets (defined below);

(collectively, the "Property").

Water Assets: All right, title, and interest at any time of Trustor (or any of its bailors, agents, or instrumentalities), whether now existing or hereafter arising or acquired, whether direct or indirect, whether owned legally, of record, equitably or beneficially, whether constituting real or personal property (or subject to any other characterizations), whether created or authorized under existing or future laws or regulations, and however arising in, including without limitation, the following:

(a) All water (including any water inventory in storage), water rights and entitlements, other rights to water and other rights to receive water or water rights of every kind or nature whatsoever including (i) the groundwater on, under, pumped from or otherwise available to the Property, whether as the result of groundwater rights, contractual rights or otherwise, (ii) Trustor's right to remove and extract any such groundwater including any permits, rights or licenses granted by any governmental authority or agency or any rights granted or created by any use, easement, covenant, agreement, or contract with any person or entity, (iii) any rights to which the Property is entitled with respect to surface water, whether such right is appropriative, riparian, prescriptive, decreed or otherwise and whether or not pursuant to permit or other governmental authorization, or the right to store any such water, and (iv) any water, water right, water allocation, distribution right, delivery right, water storage right, or other water-related entitlement appurtenant or otherwise applicable to the Property by virtue of the Property being situated within the boundaries of any district, agency, or other governmental entity or within the boundaries of any private water company, mutual water company, or other non-governmental entity;

(b) All stock, interest or rights (including any water allocations, voting or decision rights) in any entity, together with any and all rights from any entity or other person to acquire, receive, exchange, sell, lease, or otherwise transfer any Water Assets, to store, deposit or otherwise create water credits in a water bank or similar or other arrangement for allocating water, to transport or deliver water, or otherwise to deal with any Water Asset;

(c) All licenses, permits, approvals, contracts, decrees, rights and interests to acquire or appropriate any Water Assets, water bank or other credits evidencing any right to Water Assets, to store, carry, transport or deliver Water Assets, to sell, lease, exchange, or otherwise transfer any Water Asset, or to change the point for diversion of water, the location of any Water Asset, the place of use of any Water Asset, or the purpose of the use of any Water Asset;

Deed of Trust, etc. (09-16) (Page 2 of 12)

(d) All rights, claims, causes of action, judgments, awards, and other judicial, arbiter or administrative relief in any way relating to any Water Asset;

(e) All storage and treatment rights for any Water Asset, whether on or off the Property or other property of Trustor, together with all storage tanks, and other equipment used or usable in connection with such storage and any water bank deposit credits, deposit accounts or other rights arising on account of the storage or nonuse of any Water Asset;

(f) All rights to transport, carry, allocate or otherwise deliver Water Assets by any means wherever located;

(g) All irrigation and watering equipment and all systems, ditches, laterals, conduits, and rights-of-way used to convey such water or to drain the Property;

(h) All guaranties, warranties, marketing, management or service contracts, indemnity agreements, and water right agreements, other water related contracts and water reallocation rights, all insurance policies regarding or relating to any Water Asset; and

(i) All rents, issues, profits, proceeds and other accounts, instruments, chattel paper, contract rights, general intangibles, deposit accounts, and other rights to payment arising from or on account of any use, nonuse, sale, lease, transfer or other disposition of any Water Asset.

References to "water" and "water rights" are used herein in the broadest and most comprehensive sense of the term(s). The term "water" includes water rights and rights to water or whatever rights to money, proceeds, property or other benefits are exchanged or received for or on account of any Water Assets or any conservation or other nonuse of water, including whatever rights are achieved by depositing one's share of any Water Assets in any water bank or with any water authority, or any other water reallocation rights.

**SECURITY AGREEMENT:** To the extent that any of the Property, including without limitation any Water Asset or Carbon Credits, constitutes personal property, this Deed of Trust shall also be deemed to be a security agreement and Trustor does hereby create and grant to Beneficiary a security interest in all such personal property described herein and further grants to Beneficiary all of the rights and remedies of a secured party under the Uniform Commercial Code as may be amended from time to time and other applicable state law, which rights are cumulative.

**TRUSTOR ABSOLUTELY AND UNCONDITIONALLY ASSIGNS,** transfers, conveys and sets over to Beneficiary all the rents, royalties, issues, profits, revenue, income and other benefits of the Property arising from the use or enjoyment of all or any portion thereof, or from any lease, mineral lease to the extent owned by Trustor, or agreement pertaining to the Property (collectively the "Rents"); SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Trustor by Paragraph B.3 hereof. This assignment shall be perfected automatically without appointment of a receiver or Beneficiary becoming a mortgagee in possession.

**FOR THE PURPOSE OF SECURING:** (1) payment of the indebtedness or obligations evidenced by the following promissory note(s) payable by Trustor and/or others to the Beneficiary at the times, in the manner and with interest as therein set forth (promissory notes may evidence a revolving line of credit and may contain variable or adjustable interest rate provisions and offer the ability to convert to other interest rate products):

| Face Amount | Dated |
|-------------|-------|
| $150,000.00 | April 20, 2015 |
| $325,000.00 | March 7, 2016 |

(2) the payment of such additional loans or advances, including advances under a revolving line of credit, with interest thereon, as hereafter may be made to Trustor, or Trustor's successors or assigns, evidenced by a promissory note, guaranty or otherwise; PROVIDED HOWEVER, THAT, such additional loans or advances shall be secured by

Deed of Trust, etc. (09-16) (Page 3 of 12)

this Deed of Trust only if the promissory note, guaranty, or other document evidencing such loans or advances shall recite that it is to be secured by this Deed of Trust; (3) the payment of any substitute notes, renewals, reamortizations, conversion agreements and extensions of all indebtedness secured by this Deed of Trust; (4) the performance of every obligation and agreement of Trustor whether contained or incorporated by reference in this Deed of Trust, or contained in any loan document or guaranty executed by Trustor in favor of Beneficiary, with respect to any loan or advance secured by this Deed of Trust; and (5) the payment of all sums expended or advanced by Beneficiary under or pursuant to the terms of this Deed of Trust, together with interest thereon as herein provided. The foregoing shall hereinafter collectively be referred to as the "Indebtedness". The continuing validity and priority of this Deed of Trust as security for future loans or advances shall not be impaired by the fact that at certain times hereafter there may exist no outstanding indebtedness from Trustor to Beneficiary or no commitment to make loans or advances.

## A. TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR AGREES:

1. To use loan proceeds solely for the purposes approved by Beneficiary.

2. To keep the Property in good condition, working order and repair; care for the Property in accordance with standards of good husbandry and to keep all trees, vines and crops on the Property properly cultivated, irrigated, fertilized, sprayed, and fumigated; not to sell, transfer, assign, encumber or convey any water or water right from the Property, or to enter into an agreement for the nonuse of water, without the prior written consent of Beneficiary, not to remove, destroy or suffer the removal or destruction of any building, fence, canal, well or other improvements or fixtures thereon; not to remove, replace or alter any horticultural or viticultural tree, vine or shrub planted thereon without the prior written consent of Beneficiary, except in the ordinary course of business; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon; to comply with all laws, covenants and restrictions affecting the Property; not to commit or permit waste thereof; not to commit, suffer or permit any act upon the Property in violation of law; to do all other acts which from the character or use of the Property may be reasonably necessary, the specific enumerations herein not excluding the general; to observe and perform all obligations of Trustor under any lease of the Property.

3. To provide, maintain and deliver to Beneficiary, "All Risk" or "Special Form" coverage, flood and all other types of insurance in terms and amounts as may be required by law or Beneficiary, with lender's loss payable endorsements solely in favor of Beneficiary. In the event of loss, the insurance proceeds, or any part thereof, may be applied by Beneficiary, at its option, to reduce the indebtedness or restore or repair the property damaged. Failure to obtain, maintain or deliver to Beneficiary the insurance required shall constitute a default under this Deed of Trust.

At least thirty (30) days prior to the expiration of any such policy of insurance, Trustor will deliver a policy renewing or extending such expiring insurance and written evidence demonstrating payment of the premium for such insurance. If any such policy and evidence of payment (or copies of same, if originals cannot be delivered to Beneficiary) are not so delivered to Beneficiary, without notice to or demand upon Trustor and without releasing Trustor from any obligation under this Deed of Trust, Beneficiary may (but is not obligated to), at Trustor's expense, obtain insurance in such types, on such terms and in such amounts as Beneficiary in its sole discretion shall decide, through or from any insurance agency or company acceptable to it. Any insurance obtained by Beneficiary shall be for its sole benefit and to protect the security of this Deed of Trust. The expense and cost of such insurance shall, at Beneficiary's sole option, be payable on demand or added to the Indebtedness as provided herein. Trustee nor Beneficiary shall not be chargeable with or responsible for the procurement or maintenance of any such insurance, the collection of any proceeds from such insurance, or the insolvency of any insurance company or underwriter.

4. To appear in and litigate any action or proceeding purporting to affect the security hereof, the title to the Property, or the rights or powers of Beneficiary or Trustee. Beneficiary or Trustee may appear in and litigate any such action or proceedings, including any bankruptcy, partition or condemnation proceeding, affecting the Property, or Beneficiary's interest therein, in which event Trustor agrees to pay all costs and expenses thereof, including attorney's fees and costs of securing evidence of title.

Deed of Trust, etc. (09-16) (Page 4 of 12)

5. To pay on or before the due date all taxes and assessments affecting the Property, including all assessments upon water company stock and all rents, assessments and charges for water, appurtenant to or used in connection with the Property; to pay, when due, all encumbrances, charges, and liens, on the Property or any part thereof, which at any time appear to be prior or superior hereto.

6. In the event that Beneficiary utilizes the services of attorneys, accountants, appraisers, consultants, or other professional or outside assistance, including the services of in-house counsel or any other attorney or professional who is a direct employee of Beneficiary, the reasonable amount of expenses incurred by Beneficiary to utilize such persons in connection with any of the following shall be payable on demand and Beneficiary may, at its option, add the amount of such expenses to any portion of the Indebtedness, and charge interest on such amount at the interest rate applicable to such portion of the Indebtedness:

(a) The preparation or modification of this Deed of Trust, or any other agreement or document incident to the Indebtedness;

(b) Advising Beneficiary concerning its legal rights and obligations with regard to the Deed of Trust, the other agreements incident to the Indebtedness, or the Property, including advising Beneficiary with regard to the extent of Trustor's rights, if any, under the provisions of the Farm Credit Act, any policy or program of Beneficiary, or any state or federal law;

(c) Any litigation, dispute, proceeding, or action, whether instituted by Beneficiary, Trustor or any other person, relating to the Indebtedness, the Property or Trustor's affairs;

(d) The furtherance of Beneficiary's interest in any bankruptcy, insolvency, or reorganization case or proceeding instituted by or against Trustor, including any steps to (i) modify or terminate the automatic stay, (ii) prohibit or condition Trustor's use of cash collateral, (iii) object to any disclosure statement or plan, (iv) propose or confirm a plan, and (v) prosecute or defend adversary proceedings or contested matters, and take or defend examinations or discovery, whether or not related to any adversary proceeding or contested matter;

(e) The inspection, verification, protection, collection, processing, sale, liquidation, or disposition of the Property; or

(f) Any of the type of expenses referred to in (a) through (e) above incurred by Beneficiary in connection with any guaranty of the Indebtedness.

The fees and costs described herein and elsewhere in this Deed of Trust shall be in addition to those set forth in the loan agreement or any other written agreement between Trustor and Beneficiary.

7. Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation to do so and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may make or do the same in such manner and to such extent as either may deem necessary to protect the Property, Beneficiary or Trustee being authorized to enter upon the Property for such purposes; commence, appear in and litigate any action or proceeding purporting to affect the Property or the rights or powers of Trustor, including any bankruptcy proceeding affecting the Property; pay, purchase, contest, or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior to the interest of Beneficiary in the Property; and in exercising any such powers, incur any liability, expend whatever amounts in its absolute discretion it may deem necessary therefore, including attorney's, accountant's, and appraisal fees, environmental fees, costs of securing evidence of title, and the costs of obtaining a third party contract to monitor the payment of taxes and assessments affecting the Property and all amounts so expended shall be obligations of Trustor secured by this Deed of Trust and shall bear interest at the rate of 15% per annum from the date expended until paid. Nothing contained herein shall prohibit Beneficiary from entering the Property, at a reasonable time and upon reasonable notice to Trustor, without incurring or assuming any obligations or liabilities whatsoever, for the sole purpose of inspecting the Property.

Deed of Trust, etc. (09-16) (Page 5 of 12)

8. To pay immediately and without demand all sums expended by Beneficiary or Trustee pursuant to the provisions hereof, with interest from date of expenditure at the same rate as is provided for in the note or notes secured by this Deed of Trust or guarantied by the continuing guaranty or continuing guaranties secured by this Deed of Trust. In the event that such sums are not immediately paid, they shall be added, along with the appropriate amount of capital stock or participation certificates, to the principal balance of the Indebtedness and shall accrue interest as therein set forth. All such sums shall be secured hereby.

9. Environmental Laws and Hazardous Substances.

(a) As used in this Paragraph 9:

(i) "Environmental Laws" shall mean all federal, state and local laws, ordinances, rules and regulations now or hereafter in force, as amended from time to time, in any way relating to or regulating human health or safety, industrial hygiene or protection of the environment.

(ii) "Hazardous Substances" shall mean any substance or material that is described, designated or regulated as a toxic or hazardous substance, waste or material or a pollutant or contaminant, or words of similar import, in any of the Environmental Laws.

(iii) "Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment, including continuing migration, of Hazardous Substances into, onto or through the soil, surface water or groundwater of the Property, whether or not caused by, contributed to, permitted by, acquiesced to or known to Trustor.

(iv) "User" shall mean any person other than Trustor who occupies, uses or comes onto or has occupied, used or come onto the Property or any part thereof and any agent or contractor of such a person.

(b) Trustor represents and warrants to Beneficiary that as of the date of this Deed of Trust and to the best of Trustor's knowledge, based on due inquiry and investigation:

(i) except as previously disclosed in writing by Trustor to Beneficiary (A) no Hazardous Substances in excess of permitted levels or reportable quantities under applicable Environmental Laws are present in, on or under the Property or any nearby real property which could migrate to the Property, (B) no Release or threatened Release exists or has occurred, (C) neither Trustor nor any User has ever used the Property or any part thereof for the production, manufacture, generation, treatment, handling, storage, transportation or disposal of Hazardous Substances, (D) no underground, surface or elevated storage tanks of any kind, wells (except domestic water wells), septic tanks, pits, ponds or other impoundments ("Tanks") are or ever have been located in or on the Property, and (E) no investigation, claim, demand, action or proceeding of any kind relating to any Release or threatened Release or any past or present violation of any Environmental Laws relating to the Property has been made or commenced, or is pending, or is being threatened by any governmental authority or other person;

(ii) all operations and activities at, and the use and occupancy of, the Property comply with all applicable Environmental Laws;

(iii) Trustor and every User has, and is in strict compliance with, every permit, license and approval required by all applicable Environmental Laws for all activities and operations at, and the use and occupancy of, the Property;

(iv) neither the Property, nor any portion thereof, nor any adjacent property or portion thereof, has been or is proposed to be listed under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601, et seq.), or any analogous state law; and

(v) any written disclosure submitted by or on behalf of Trustor to Beneficiary at Beneficiary's request concerning any Release or threatened Release, past or present compliance by Trustor, User or any other person of any Environmental Laws applicable to the Property, the past and present use and occupancy of the Property, any environmental concerns relating to the Property and the like was true and complete when submitted.

(o) Trustor agrees that:

(i) Except in the ordinary course of business, in a good and husbandlike manner and in strict compliance with all applicable Environmental Laws, Trustor promises that neither Trustor nor any User shall use, produce, manufacture, generate, treat, handle, store, transport, or dispose of any Hazardous Substances in, on or under the Property, or use the Property for any such purposes;

(ii) Trustor shall not cause, contribute to, permit or acquiesce to any Release or threatened Release;

(iii) Trustor shall comply fully, and shall cause every User to comply fully, with all Environmental Laws applicable to the Property, and all other laws, ordinances and regulations applicable to the use or occupancy thereof, or any operations or activities therein or thereon;

(iv) With respect to any Tanks disclosed in writing to Beneficiary, Trustor shall comply with all Environmental Laws and any requirements of city or county fire departments, applicable to the maintenance and use of such Tanks, including, without limitation, Title 40 of the Code of Federal Regulations part 112;

(v) To facilitate performance of Trustor's obligations under Paragraph 9(o)(i), (ii), (iii) and (iv) of this Deed of Trust, Trustor shall regularly inspect the Property, monitor the activities and operations of every User and confirm that every User has obtained and fully complies with all permits, licenses and approvals required by all applicable Environmental Laws;

(vi) Immediately after Trustor obtains any information indicating any Release or threatened Release, or that Hazardous Substances in, on or under any nearby property could migrate to the Property or a violation of any Environmental Laws may have occurred or could occur regarding the Property, Trustor shall give notice thereof to Beneficiary with a reasonably detailed description of the event, occurrence or condition in question;

(vii) If Beneficiary obtains any information that Beneficiary believes in good faith indicates a reasonable possibility of a Release or threatened Release, or that Hazardous Substances in, on or under any nearby real property could migrate to the Property or any violation of any Environmental Laws may have occurred or could occur regarding the Property, then Trustor shall, at the expense of Trustor, promptly after a request by Beneficiary, or Beneficiary may at Trustor's expense any time prior to completion of a judicial or nonjudicial foreclosure, engage a qualified environmental engineer to conduct a comprehensive environmental assessment of the Property and prepare and submit to Beneficiary a written report containing the findings and conclusions resulting from such investigation. Trustor shall, on demand, pay to Beneficiary all sums expended by Beneficiary in connection with any such comprehensive environmental assessment, together with interest thereon after such demand at the interest rate as set forth in the applicable promissory note(s) evidencing the Indebtedness;

(viii) Trustor shall permit, or cause any User to permit, Beneficiary or its agents or independent contractors to enter and inspect the Property (including the taking of building materials, soil and groundwater samples) at any reasonable time and after reasonable notice, except in an emergency, whether or not a default has occurred under this Deed of Trust, and including after the commencement of judicial or nonjudicial foreclosure proceedings, for purposes of determining, as Beneficiary deems necessary or desirable; the existence, location or nature of any Hazardous Substances into, onto, or spread beneath or from the Property, that is located or has been spilled, disposed of, discharged or released on, under or about the Property. Trustor acknowledges that all inspections and reviews undertaken by Beneficiary are solely for the benefit and protection of Beneficiary and agrees that Beneficiary shall have no duty to Trustor with respect to Hazardous Substances or Environmental Laws as a result of any such inspections, and such inspections shall not result in a waiver of any default by Trustor. If Trustor or any User fails to

Deed of Trust, etc. (09-16) (Page 7 of 12)

comply fully with the terms of this section, Beneficiary may obtain affirmative injunctive relief to compel such compliance; and

(ix) If any Release or threatened Release exists or occurs before this Deed of Trust is reconveyed or foreclosed upon, or if Trustor is in breach of any of its representations, warranties or covenants as set forth in this Section 9, Trustor shall immediately give notice of the condition to Beneficiary, and Trustor shall at its own expense cause all Hazardous Substances to be cleaned up and removed from the Property, and the Property shall be restored, in compliance with all applicable Environmental Laws and other laws, ordinances, rules and regulations (the "Remediation Work"). If requested by Beneficiary, Trustor shall submit to Beneficiary, for Beneficiary's prior approval, complete plans and specifications for all Remediation Work to be done before any Remediation Work is performed, except in an emergency. Alternatively, Beneficiary may cause such Remediation Work to be completed at Trustor's expense.

(d) Beneficiary shall have the right, but not the obligation, to advise appropriate governmental authorities of any environmental condition on or affecting the Property that constitutes or may constitute a breach of Trustor's obligations hereunder.

(e) Trustor and its successors and assigns shall indemnify, defend, protect, and hold harmless Beneficiary and/or Trustee, its directors, officers, employees, agents, shareholders, successors and assigns and their officers, employees or agents, from and against any and all claims, suits, damages, foreseeable and unforeseeable consequential damages, liens, losses, liabilities, interest, judgments, cleanup costs, demands, actions, causes of action, injuries, administrative proceedings and orders, consent agreements and orders, penalties, costs and expenses (including any fees and expenses incurred in enforcing this indemnity, any out-of-pocket litigation costs, sums paid in settlement of claims, and all consultant, expert and the reasonable fees and expenses of counsel, including in-house legal services) of any kind whatsoever ("Claims") paid, incurred or suffered by, or asserted against Beneficiary and/or Trustee, including but not limited to Claims arising out of loss of life, injury to persons, trespass or damage to or contamination of property or natural resources, or injury to business, in connection with or arising out of the activities of Trustor on the Property, Trustor's predecessors in interest, third parties who have been invited, permitted or trespassed on the Property, or parties in a contractual relationship with Trustor, or any of them, or which directly or indirectly arise out of or result from or in any way connected with the Property, whether or not caused by Trustor or within the control of Trustor, including without limitation: (i) the presence, use, generation, treatment, storage, disposal, Release, threatened Release, or discharge of any Hazardous Substances at or from said Property and/or the cleanup of Hazardous Substances within, on or under the Property; (ii) Trustor's breach of any of the representations, warranties and covenants contained herein; and (iii) Trustor's violation or alleged violation of any applicable Environmental Law, regulation or ordinance.

(f) Trustor's representations, warranties, covenants and indemnities contained herein shall survive the occurrence of any event whatsoever, including without limitation the payoff of the Indebtedness secured hereby, the reconveyance or foreclosure of this Deed of Trust, the acceptance by Trustee of a deed in lieu of foreclosure, or any transfer or abandonment of the Property.

10. Water Rights. All water used on, or water rights arising from or related to the Property is deemed to be real property and is not personal property. Trustor represents that Trustor is not in the business of transferring water and, therefore, any sale or transfer of any water or water rights is not a transfer of goods in the ordinary course of business. Trustor further agrees that in no event will any water or water rights be goods identified to a contract. Trustor hereby acknowledges that any severance of water or water rights from the Property would materially harm the Property.

11. Trustor shall not remove any of the Property from its present location, except in the ordinary course of its business as presently conducted, without first notifying the Beneficiary.

12. Trustor represents, warrants, covenants and agrees that:

Deed of Trust, etc. (09-16) (Page 8 of 12)

Exhibit F
Page 9 Exhibit 2 to
Request for Judicial Notice
Page 106

(a) If Trustor is a business entity, Trustor will not change Trustor's name or principal place of business without immediately giving Beneficiary written notice of such change, and in no event shall such notice be more than fifteen (15) days after such change.

(b) To the extent that any Trustor is a corporation, partnership, joint venture, limited liability company, or limited liability limited partnership, Trustor will not change Trustor's name or principal place of business, registration or incorporation.

(c) Trustor will not deliver any Property under any consignment or bailment without first obtaining the consent of Beneficiary and executing such additional documents as Beneficiary may require to continue and perfect the security interests granted herein. Trustor agrees to cooperate with Beneficiary in obtaining control agreements, bailee acknowledgements and/or other acknowledgements and agreements deemed necessary or advisable by Beneficiary.

(d) To the extent that any Trustor is a partnership, joint venture, or limited liability company, its name and state of organization or registration as stated in the introductory paragraph of this Deed of Trust is its exact legal name and state of organization or registration, it is duly organized and existing under the laws of said state, and the individuals executing this Deed of Trust and all agreements relating to the Indebtedness are fully authorized to execute the same and no other signature is necessary in order to bind the Trustor.

**B.  IT IS MUTUALLY AGREED THAT:**

1. Any award of damages in connection with any taking or condemnation or injury to the Property by reason of public use, or for damages resulting from private trespass or injury to the Property, is absolutely and unconditionally assigned and shall be paid to Beneficiary, under the terms and conditions of this Deed of Trust pertaining to Rents. Upon receipt of such money Beneficiary may apply the same on the Indebtedness. Trustor agrees to execute such further documents as may be required to effect the assignments herein made as Beneficiary or Trustee may require.

2. At any time, without affecting the liability of any person for the payment of the Indebtedness, and without otherwise affecting the security hereof, Trustee may (a) consent to or join in the making of any map or plat of the Property; (b) grant any easement or create any restriction thereof; (c) subordinate this Deed of Trust; (d) extend or modify the term of the loan or loans secured hereby; and (e) reconvey without warranty, all or any part of the Property. Trustor agrees to pay reasonable fees for any of the foregoing services.

3. Prior to any default by Trustor in the payment, observance, performance and discharge of any condition, obligation, covenant, or agreement of Trustor contained herein, Trustor may, as the agent and fiduciary representative of Beneficiary for collection and distribution purposes only, collect and receive the Rents as they come due and payable; the Rents are to be applied by Trustor to the payment of the Indebtedness and to the payment of all other sums payable under this Deed of Trust and, thereafter, so long as aforesaid has occurred, the balance shall be distributed to the account of Trustor. However, Beneficiary shall have the right before or after the occurrence of any default to notify any account debtor to pay all amounts owing with respect to Rents directly to Beneficiary. Upon any default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Indebtedness, enter upon and take possession of the Property or any part thereof, in his own name, sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any Indebtedness, and in such order as Beneficiary may determine; also perform such acts of repair, cultivation, irrigation or protection, as may be necessary or proper to conserve the value of the Property; also lease the same or any part thereof for such rental, term, and upon such conditions as its judgment may dictate; also prepare for harvest, remove, and sell any crops that may be growing upon the Property, and apply the proceeds thereof upon the Indebtedness.

4. The entering upon and taking possession of the Property, the collection of Rents, or the proceeds of fire and other insurance policies, or compensation or awards for any taking of or damage to the Property, and the application

Deed of Trust, etc. (02-16) (Page 9 of 12)

or release thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

5. Upon default by Trustor in payment of all or a portion of the Indebtedness or in performance of any agreement hereunder or in the performance of any agreement pertaining to the Indebtedness or the breach of any representation, covenant or warranty (each a "default"), the Indebtedness shall immediately become due and payable at the option of the Beneficiary and in accordance with applicable state law. In the event of default, Beneficiary may employ counsel to enforce payment of the Indebtedness, may cause the Trustee to sell the Property in accordance with the power of sale granted herein and the applicable state law, and may exercise such other rights and remedies granted under this Deed of Trust or by law and equity, including, but not limited to, California Code of Civil Procedure Sections 726.5 and 736, or similar state law, which rights and remedies shall be cumulative and not exclusive. Trustee may sell the Property as a whole or in separate parcels, and in such order as it may determine. The purchase price shall be payable in lawful money of the United States at the time of the sale. To the extent permitted by applicable law, Trustee may hold one or more sales of all or any portion of the Property by public announcement at the time and place of sale set forth in the notice thereof, and from time to time thereafter may postpone such sale or sales of all or any portion of the Property to the same or separate days by public announcement at such time fixed by the preceding postponement. Any person, including Trustee or Beneficiary, may purchase at such sale. Beneficiary may credit bid at any such sale, and if Beneficiary is the successful purchaser, it may apply any of the outstanding Indebtedness in settlement of the purchase price. Beneficiary may resort to and realize upon the security hereunder and any other real or personal property security now or hereafter held by Beneficiary for the Indebtedness in such order and manner as Beneficiary may, in its sole discretion, determine; or may resort to any or all such security may be taken concurrently or successively and in one or several consolidated or independent judicial actions or lawful nonjudicial proceedings, or both. If the Indebtedness is also secured by personal property, fixtures or crops, Beneficiary may enforce its security interest in the personal property, fixtures and crops and its lien under this Deed of Trust in any manner and in any order or sequence permitted by applicable law and the Uniform Commercial Code. Beneficiary shall have no duty or obligation to clean-up or otherwise prepare the personal property for sale. If Beneficiary elects to sell all or any portion of the personal property, Beneficiary is authorized to disclaim all warranties in connection with said sale. All remedies are cumulative and none are exclusive; no election by Beneficiary to pursue one remedy or item of collateral shall be deemed to be a release or waiver of any other item of collateral or a release or modification of the inability of Trustor or any guarantor to pay all Indebtedness or perform in full all obligations to Beneficiary. The procedures governing the enforcement by Beneficiary of its foreclosure and provisional remedies against Trustor shall be governed by the laws of the state in which the Property is located. Nothing contained herein shall be construed to provide that the substantive law of the state in which the Property is located shall apply to the Beneficiary's rights and the Trustor's obligations hereunder or under the promissory note(s), which are and shall continue to be governed by the substantive law of the state in which the promissory note was executed.

6. The failure on the part of the Beneficiary to promptly enforce any right hereunder shall not operate as a waiver of such right and the waiver by Beneficiary of any default shall not constitute a waiver of any other or subsequent default. Subsequent acceptance of any payment by the holder hereof shall not be deemed a waiver of any default by Trustor, or of Beneficiary's rights hereunder as the result of any sale, agreement to sell, conveyance, or alienation, regardless of holder's knowledge of such default, sale, agreement to sell, conveyance, or alienation at the time of acceptance of such payment.

7. This Deed of Trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the holder and owner of any note or guaranty secured hereby; or, if the note has been pledged, the pledgee thereof. In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural. All obligations of Trustor hereunder are joint and several.

8. Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee. This provision shall not act as a waiver of Trustor's right to notification of the Beneficiary's sale of personal property as granted in the Uniform Commercial Code.

Deed of Trust, etc. (09-16) (Page 10 of 12)

9. Beneficiary may, from time to time or at any time, substitute a Trustee or Trustees to execute the trust hereby created, and when any such substitution has been filed for record in the office the recorder of the county in which the Property herein described is situated, it shall be conclusive evidence of the appointment of such Trustee or Trustees, and such new Trustee or Trustees shall succeed to all of the powers and duties of the Trustee or Trustees named herein.

10. (a) In the event the Property, or any part thereof, or any interest therein, is sold, agreed to be sold, conveyed, alienated or further encumbered subject to any lien or charge, voluntarily or involuntarily, contractual or statutory, or transferred, including any sale of Carbon Credits or any water transfer as defined in subsection (b) below, by Trustor, or by operation of law or otherwise, without Beneficiary's prior written consent, the same shall be a default and all Indebtedness, regardless of the maturity dates, at the option of the holder hereof, and without demand or notice, shall immediately become due and payable. Failure to exercise such option shall not constitute a waiver of the right to exercise this option in the event of subsequent sale, agreement to sell, conveyance or alienation.

(b) A water transfer is any transfer, assignment, sale, agreement to sell, conveyance, exchange, gift, encumbrance, pledge, hypothecation, alienation, grant of option to purchase, or other disposition of, directly, indirectly or in trust, voluntarily or involuntarily, by operation of law or otherwise, or the entry into a binding agreement to do any of the foregoing with respect to all or any part of any existing or hereafter created or acquired Water Assets.

(c) Trustor shall provide to Beneficiary upon request copies of any and all instruments in its possession or control, or to which it has access, pursuant to which the Trustor, or any predecessor-in-interest to Trustor, reserved, conveyed or leased any coal, oil, petroleum, gas or other mineral rights (collectively, "mineral rights"), or any portion thereof, in, on or under the Property to any third party, including any modifications, amendments, or addenda to said instruments. Trustor shall provide to Beneficiary prompt notice of (a) any reservation, sale, lease or other transfer of any minerals in, on or under the Property occurring after the date hereof, and (b) the commencement by Trustor or any third party of any action to exploit any mineral rights in, on or under the Property, including the mining or other removal thereof and further including any preparatory work such as, without limitation, the installation of roads, wells, pipelines or other equipment (individually and collectively, a "Mineral Exploitation Event"). If any Mineral Exploitation Event occurs after the date hereof, Beneficiary shall have the right, at its sole option, exercisable by written notice to Trustor, to declare all Indebtedness, regardless of maturity date, immediately due and payable. Notwithstanding the foregoing, if the Exploited Parcel(s) constitute one or more separate legal parcels not necessary for the continuing use of the remainder of the Property, Beneficiary may at its sole option, exercisable by written notice to Trustor, to declare a portion of the Indebtedness (the "Accelerated Loan Amount") immediately due and payable equal to 110% of the value of the parcel or parcels overlying the mineral estate (whether created by reservation, grant or lease) within which the Mineral Exploitation Event occurred or is occurring (the "Exploited Parcels"). The value of the Exploited Parcel(s) shall be determined by Beneficiary in its sole but reasonable discretion using any reasonable method of valuation. Beneficiary shall, subject to receipt of the Accelerated Loan Amount, release the Exploited Parcels from the lien of this Deed of Trust.

11. If Trustor is an entity other than a natural person (such as a corporation or other organization), then any Indebtedness, irrespective of the maturity date, at the option of the Beneficiary, and without demand or notice, shall become immediately due and payable if: (a) a beneficial interest in Trustor equal to 25% or more in the aggregate is sold or transferred; (b) there is a change in either the identity or number of the managing members, partners or managers of Trustor if Trustor is a partnership or similar entity; or (c) there is a change in ownership of more than 25% of the voting stock of Trustor if Trustor is a corporation or similar entity.

12. If any portion of the Property is determined to be personal property, the Trustor has granted the Beneficiary a security interest therein and Beneficiary shall have all of the rights and remedies of a secured creditor under the Uniform Commercial Code. Trustor hereby authorizes Beneficiary to file the required Uniform Commercial Code financing statements, amendments, continuation statements and/or termination statements to perfect, amend, continue or terminate its security interest in the Property or any part thereof. Trustor further authorizes Beneficiary to file, with or without any additional signature from Trustor, as Beneficiary may elect, such amendments and continuation statements as Beneficiary may deem necessary or desirable from time to time to perfect or continue such lien.

Deed of Trust, etc. (09-16) (Page 11 of 12)

13. In the event any one or more of the provisions contained in this Deed of Trust or in any promissory note or guaranty hereby secured shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceable shall not affect any other provision of this Deed of Trust or said promissory note or guaranty, but this Deed of Trust and said promissory notes or guaranties shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

14. Trustor agrees that he/she is entitled only to those notices required by applicable law and requests that a copy of any notice of default and of any notice of sale hereunder be mailed to Trustor at the address set forth below.

**ALL SIGNATURES MUST BE ACKNOWLEDGED BEFORE A NOTARY PUBLIC.**

13610 Avenue 21 1/2
Chowchilla, California 93610

       LJB Farms, LLC, a California limited liability company

       By: _____
       Joanna L. Botelho, Manager

Deed of Trust, etc. (09-16) (Page 12 of 12)

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of
the individual who signed the document to which this certificate is attached, and not
the truthfulness, accuracy, or validity of that document.

State of California
County of _____Merced_____ )

On ___03-03-2017_____ before me, _____Dori L. Silva, notary public_____
                                              (insert name and title of the officer)

personally appeared ____Joanna L. Botelho_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

DORI L. SILVA
Commission # 2010079
Notary Public - California
Merced County
My Comm. Expires Mar 12, 2017

Attachment to Deed of Trust
LJB Farms, LLC
Dated February 9, 2017
Page 1 of 1

### EXHIBIT "A"

Real property in the unincorporated area of the County of Madera, State of California, described as follows:

LOT 10 IN BLOCK 23 OF CENTRAL TRACT ACCORDING TO MAP ENTITLED, "CENTRAL TRACT" BEING A PORTION OF SUBDIVISION NO. 1 OF THE CHOWCHILLA RANCH, FILED AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF THE COUNTY OF MADERA, STATE OF CALIFORNIA, OCTOBER 10, 1912 IN BOOK 3 OF MAPS, AT PAGE 13.

APN: 024-120-007

# Exhibit G

Electronically Recorded in Official Records, MERCED COUNTY          03/07/2017
**BARBARA J LEVEY**                                                 12:33 PM
Merced County Clerk – Recorder                                      re16

228 American Ag Credit, ACA

Doc#:  **2017007573**



*S10000126132S*

| | |
|---|---|
| Titles: 3 | Pages: 14 |
| Fees | 87.00 |
| Taxes | 0.00 |
| Other | 0.00 |
| **PAID** | **87.00** |

**ORIGINAL**

Recording Requested by:

WHEN RECORDED MAIL TO:

American AgCredit, PCA
711 W. 19th Street
Merced, California 95340

The undersigned hereby affirm that there is no Social
Security number contained in this document.

Space Above This Line For Recorder's Use

## DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING

THIS DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FIXTURE FILING (hereinafter "Deed of Trust") is given this 9th day of February, 2017 by LJB Farms, LLC, a California limited liability company whose address is 19610 Avenue 21 1/2, Chowchilla, California 93610, as trustor ("Trustor"), to American AgCredit, PCA, as trustee ("Trustee"), for the benefit of American AgCredit, FCA, a corporation existing and operating under the Farm Credit Act of 1971, as amended, having an office at 711 W. 19th Street, Merced, California 95340, as beneficiary ("Beneficiary").

WITNESSETH: That Trustor IRREVOCABLY GRANTS, CONVEYS AND ASSIGNS unto said Trustee, in trust, with power of sale together with right of entry and possession the following described real property situated in the County of Merced, State of California:

Refer to Exhibit "A" attached hereto and incorporated herein by reference thereto.

## TOGETHER WITH:

(1) all buildings, structures, equipment, fixtures (including, but not limited to, tubs, vines and shrubs), machinery and improvements of every kind and description now or hereafter constructed or placed thereon; all standing timber and timber to be cut located thereon; all pumping plants, electrical generators, wind machines, and fencing and storage tanks, now or hereafter used in connection with the Property, all of which are hereby declared to be fixtures;

Deed of Trust, etc. (09-16) (Page 1 of 12)

Exhibit G
Page 2 Exhibit 2 to
Request for Judicial Notice
Page 114

(2)  all grazing rights, leases, permits and licenses; all oil, gas, and mineral leases to the extent owned by Trustor, permits and rights used with the Property; all oil, gas, and mineral interests to the extent owned by Trustor including royalty interests, rents, profits, bonus money, revenue, income, rights and benefits related to or arising out of the Property or the leasing thereof; and all tenements, hereditaments, easements, rights-of-way, and appurtenances to the Property;

(3)  all carbon credits, carbon sequestration units, carbon financial instrument contracts, renewal energy credits and the like arising out of methane capture, carbon sequestration and renewal energy systems, including without limitation credits tradable under any greenhouse gases commodity exchange such as, by way of example and not limitation, trading units commonly referred to as Exchange Soil Offsets (XSOs), Exchange Methane Offsets (XMOs) and Exchange Forest Offsets (XFOs) under the Chicago Climate Exchange (CCX) (collectively, "Carbon Credits");

(4)  the right, in the name of and on behalf of Trustor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Beneficiary in the Property;

(5)  all proceeds, products, substitutions and accessions (including claims and demands therefor) of each of the elements of the Property;

(6)  all Water Assets (defined below);

(collectively, the "Property").

Water Assets:  All right, title, and interest at any time of Trustor (or any of its bailers, agents, or instrumentalities), whether now existing or hereafter arising or acquired, whether direct or indirect, whether owned legally, of record, equitably or beneficially, whether constituting real or personal property (or subject to any other characterizations), whether created or authorized under existing or future laws or regulations, and however arising in, including without limitation, the following:

(a)  All water (including any water inventory in storage), water rights and entitlements, other rights to water and other rights to receive water or water rights of every kind or nature whatsoever including (i) the groundwater on, under, pumped from or otherwise available to the Property, whether as the result of groundwater rights, contractual rights or otherwise, (ii) Trustor's right to remove and extract any such groundwater including any permits, rights or licenses granted by any governmental authority or agency or any rights granted or created by any use, easement, covenant, agreement, or contract with any person or entity, (iii) any rights to which the Property is entitled with respect to surface water, whether such right is appropriative, riparian, prescriptive, decreed or otherwise and whether or not pursuant to permit or other governmental authorization, or the right to store any such water, and (iv) any water, water right, water allocation, distribution right, delivery right, water storage right, or other water-related entitlement appurtenant or otherwise applicable to the Property by virtue of the Property being situated within the boundaries of any district, agency, or other governmental entity or within the boundaries of any private water company, mutual water company, or other non-governmental entity;

(b)  All stock, interest or rights (including any water allocations, voting or decision rights) in any entity, together with any and all rights from any entity or other person to acquire, receive, exchange, sell, lease, or otherwise transfer any Water Assets, to store, deposit or otherwise create water credits in a water bank or similar or other arrangement for allocating water, to transport or deliver water, or otherwise to deal with any Water Asset;

(c)  All licenses, permits, approvals, contracts, decrees, rights and interests to acquire or appropriate any Water Assets, water bank or other credits evidencing any right to Water Assets, to store, carry, transport or deliver Water Assets, to sell, lease, exchange, or otherwise transfer any Water Asset, or to change the point for diversion of water, the location of any Water Asset, the place of use of any Water Asset, or the purpose of the use of any Water Asset;

Deed of Trust, etc. (09-16) (Page 2 of 12)

(d) All rights, claims, causes of action, judgments, awards, and other judicial, arbiter or administrative relief in any way relating to any Water Asset;

(e) All storage and treatment rights for any Water Asset, whether on or off the Property or other property of Trustor, together with all storage tanks, and other equipment used or usable in connection with such storage and any water bank deposit credits, deposit accounts or other rights arising on account of the storage or nonuse of any Water Asset;

(f) All rights to transport, carry, allocate or otherwise deliver Water Assets by any means wherever located;

(g) All irrigation and watering equipment and all systems, ditches, laterals, conduits, and rights-of-way used to convey such water or to drain the Property;

(h) All guaranties, warranties, marketing, management or service contracts, indemnity agreements, and water right agreements, other water related contracts and water reallocation rights, all insurance policies regarding or relating to any Water Asset; and

(i) All rents, issues, profits, proceeds and other accounts, instruments, chattel paper, contract rights, general intangibles, deposit accounts, and other rights to payment arising from or on account of any use, nonuse, sale, lease, transfer or other disposition of any Water Asset.

References to "water" and "water rights" are used herein in the broadest and most comprehensive sense of the term(s). The term "water" includes water rights and rights to water or whatever rights to money, proceeds, property or other benefits are exchanged or received for or on account of any Water Assets or any conservation or other nonuse of water, including whatever rights are achieved by depositing one's share of any Water Assets in any water bank or with any water authority, or any other water reallocation rights.

**SECURITY AGREEMENT:** To the extent that any of the Property, including without limitation any Water Asset or Carbon Credits, constitutes personal property, this Deed of Trust shall also be deemed to be a security agreement and Trustor does hereby create and grant to Beneficiary a security interest in all such personal property described herein and further grants to Beneficiary all of the rights and remedies of a secured party under the Uniform Commercial Code as may be amended from time to time and other applicable state law, which rights are cumulative.

**TRUSTOR ABSOLUTELY AND UNCONDITIONALLY ASSIGNS,** transfers, conveys and sets over to Beneficiary all the rents, royalties, issues, profits, revenue, income and other benefits of the Property arising from the use or enjoyment of all or any portion thereof, or from any lease, mineral lease to the extent owned by Trustor, or agreement pertaining to the Property (collectively the "Rents"); SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Trustor by Paragraph B.3 hereof. This assignment shall be perfected automatically without appointment of a receiver or Beneficiary becoming a mortgagee in possession.

**FOR THE PURPOSE OF SECURING:** (1) payment of the indebtedness or obligations evidenced by the following promissory note(s) payable by Trustor and/or others to the Beneficiary at the times, in the manner and with interest as therein set forth (promissory notes may evidence a revolving line of credit and may contain variable or adjustable interest rate provisions and offer the ability to convert to other interest rate products):

| Face Amount | Dated |
|---|---|
| $150,000.00 | April 20, 2015 |
| $325,000.00 | March 7, 2016 |

(2) the payment of such additional loans or advances, including advances under a revolving line of credit, with interest thereon, as hereafter may be made to Trustor, or Trustor's successors or assigns, evidenced by a promissory note, guaranty or otherwise; PROVIDED HOWEVER, THAT, such additional loans or advances shall be secured by

Deed of Trust, etc. (09-16) (Page 3 of 12)

this Deed of Trust only if the promissory note, guaranty, or other document evidencing such loans or advances shall recite that it is to be secured by this Deed of Trust; (3) the payment of any substitute notes, renewals, reamortizations, conversion agreements and extensions of all indebtedness secured by this Deed of Trust; (4) the performance of every obligation and agreement of Trustor whether contained or incorporated by reference in this Deed of Trust, or contained in any loan document or guaranty executed by Trustor in favor of Beneficiary, with respect to any loan or advance secured by this Deed of Trust; and (5) the payment of all sums expended or advanced by Beneficiary under or pursuant to the terms of this Deed of Trust, together with interest thereon as herein provided. The foregoing shall hereinafter collectively be referred to as the "Indebtedness". The continuing validity and priority of this Deed of Trust as security for future loans or advances shall not be impaired by the fact that at certain times hereafter there may exist no outstanding indebtedness from Trustor to Beneficiary or no commitment to make loans or advances.

**A. TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR AGREES:**

1. To use loan proceeds solely for the purposes approved by Beneficiary.

2. To keep the Property in good condition, working order and repair; care for the Property in accordance with standards of good husbandry and to keep all trees, vines and crops on the Property properly cultivated, irrigated, fertilized, sprayed, and fumigated; not to sell, transfer, assign, encumber or convey any water or water right from the Property, or to enter into an agreement for the nonuse of water, without the prior written consent of Beneficiary, not to remove, destroy or suffer the removal or destruction of any building, fence, canal, well or other improvements or fixtures thereon; not to remove, replace or alter any horticultural or viticultural tree, vine or shrub planted thereon without the prior written consent of Beneficiary, except in the ordinary course of business; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon; to comply with all laws, covenants and restrictions affecting the Property; not to commit or permit waste thereof; not to commit, suffer or permit any act upon the Property in violation of law; to do all other acts which from the character or use of the Property may be reasonably necessary, the specific enumerations herein not excluding the general; to observe and perform all obligations of Trustor under any lease of the Property.

3. To provide, maintain and deliver to Beneficiary, "All Risk" or "Special Form" coverage, flood and all other types of insurance in terms and amounts as may be required by law or Beneficiary, with lender's loss payable endorsements solely in favor of Beneficiary. In the event of loss, the insurance proceeds, or any part thereof, may be applied by Beneficiary, at its option, to reduce the indebtedness or restore or repair the property damaged. Failure to obtain, maintain or deliver to Beneficiary the insurance required shall constitute a default under this Deed of Trust.

At least thirty (30) days prior to the expiration of any such policy of insurance, Trustor will deliver a policy renewing or extending such expiring insurance and written evidence demonstrating payment of the premium for such insurance. If any such policy and evidence of payment (or copies of same, if originals cannot be delivered to Beneficiary) are not so delivered to Beneficiary, without notice to or demand upon Trustor and without releasing Trustor from any obligation under this Deed of Trust, Beneficiary may (but is not obligated to), at Trustor's expense, obtain insurance in such types, on such terms and in such amounts as Beneficiary in its sole discretion shall decide, through or from any insurance agency or company acceptable to it. Any insurance obtained by Beneficiary shall be for its sole benefit and to protect the security of this Deed of Trust. The expense and cost of such insurance shall, at Beneficiary's sole option, be payable on demand or added to the Indebtedness as provided herein. Trustee nor Beneficiary shall not be chargeable with or responsible for the procurement or maintenance of any such insurance, the collection of any proceeds from such insurance, or the insolvency of any insurance company or underwriter.

4. To appear in and litigate any action or proceeding purporting to affect the security hereof, the title to the Property, or the rights or powers of Beneficiary or Trustee. Beneficiary or Trustee may appear in and litigate any such action or proceedings, including any bankruptcy, partition or condemnation proceeding, affecting the Property, or Beneficiary's interest therein, in which event Trustor agrees to pay all costs and expenses thereof, including attorney's fees and costs of securing evidence of title.

Deed of Trust, etc. (09-16) (Page 4 of 12)

5.   To pay on or before the due date all taxes and assessments affecting the Property, including all assessments upon water company stock and all rents, assessments and charges for water, appurtenant to or used in connection with the Property; to pay, when due, all encumbrances, charges, and liens, on the Property or any part thereof, which at any time appear to be prior or superior hereto.

6.   In the event that Beneficiary utilizes the services of attorneys, accountants, appraisers, consultants, or other professional or outside assistance, including the services of in-house counsel or any other attorney or professional who is a direct employee of Beneficiary, the reasonable amount of expenses incurred by Beneficiary to utilize such persons in connection with any of the following shall be payable on demand and Beneficiary may, at its option, add the amount of such expenses to any portion of the Indebtedness, and charge interest on such amount at the interest rate applicable to such portion of the Indebtedness:

          (a)  The preparation or modification of this Deed of Trust, or any other agreement or document incident to the Indebtedness;

          (b)  Advising Beneficiary concerning its legal rights and obligations with regard to the Deed of Trust, the other agreements incident to the Indebtedness, or the Property, including advising Beneficiary with regard to the extent of Trustor's rights, if any, under the provisions of the Farm Credit Act, any policy or program of Beneficiary, or any state or federal law;

          (c)  Any litigation, dispute, proceeding, or action, whether instituted by Beneficiary, Trustor or any other person, relating to the Indebtedness, the Property or Trustor's affairs;

          (d)  The furtherance of Beneficiary's interest in any bankruptcy, insolvency, or reorganization case or proceeding instituted by or against Trustor, including any steps to (i) modify or terminate the automatic stay, (ii) prohibit or condition Trustor's use of cash collateral, (iii) object to any disclosure statement or plan, (iv) propose or confirm a plan, and (v) prosecute or defend adversary proceedings or contested matters, and take or defend examinations or discovery, whether or not related to any adversary proceeding or contested matter;

          (e)  The inspection, verification, protection, collection, processing, sale, liquidation, or disposition of the Property; or

          (f)  Any of the type of expenses referred to in (a) through (e) above incurred by Beneficiary in connection with any guaranty of the Indebtedness.

The fees and costs described herein and elsewhere in this Deed of Trust shall be in addition to those set forth in the loan agreement or any other written agreement between Trustor and Beneficiary.

7.   Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation to do so and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may make or do the same in such manner and to such extent as either may deem necessary to protect the Property, Beneficiary or Trustee being authorized to enter upon the Property for such purposes; commence, appear in and litigate any action or proceeding purporting to affect the Property or the rights or powers of Trustor, including any bankruptcy proceeding affecting the Property; pay, purchase, contest, or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior to the interest of Beneficiary in the Property; and in exercising any such powers, incur any liability, expend whatever amounts in its absolute discretion it may deem necessary therefore, including attorney's, accountant's, and appraisal fees, environmental fees, costs of securing evidence of title, and the costs of obtaining a third party contract to monitor the payment of taxes and assessments affecting the Property and all amounts so expended shall be obligations of Trustor secured by this Deed of Trust and shall bear interest at the rate of 15% per annum from the date expended until paid. Nothing contained herein shall prohibit Beneficiary from entering the Property, at a reasonable time and upon reasonable notice to Trustor, without incurring or assuming any obligations or liabilities whatsoever, for the sole purpose of inspecting the Property.

Deed of Trust, etc. (09-16) (Page 5 of 12)

8. To pay immediately and without demand all sums expended by Beneficiary or Trustee pursuant to the provisions hereof, with interest from date of expenditure at the same rate as is provided for in the note or notes secured by this Deed of Trust or guaranteed by the continuing guaranty or continuing guaranties secured by this Deed of Trust. In the event that such sums are not immediately paid, they shall be added, along with the appropriate amount of capital stock or participation certificates, to the principal balance of the Indebtedness and shall accrue interest as therein set forth. All such sums shall be secured hereby.

9. Environmental Laws and Hazardous Substances.

(a) As used in this Paragraph 9:

(i) "Environmental Laws" shall mean all federal, state and local laws, ordinances, rules and regulations now or hereafter in force, as amended from time to time, in any way relating to or regulating human health or safety, industrial hygiene or protection of the environment.

(ii) "Hazardous Substances" shall mean any substance or material that is described, designated or regulated as a toxic or hazardous substance, waste or material or a pollutant or contaminant, or words of similar import, in any of the Environmental Laws.

(iii) "Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment, including continuing migration, of Hazardous Substances into, onto or through the soil, surface water or groundwater of the Property, whether or not caused by, contributed to, permitted to, or acquiesced to or known to Trustor.

(iv) "User" shall mean any person other than Trustor who occupies, uses or comes onto or has occupied, used or come onto the Property or any part thereof and any agent or contractor of such a person.

(b) Trustor represents and warrants to Beneficiary that as of the date of this Deed of Trust and to the best of Trustor's knowledge, based on due inquiry and investigation:

(i) except as previously disclosed in writing by Trustor to Beneficiary (A) no Hazardous Substances in excess of permitted levels or reportable quantities under applicable Environmental Laws are present in, on or under the Property or any nearby real property which could migrate to the Property, (B) no Release or threatened Release exists or has occurred, (C) neither Trustor nor any User has ever used the Property or any part thereof for the production, manufacture, generation, treatment, handling, storage, transportation or disposal of Hazardous Substances, (D) no underground, surface or elevated storage tanks of any kind, wells (except domestic water wells), septic tanks, pits, ponds or other impoundments ("Tanks") are or ever have been located in or on the Property, and (E) no investigation, claim, demand, action or proceeding of any kind relating to any Release or threatened Release or any past or present violation of any Environmental Laws relating to the Property has been made or commenced, or is pending, or is being threatened by any governmental authority or other person;

(ii) all operations and activities at, and the use and occupancy of, the Property comply with all applicable Environmental Laws;

(iii) Trustor and every User has, and is in strict compliance with, every permit, license and approval required by all applicable Environmental Laws for all activities and operations at, and the use and occupancy of, the Property;

(iv) neither the Property, nor any portion thereof, nor any adjacent property or portion thereof, has been or is proposed to be listed under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601, et seq.), or any analogous state law; and

Deed of Trust, etc. (09-16) (Page 6 of 12)

(v) any written disclosure submitted by or on behalf of Trustor to Beneficiary at Beneficiary's request concerning any Release or threatened Release, past or present compliance by Trustor, User or any other person of any Environmental Laws applicable to the Property, the past and present use and occupancy of the Property, any environmental concerns relating to the Property and the like was true and complete when submitted.

(c) Trustor agrees that:

(i) Except in the ordinary course of business, in a good and husbandlike manner and in strict compliance with all applicable Environmental Laws, Trustor promises that neither Trustor nor any User shall use, produce, manufacture, generate, treat, handle, store, transport, or dispose of any Hazardous Substances in, on or under the Property, or use the Property for any such purposes;

(ii) Trustor shall not cause, contribute to, permit or acquiesce to any Release or threatened Release;

(iii) Trustor shall comply fully, and shall cause every User to comply fully, with all Environmental Laws applicable to the Property, and all other laws, ordinances and regulations applicable to the use or occupancy thereof, or any operations or activities therein or thereon;

(iv) With respect to any Tanks disclosed in writing to Beneficiary, Trustor shall comply with all Environmental Laws and any requirements of city or county fire departments, applicable to the maintenance and use of such Tanks, including, without limitation, Title 40 of the Code of Federal Regulations part 112;

(v) To facilitate performance of Trustor's obligations under Paragraph 9(c)(i), (ii), (iii) and (iv) of this Deed of Trust, Trustor shall regularly inspect the Property, monitor the activities and operations of every User and confirm that every User has obtained and fully complies with all permits, licenses and approvals required by all applicable Environmental Laws;

(vi) Immediately after Trustor obtains any information indicating any Release or threatened Release, or that Hazardous Substances in, on or under any nearby property could migrate to the Property or a violation of any Environmental Laws may have occurred or could occur regarding the Property, Trustor shall give notice thereof to Beneficiary with a reasonably detailed description of the event, occurrence or condition in question;

(vii) If Beneficiary obtains any information that Beneficiary believes in good faith indicates a reasonable possibility of a Release or threatened Release, or that Hazardous Substances in, on or under any nearby real property could migrate to the Property or any violation of any Environmental Laws may have occurred or could occur regarding the Property, then Trustor shall, at the expense of Trustor, promptly after a request by Beneficiary, or Beneficiary may at Trustor's expense any time prior to completion of a judicial or nonjudicial foreclosure, engage a qualified environmental engineer to conduct a comprehensive environmental assessment of the Property and prepare and submit to Beneficiary a written report containing the findings and conclusions resulting from such investigation. Trustor shall, on demand, pay to Beneficiary all sums expended by Beneficiary in connection with any such comprehensive environmental assessment, together with interest thereon after such demand at the interest rate as set forth in the applicable promissory note(s) evidencing the Indebtedness;

(viii) Trustor shall permit, or cause any User to permit, Beneficiary or its agents or independent contractors to enter and inspect the Property (including the taking of building materials, soil and groundwater samples) at any reasonable time and after reasonable notice, except in an emergency, whether or not a default has occurred under this Deed of Trust, and including after the commencement of judicial or nonjudicial foreclosure proceedings, for purposes of determining, as Beneficiary deems necessary or desirable: the existence, location or nature of any Hazardous Substances into, onto, or spread beneath or from the Property, that is located or has been spilled, disposed of, discharged or released on, under or about the Property. Trustor acknowledges that all inspections and reviews undertaken by Beneficiary are solely for the benefit and protection of Beneficiary and agrees that Beneficiary shall have no duty to Trustor with respect to Hazardous Substances or Environmental Laws as a result of any such inspections, and such inspections shall not result in a waiver of any default by Trustor. If Trustor or any User fails to

Deed of Trust, etc. (09-16) (Page 7 of 12)

comply fully with the terms of this section, Beneficiary may obtain affirmative injunctive relief to compel such compliance; and

(ix) If any Release or threatened Release exists or occurs before this Deed of Trust is reconveyed or foreclosed upon, or if Trustor is in breach of any of its representations, warranties or covenants as set forth in this Section 9, Trustor shall immediately give notice of the condition to Beneficiary, and Trustor shall at its own expense cause all Hazardous Substances to be cleaned up and removed from the Property, and the Property shall be restored, in compliance with all applicable Environmental Laws and other laws, ordinances, rules and regulations (the "Remediation Work"). If requested by Beneficiary, Trustor shall submit to Beneficiary, for Beneficiary's prior approval, complete plans and specifications for all Remediation Work to be done before any Remediation Work is performed, except in an emergency. Alternatively, Beneficiary may cause such Remediation Work to be completed at Trustor's expense.

(d) Beneficiary shall have the right, but not the obligation, to advise appropriate governmental authorities of any environmental condition on or affecting the Property that constitutes or may constitute a breach of Trustor's obligations hereunder.

(e) Trustor and its successors and assigns shall indemnify, defend, protect, and hold harmless Beneficiary and/or Trustee, its directors, officers, employees, agents, shareholders, successors and assigns and their officers, employees or agents, from and against any and all claims, suits, damages, foreseeable and unforeseeable consequential damages, liens, losses, liabilities, interest, judgments, cleanup costs, demands, actions, causes of action, injuries, administrative proceedings and orders, consent agreements and orders, penalties, costs and expenses (including any fees and expenses incurred in enforcing this indemnity, any out-of-pocket litigation costs, sums paid in settlement of claims, and all consultant, expert and the reasonable fees and expenses of counsel, including in-house legal services) of any kind whatsoever ("Claims") paid, incurred or suffered by, or asserted against Beneficiary and/or Trustee , including but not limited to Claims arising out of loss of life, injury to persons, trespass or damage to or contamination of property or natural resources, or injury to business, in connection with or arising out of the activities of Trustor on the Property, Trustor's predecessors in interest, third parties who have been invited, permitted or trespassed on the Property, or parties in a contractual relationship with Trustor, or any of them, or which directly or indirectly arise out of or result from or in any way connected with the Property, whether or not caused by Trustor or within the control of Trustor, including without limitation: (i) the presence, use, generation, treatment, storage, disposal, Release, threatened Release, or discharge of any Hazardous Substances at or from said Property and/or the cleanup of Hazardous Substances within, on or under the Property; (ii) Trustor's breach of any of the representations, warranties and covenants contained herein; and (iii) Trustor's violation or alleged violation of any applicable Environmental Law, regulation or ordinance.

(f) Trustor's representations, warranties, covenants and indemnities contained herein shall survive the occurrence of any event whatsoever, including without limitation the payoff of the Indebtedness secured hereby, the reconveyance or foreclosure of this Deed of Trust, the acceptance by Trustee of a deed in lieu of foreclosure, or any transfer or abandonment of the Property.

10. Water Rights. All water used on, or water rights arising from or related to the Property is deemed to be real property and is not personal property. Trustor represents that Trustor is not in the business of transferring water and, therefore, any sale or transfer of any water or water rights is not a transfer of goods in the ordinary course of business. Trustor further agrees that in no event will any water or water rights be goods identified to a contract. Trustor hereby acknowledges that any severance of water or water rights from the Property would materially harm the Property.

11. Trustor shall not remove any of the Property from its present location, except in the ordinary course of its business as presently conducted, without first notifying the Beneficiary.

12. Trustor represents, warrants, covenants and agrees that:

Deed of Trust, etc. (09-16) (Page 8 of 12)

(a) If Trustor is a business entity, Trustor will not change Trustor's name or principal place of business without immediately giving Beneficiary written notice of such change, and in no event shall such notice be more than fifteen (15) days after such change.

(b) To the extent that any Trustor is a corporation, partnership, joint venture, limited liability company, or limited liability limited partnership, Trustor will not change Trustor's name or principal place of business, registration or incorporation.

(c) Trustor will not deliver any Property under any consignment or bailment without first obtaining the consent of Beneficiary and executing such additional documents as Beneficiary may require to continue and perfect the security interests granted herein. Trustor agrees to cooperate with Beneficiary in obtaining control agreements, bailee acknowledgements and/or other acknowledgements and agreements deemed necessary or advisable by Beneficiary.

(d) To the extent that any Trustor is a partnership, joint venture, or limited liability company, its name and state of organization or registration as stated in the introductory paragraph of this Deed of Trust is its exact legal name and state of organization or registration, it is duly organized and existing under the laws of said state, and the individuals executing this Deed of Trust and all agreements relating to the Indebtedness are fully authorized to execute the same and no other signature is necessary in order to bind the Trustor.

**B.  IT IS MUTUALLY AGREED THAT:**

1.  Any award of damages in connection with any taking or condemnation or injury to the Property by reason of public use, or for damages resulting from private trespass or injury to the Property, is absolutely and unconditionally assigned and shall be paid to Beneficiary, under the terms and conditions of this Deed of Trust pertaining to Rents. Upon receipt of such money Beneficiary may apply the same on the Indebtedness. Trustor agrees to execute such further documents as may be required to effect the assignments herein made as Beneficiary or Trustee may require.

2.  At any time, without affecting the liability of any person for the payment of the Indebtedness, and without otherwise affecting the security hereof, Trustee may (a) consent to or join in the making of any map or plat of the Property; (b) grant any easement or create any restriction thereof; (c) subordinate this Deed of Trust; (d) extend or modify the term of the loan or loans secured hereby; and (e) reconvey without warranty, all or any part of the Property. Trustor agrees to pay reasonable fees for any of the foregoing services.

3.  Prior to any default by Trustor in the payment, observance, performance and discharge of any condition, obligation, covenant, or agreement of Trustor contained herein, Trustor may, as the agent and fiduciary representative of Beneficiary for collection and distribution purposes only, collect and receive the Rents as they come due and payable; the Rents are to be applied by Trustor to the payment of the Indebtedness and to the payment of all other sums payable under this Deed of Trust and, thereafter, so long as aforesaid has occurred, the balance shall be distributed to the account of Trustor. However, Beneficiary shall have the right before or after the occurrence of any default to notify any account debtor to pay all amounts owing with respect to Rents directly to Beneficiary. Upon any default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Indebtedness, enter upon and take possession of the Property or any part thereof, in his own name, sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any Indebtedness, and in such order as Beneficiary may determine; also perform such acts of repair, cultivation, irrigation or protection, as may be necessary or proper to conserve the value of the Property; also lease the same or any part thereof for such rental, term, and upon such conditions as its judgment may dictate; also prepare for harvest, remove, and sell any crops that may be growing upon the Property, and apply the proceeds thereof upon the Indebtedness.

4.  The entering upon and taking possession of the Property, the collection of Rents, or the proceeds of fire and other insurance policies, or compensation or awards for any taking of or damage to the Property, and the application

Deed of Trust, etc. (09-16) (Page 9 of 12)

Exhibit G
Page 10 Exhibit 2 to
Request for Judicial Notice
Page 122

or release thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

5.   Upon default by Trustor in payment of all or a portion of the Indebtedness or in performance of any agreement hereunder or in the performance of any agreement pertaining to the Indebtedness or the breach of any representation, covenant or warranty (each a "default"), the Indebtedness shall immediately become due and payable at the option of the Beneficiary and in accordance with applicable state law. In the event of default, Beneficiary may employ counsel to enforce payment of the Indebtedness, may cause the Trustee to sell the Property in accordance with the power of sale granted herein and the applicable state law, and may exercise such other rights and remedies granted under this Deed of Trust or by law and equity, including, but not limited to, California Code of Civil Procedure Sections 726.5 and 736, or similar state law, which rights and remedies shall be cumulative and not exclusive. Trustee may sell the Property as a whole or in separate parcels, and in such order as it may determine. The purchase price shall be payable in lawful money of the United States at the time of the sale. To the extent permitted by applicable law, Trustee may hold one or more sales of all or any portion of the Property by public announcement at the time and place of sale set forth in the notice thereof, and from time to time thereafter may postpone such sale or sales of all or any portion of the Property to the same or separate days by public announcement at such time fixed by the preceding postponement. Any person, including Trustee or Beneficiary, may purchase at such sale. Beneficiary may credit bid at any such sale, and if Beneficiary is the successful purchaser, it may apply any of the outstanding Indebtedness in settlement of the purchase price. Beneficiary may resort to and realize upon the security hereunder and any other real or personal property security now or hereafter held by Beneficiary for the Indebtedness in such order and manner as Beneficiary may, in its sole discretion, determine; or may resort to any or all such security may be taken concurrently or successively and in one or several consolidated or independent judicial actions or lawful nonjudicial proceedings, or both. If the Indebtedness is also secured by personal property, fixtures or crops, Beneficiary may enforce its security interest in the personal property, fixtures and crops and its lien under this Deed of Trust in any manner and in any order or sequence permitted by applicable law and the Uniform Commercial Code. Beneficiary shall have no duty or obligation to clean-up or otherwise prepare the personal property for sale. If Beneficiary elects to sell all or any portion of the personal property, Beneficiary is authorized to disclaim all warranties in connection with said sale. All remedies are cumulative and none are exclusive; no election by Beneficiary to pursue one remedy or item of collateral shall be deemed to be a release or waiver of any other item of collateral or a release or modification of the inability of Trustor or any guarantor to pay all Indebtedness or perform in full all obligations to Beneficiary. The procedures governing the enforcement by Beneficiary of its foreclosure and provisional remedies against Trustor shall be governed by the laws of the state in which the Property is located. Nothing contained herein shall be construed to provide that the substantive law of the state in which the Property is located shall apply to the Beneficiary's rights and the Trustor's obligations hereunder or under the promissory note(s), which are and shall continue to be governed by the substantive law of the state in which the promissory note was executed.

6.   The failure on the part of the Beneficiary to promptly enforce any right hereunder shall not operate as a waiver of such right and the waiver by Beneficiary of any default shall not constitute a waiver of any other or subsequent defaults. Subsequent acceptance of any payment by the holder hereof shall not be deemed a waiver of any default by Trustor, or of Beneficiary's rights hereunder as the result of any sale, agreement to sell, conveyance, or alienation, regardless of holder's knowledge of such default, sale, agreement to sell, conveyance, or alienation at the time of acceptance of such payment.

7.   This Deed of Trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the holder and owner of any note or guaranty secured hereby; or, if the note has been pledged, the pledgee thereof. In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural. All obligations of Trustor hereunder are joint and several.

8.   Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee. This provision shall not act as a waiver of Trustor's right to notification of the Beneficiary's sale of personal property as granted in the Uniform Commercial Code.

Deed of Trust, etc. (09-16) (Page 10 of 12)

9.　Beneficiary may, from time to time or at any time, substitute a Trustee or Trustees to execute the trust hereby created, and when any such substitution has been filed for record in the office the recorder of the county in which the Property herein described is situated, it shall be conclusive evidence of the appointment of such Trustee or Trustees, and such new Trustee or Trustees shall succeed to all of the powers and duties of the Trustee or Trustees named herein.

10.　(a)　In the event the Property, or any part thereof, or any interest therein, is sold, agreed to be sold, conveyed, alienated or further encumbered subject to any lien or charge, voluntarily or involuntarily, contractual or statutory, or transferred, including any sale of Carbon Credits or any water transfer as defined in subsection (b) below, by Trustor, or by operation of law or otherwise, without Beneficiary's prior written consent, the same shall be a default and all Indebtedness, regardless of the maturity dates, at the option of the holder hereof, and without demand or notice, shall immediately become due and payable. Failure to exercise such option shall not constitute a waiver of the right to exercise this option in the event of subsequent sale, agreement to sell, conveyance or alienation.

(b)　A water transfer is any transfer, assignment, sale, agreement to sell, conveyance, exchange, gift, encumbrance, pledge, hypothecation, alienation, grant of option to purchase, or other disposition of, directly, indirectly or in trust, voluntarily or involuntarily, by operation of law or otherwise, or the entry into a binding agreement to do any of the foregoing with respect to all or any part of any existing or hereafter created or acquired Water Assets.

(c)　Trustor shall provide to Beneficiary upon request copies of any and all instruments in its possession or control, or to which it has access, pursuant to which the Trustor, or any predecessor-in-interest to Trustor, reserved, conveyed or leased any coal, oil, petroleum, gas or other mineral rights (collectively, "mineral rights"), or any portion thereof, in, on or under the Property to any third party, including any modifications, amendments, or addenda to said instruments. Trustor shall provide to Beneficiary prompt notice of (a) any reservation, sale, lease or other transfer of any minerals in, on or under the Property occurring after the date hereof, and (b) the commencement by Trustor or any third party of any action to exploit any mineral rights in, on or under the Property, including the mining or other removal thereof and further including any preparatory work such as, without limitation, the installation of roads, wells, pipelines or other equipment (individually and collectively, a "Mineral Exploitation Event"). If any Mineral Exploitation Event occurs after the date hereof, Beneficiary shall have the right, at its sole option, exercisable by written notice to Trustor, to declare all Indebtedness, regardless of maturity date, immediately due and payable. Notwithstanding the foregoing, if the Exploited Parcel(s) constitute one or more separate legal parcels not necessary for the continuing use of the remainder of the Property, Beneficiary may at its sole option, exercisable by written notice to Trustor, to declare a portion of the Indebtedness (the "Accelerated Loan Amount") immediately due and payable equal to 110% of the value of the parcel or parcels overlying the mineral estate (whether created by reservation, grant or lease) within which the Mineral Exploitation Event occurred or is occurring (the "Exploited Parcels"). The value of the Exploited Parcel(s) shall be determined by Beneficiary in its sole but reasonable discretion using any reasonable method of valuation. Beneficiary shall, subject to receipt of the Accelerated Loan Amount, release the Exploited Parcels from the lien of this Deed of Trust.

11.　If Trustor is an entity other than a natural person (such as a corporation or other organization), then any Indebtedness, irrespective of the maturity date, at the option of the Beneficiary, and without demand or notice, shall become immediately due and payable if: (a) a beneficial interest in Trustor equal to 25% or more in the aggregate is sold or transferred; (b) there is a change in either the identity or number of the managing members, partners or managers of Trustor if Trustor is a partnership or similar entity; or (c) there is a change in ownership of more than 25% of the voting stock of Trustor if Trustor is a corporation or similar entity.

12.　If any portion of the Property is determined to be personal property, the Trustor has granted the Beneficiary a security interest therein and Beneficiary shall have all of the rights and remedies of a secured creditor under the Uniform Commercial Code. Trustor hereby authorizes Beneficiary to file the required Uniform Commercial Code financing statements, amendments, continuation statements and/or termination statements to perfect, amend, continue or terminate its security interest in the Property or any part thereof. Trustor further authorizes Beneficiary to file, with or without any additional signature from Trustor, as Beneficiary may elect, such amendments and continuation statements as Beneficiary may deem necessary or desirable from time to time to perfect or continue such lien.

Deed of Trust, etc. (09-16) (Page 11 of 12) ·

13. In the event any one or more of the provisions contained in this Deed of Trust or in any promissory note or guaranty hereby secured shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceable shall not affect any other provision of this Deed of Trust or said promissory note or guaranty, but this Deed of Trust and said promissory notes or guaranties shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

14. Trustor agrees that he/she is entitled only to those notices required by applicable law and requests that a copy of any notice of default and of any notice of sale hereunder be mailed to Trustor at the address set forth below.

**ALL SIGNATURES MUST BE ACKNOWLEDGED BEFORE A NOTARY PUBLIC.**

13610 Avenue 21 1/2                              LJB Farms, LLC, a California limited liability company
Chowchilla, California 93610

By: _____
     Joanna L. Botelho, Manager

Deed of Trust, etc. (09-16) (Page 12 of 12)

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of
the individual who signed the document to which this certificate is attached, and not
the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Merced _____ )

On ___ 03-03-2017 _____ before me, ____ Dori L. Silva, notary public ____
                                          (insert name and title of the officer)

personally appeared ___ Joanna L. Botelho _____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

> DORI L. SILVA
> Commission # 2010070
> Notary Public - California
> Merced County
> My Comm. Expires Mar 12, 2017

Signature _____ (Seal)

Attachment to Deed of Trust
LJB Farms, LLC
Dated February 9, 2017
Page 1 of 1

### EXHIBIT "A"

Real property in the City of Le Grand, County of Merced, State of California, described as follows:

PARCEL 1:

ALL THAT PORTION OF THE EAST HALF OF LOT 4, AS SHOWN ON THE MAP ENTITLED "LE GRAND
COLONY NO. 1", FILED MAY 5, 1914, IN THE OFFICE OF THE COUNTY RECORDER OF MERCED COUNTY,
IN VOL. 7 OF OFFICIAL PLATS, AT PAGE 11, DESCRIBED AS FOLLOWS:, TO-WIT:

BEGINNING AT A POINT ON THE EAST LINE OF SAID LOT 4, DISTANT THEREON, NORTH 0° 26' EAST,
936.77 FEET FROM THE SOUTHEAST CORNER OF SAID LOT 4; THENCE NORTH 89° 22' WEST, 1247.95
FEET; THENCE NORTH 0° 26' EAST, 383.23 FEET TO THE NORTH LINE OF SAID LOT 4; THENCE SOUTH
89° 32' EAST, 1247.95 FEET TO THE NORTHEAST CORNER OF SAID LOT 4; THENCE SOUTH 0° 26'
WEST, 383.23 FEET TO THE POINT OF BEGINNING, (BEING ALL OF THE EAST HALF OF SAID LOT 4,
EXCEPT THE 29.12 ACRE PARCEL OF LAND CONVEYED BY GENE CASTILE AND FAY D. CASTILE, TO EVA
L. MILLER, BY DEED RECORDED FEBRUARY 8, 1950, IN VOL. 977 OF OFFICIAL RECORDS, AT PAGE
411).

APN: 068-030-054-000

PARCEL 2:

THE EAST 34.78 ACRES OF LOT 1, AS SHOWN ON THE MAP ENTITLED, "MAP OF LE GRAND COLONY
NO. 1", FILED MAY 5, 1914, IN THE OFFICE OF THE COUNTY RECORDER OF MERCED COUNTY, IN VOL.
7 OF OFFICIAL PLATS AT PAGE 11.

A.P.N.: 068-030-053-000

**Exhibit H**

Date:    August 12, 2013

To:    The Almond Company
      P.O. Box 787, Chowchilla, California 93610

RE:    LJB Farms, LLC, a California limited liability company

## NOTICE OF ASSIGNMENT

The following Assignment form has been executed by the Grower named below. Please execute the Acceptance of Assignment and return it to this office. Please retain a copy for your files. This assignment constitutes a first assignment and should be accepted without alteration. Alterations, changes, or additions by Marketing Organization shall not be binding on Lender unless accepted in writing by Lender.

Yours very truly,

Lender:     American AgCredit, PCA

Address:    711 W. 19th Street, Merced, California 95340

By:

        Scott Collins, Vice President

## ASSIGNMENT OF PROCEEDS OF SALE OF CROPS

For and in consideration of advances made or to be made by American AgCredit, PCA ("Lender"), the undersigned ("Grower"), does hereby sell, assign, and transfer to Lender all of the Proceeds of Sale of all Crops, now owned, held in the account of, or hereafter acquired by Grower, including the unpaid portion of the Proceeds of Sale of all crops previously delivered. This assignment shall remain in effect for each year hereafter until the Assignment is released in writing by Lender.

For purposes of this assignment, the term "Marketing Organization" shall mean The Almond Company and any entities affiliated with it for marketing or processing purposes. The term "Crops" shall include, but not be limited to, all crops produced by Grower, all agricultural commodities owned or controlled by Grower, and all commodities received by Marketing Organization on Grower's behalf as a result of Grower's participation in any federal or other payment-in-kind program or any other crop loan, reserve or other production control or price support program. The term "Proceeds of Sale" shall mean all sums of money payable by Marketing Organization to Grower relating to the Crops, including, but not limited to, payments resulting from the sale of Crops, all refunds, including refunds of prepaid freight charges, all credits, all distributions of Grower's equity or investment in Marketing Organization, including revolving fund credits and patronage dividends, and any payments received by Marketing Organization on Grower's behalf as a result of Grower's participation in any federal or other crops loan, reserve or other production control or price support program. The term "Proceeds of Sale" shall not include Marketing Organization's costs directly related to the processing or marketing of Grower's Crops.

Grower does hereby authorize and direct Marketing Organization to deliver immediately when due and payable all Proceeds of Sale to Lender at the following address:

      American AgCredit, PCA
      711 W. 19th Street
      Merced, California 95340

Grower does hereby warrant that this is the first assignment of the Proceeds of Sale of the Crops. The terms and conditions of any security agreement executed by Grower in favor of Lender is incorporated herein by reference.

Assignment of Proceeds (06-12) Page 1 of 2

Grower does hereby authorize the release of information about Grower's account by Marketing Organization to Lender, including but not limited to inquiries about revolving funds, patronage dividends or other payments or credits owed by Marketing Organization to Grower.

IN WITNESS WHEREOF, Grower has executed this assignment order this 12th day of August, 2013.

LJB Farms, LLC, a California limited liability company



By: _____
Joanna L. Botelho, Manager

## ACCEPTANCE OF ASSIGNMENT AND SUBORDINATION AGREEMENT

In consideration of Lender's granting credit to Grower for crop production, harvesting, and marketing purposes and in consideration of benefits to be derived therefrom by the undersigned, the undersigned hereby agrees, for the benefit of Lender, that any lien, claim or indebtedness now or hereafter existing in favor of the undersigned against Grower or the Crops, delivered to the undersigned, be and the same is hereby subordinated to this assignment to the extent that Grower is and becomes indebted to Lender.

The undersigned certifies that to the best of its knowledge and belief the above assignment is the first assignment of proceeds of Sale by Grower and the undersigned agrees to pay to Lender, at its office as set forth above, the Proceeds of Sale of Crops payable to Grower, reserving however, the right to deduct from Proceeds of Sale, the undersigned's costs directly related to the processing and marketing of Grower's Crops and all advances authorized in writing by Lender.

Date: ___8/28/17___

The Almond Company (MARKETING ORGANIZATION)

By: _____
CFO
The Almond Company

Assignment of Proceeds (06-12) Page 2 of 2

# Exhibit I

Exhibit I
Page 1    Exhibit 2 to
Request for Judicial Notice
Page 131

Filed 08/29/17        Case 17-12998        Claim 9



**American AgCredit ACA**
711 West 19th Street
Merced, CA 95340
209-384-1050

### Activity Statement S-18-2017

**LJB Farms, LLC**
13610 Avenue 21 1/2
Chowchilla CA 93610

### General Information

| | | | |
|---|---|---|---|
| Account Number: | ___9505 | Loan Officer: | Scott Clifton |
| Interest Rate: | 6.750000 % | Loan Type: | Commercial Loan |
| Interest Paid YTD: | $32,451.71 | | 2016 Operating |

### Balance & Payment Information

| | | | |
|---|---|---|---|
| Current Balance: | $298,832.06 | Payment Due Date: | 04/01/2018 |
| Accrued Interest: | $3,663.76 | Payment Frequency: | 12 Months |
| Late Charges: | $0.00 | | |
| Other Charges: | $32,392.43 | Available Commitment: | $0.00 |
| Daily Per Diem: | $55.26346 | | |

### Loan History

| Date | Description | | Amount | Principal Bal |
|---|---|---|---|---|
| 03/09/2016 | Loan Fee Income RE Payment | | ($750.00) | |
| 03/10/2016 | Loan Advance | | $150,000.00 | $150,000.00 |
| 03/10/2016 | Loan Advance | | $750.00 | $150,750.00 |
| 03/16/2016 | Loan Advance | | $10,000.00 | $160,750.00 |
| 03/24/2016 | Loan Advance | | $35,000.00 | $195,750.00 |
| 05/05/2016 | Loan Advance | | $30,000.00 | $225,750.00 |
| 05/11/2016 | Loan Advance | | $250.00 | $226,000.00 |
| 05/12/2016 | Loan Advance | | $10,000.00 | $236,000.00 |
| 05/20/2016 | Loan Advance | | $5,000.00 | $241,000.00 |
| 06/03/2016 | Loan Advance | | $15,000.00 | $256,000.00 |
| 06/30/2016 | Loan Advance | | $20,000.00 | $276,000.00 |
| 07/13/2016 | Loan Advance | | $25,000.00 | $301,000.00 |
| 08/03/2016 | Loan Advance | | $24,000.00 | $325,000.00 |
| 09/16/2016 | Interest Rate Change | 9.75000000 % | $0.00 | $325,000.00 |
| 09/30/2016 | Interest Rate Change | 11.00000000 % | $0.00 | $325,000.00 |

August 18, 2017

Exhibit I
Page 2

Exhibit 2 to
Request for Judicial Notice
Page 132

| Date | Description | Rate | Amount | Balance |
|---|---|---|---|---|
| 01/01/2017 | Interest Rate Change | 11.25000000 % | $0.00 | $325,000.00 |
| 03/06/2017 | Interest Rate Change | 6.25000000 % | $0.00 | $325,000.00 |
| 03/20/2017 | Loan Fee Income CL Assessed | | $4,750.00 | $325,000.00 |
| 04/03/2017 | Interest Rate Change | 6.50000000 % | $0.00 | $325,000.00 |
| 06/12/2017 | Interest Payment | | ($32,451.71) | $325,000.00 |
| 06/12/2017 | Principal Payment | | ($26,167.94) | $298,832.06 |
| 07/03/2017 | Interest Rate Change | 6.75000000 % | $0.00 | $298,832.06 |
| 07/05/2017 | Legal Fee CL Assessed | | $16,816.80 | $298,832.06 |
| 07/05/2017 | Legal Fee CL Assessed | | $2,994.43 | $298,832.06 |
| 07/05/2017 | Legal Fee CL Assessed | | $7,363.20 | $298,832.06 |
| 07/05/2017 | Legal Fee CL Assessed | | $249.60 | $298,832.06 |
| 07/31/2017 | Legal Fee CL Assessed | | $218.40 | $298,832.06 |

August 18, 2017

# Exhibit J

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
DORI SILVA
209-384-1050

B. SEND ACKNOWLEDGMENT TO: (Name and Address)
AMERICAN AGCREDIT FLCA
711 W. 18th Street
MERCED, CA 95340
USA

DOCUMENT NUMBER: 3009400002
FILING NUMBER: 12-7304277849
FILING DATE: 02/12/2013 12:01
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME
JB Parra, LLC

1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY
15810 Avenue 21 ½ | Chowchilla | CA | 93610 | USA

1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any
| | Limited Liability Company | California | ☒ NONE

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any | ☐ NONE

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
AMERICAN AGCREDIT FLCA

3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY
711 W 18th Street | Merced | CA | 95340 | USA

4. This FINANCING STATEMENT covers the following collateral:

(See Attachment(s))

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]
7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☒ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA
JB Parra, LLC

FILING OFFICE COPY

All personal property now owned or hereafter acquired including, but not limited to, all farm products, inventory, accounts, documents, payment intangibles, investment property, chattel paper, equipment and general intangibles now owned or hereafter acquired.

All carbon credits, carbon sequestration units, carbon financial instrument contracts, renewal energy credits and the like, now or hereafter created, produced or acquired, arising out of methane capture, carbon sequestration and renewal energy systems, including without limitation credits tradable under any greenhouse gases commodity exchange such as, by way of example and not limitation, trading units commonly referred to as Exchange Soil Offsets (XSOs), Exchange Methane Offsets (XMOs) and Exchange Forest Offsets (XFOs) under the Chicago Climate Exchange (CCX).

All water assets, tangible and intangible, now owned or hereafter acquired, including but not limited to:

All water storage tanks and all other equipment used or usable in connection with the storage, transport, delivery, carrying, ownership, use or other disposition of water and water related rights, now or at any time hereafter owned or acquired by debtor(s), together with all improvements, replacements, accessions and additions thereto, wherever they may be located.

All inventory, accounts, documents, chattel paper and general intangibles to the extent they constitute water and/or water rights, now owned or hereafter acquired, including but not limited to:

(1)     all water, water rights and entitlements, appurtenant or otherwise, other rights to water and to receive water of every kind or nature, including but not limited to groundwater, rights to remove and extract groundwater, rights with respect to surface water, whether appropriative, riparian or otherwise, water allocation, distribution, delivery or storage rights, now or at any time hereafter owned or acquired by debtor(s);

(2)     all rights to payments arising out of or in any way connected with debtor's sale, exchange, storage, transport, delivery, carrying, ownership, use, nonuse, or other disposition of water and water related rights.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Kriss Filipp
209-384-1050

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
AMERICAN AGCREDIT FLCA
711 W. 18th Street
MERCED, CA 95340
USA

DOCUMENT NUMBER: 5200420002
FILING NUMBER: 10-7804946
FILING DATE: 01/13/2010 15:42

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
10-7574277849

1b. This Financing Statement Amendment is to be filed for record (or recorded) in the REAL ESTATE RECORDS. Filer: [attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13]

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes: ___ AND Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

8. ☑ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☑ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:
See Attachment(s)

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME

9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10. OPTIONAL FILER REFERENCE DATA:
LB Farms, LLC

FILING OFFICE COPY

# Addendum

**Collateral Description**

All water assets, tangible and intangible, now owned or hereafter acquired, including but not limited to:

All water storage tanks and all other equipment used or usable in connection with the storage, transport, delivery, carrying, ownership, use or other disposition of water and water related rights, now or at any time hereafter owned or acquired by debtor(s), together with all improvements, replacements, accessions and additions thereto, wherever they may be located.

All inventory, accounts, documents, chattel paper and general intangibles to the extent they constitute water and/or water rights, now owned or hereafter acquired, including but not limited to:

(1) all water, water rights and entitlements, appurtenant or otherwise, other rights to water and to receive water of every kind or nature, including but not limited to groundwater, rights to remove and extract groundwater, rights with respect to surface water, whether appropriative, riparian or otherwise, water allocation, distribution, delivery or storage rights, now or at any time hereafter owned or acquired by debtor(s);

(2) all rights to payments arising out of or in any way connected with debtor's sale, exchange, storage, transport, delivery, carrying, ownership, use, nonuse, or other disposition of water and water related rights.

All carbon credits, carbon sequestration units, carbon financial instrument contracts, renewal energy credits and the like, now or hereafter created, produced or acquired, arising out of methane capture, carbon sequestration and renewal energy systems, including without limitation credits tradable under any greenhouse gases commodity exchange such as, by way of example and not limitation, trading units commonly referred to as Exchange Soil Offsets (XSOs), Exchange Methane Offsets (XMOs) and Exchange Forest Offsets (XFOs) under the Chicago Climate Exchange (CCX).